EXHIBIT C - Part 7 of 7

Public Document No. 100

PR 002499

GOV0002499

LAW OFFICES OF

deKieffer & Horgan, pllc
1090 VERMONT AVENUE, N.W.
SUITE 410
WASHINGTON, D.C. 20005

GREGORY S. MENEGAZ                    AFFILIATED OFFICE:                    GMENEGAZ@DHLAW.COM
TEL 202-783-6900                      SAARBRÜCKEN, GERMANY                                DHLAW.COM

August 10, 2020

ELECTRONIC FILING BY EMAIL:                    EAPA Investigation No. 7321
eapafad@cbp.dhs.gov                            (Certain Hardwood Plywood)
                                               POI: June 5, 2018 Onwards
Office of Trade
Regulations and Rulings                        **PUBLIC VERSION**
Penalties Branch
U.S. Customs and Border Protection             Business Proprietary information
                                               contained within brackets deleted on
                                               pages 10, 11, 15, 17-19, 21, 22, 24-27 &
                                               29.

*RE:    EAPA Con. Case No. 7321 – Request for Administrative Review*

Dear Office of Trade, Regulations & Rulings,

On behalf of Cambodian Happy Home Wood Products Co., Ltd. ("Happy Home"), a

Cambodian manufacturer of hardwood plywood, and U.S. Global Forest, Inc. ("USG"), a U.S.

importer of hardwood plywood from Cambodia (together: "Respondents"), and interested parties

pursuant to 19 C.F.R. § 165.1, we hereby request an administrative review in accordance with 19

U.S.C. § 1517(f) and 19 CFR § 165.41 of U.S. Customs and Border Protection ("CBP"), Trade

Remedy & Law Enforcement Directorate's ("TRLED') initial determination as to evasion in

EAPA Inv. 7321.

Happy Home's address is: Building No. C22-1, Sihanoukville Special Economic Zone,

Cambodia, email contact: 370688969@qq.com; USG's address is 663 Brea Canyon Rd. #8,

Walnut, CA 91789-3045, email contact: usglobalforest@gmail.com.

We are submitting a confidential version and a public version of Respondents' request in accordance with 19 C.F.R. § 165.26.

*    *    *

In accordance with 19 C.F.R. § 165.4, Respondents request confidential treatment of the information contained herein as business confidential and commercial data that is proprietary to Respondents and their suppliers, service providers, and customers. The information contained in this request to CBP that is marked confidential has never been released in any manner to a person who is not an employee or in a confidential relationship with the companies. The confidential information is not commonly known within the industry or readily ascertainable by outside persons with a minimum of time and effort. Disclosure of this information would cause substantial competitive and commercial harm to Respondents and their suppliers, service providers, and customers. The confidential information in this request for administrative review is enclosed in brackets ("[ ]") to indicate the confidential nature of the information contained herein.

Specifically, this submission contains the following confidential information:

| Page | Reason for Confidential Treatment |
|------|-----------------------------------|
| Page 10 | Details on Respondents' legal structure and business operations that are not available to the general public. |
| Page 11 | Description of Respondents' business records that are not available to the general public |
| Pages 15, 17, 29 | CBP's undisclosed confidential information |
| Pages 18, 19 | Discussion of Respondents' business records that are not available to the general public |

2

| Pages 21, 22, 24, 25, 26, 27 | Details on Respondents' sales documentation that are not available to the general public |
|---|---|

Accordingly, for the above reasons, Respondents requests confidential treatment of the information enclosed in brackets ("[ ]") that are deleted in the public version.

Please contact the undersigned if you have any questions regarding the information included in this submission.

Very truly yours,

*/s/ Gregory S. Menegaz*

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
DEKIEFFER & HORGAN, PLLC
1090 Vermont Ave., NW
Suite 410
Washington, D.C.  20005
202-783-6900

PR 002502

GOV0002502

### ATTORNEY CERTIFICATION

I, **Gregory S. Menegaz,** with **deKieffer & Horgan,** Counsel to LB Wood (Cambodia) Co., Ltd., Cambodian Happy Home Wood Products Co., Ltd., Interglobal Forest LLC, American Pacific Plywood, Inc., and U.S. Global Forest, Inc., certify the following:

(i)     All statements in this submission (and any attachments) are accurate and true to the best of my knowledge and belief.

(ii)    Any information for which I have not requested business confidential treatment pursuant to 19 CFR 165.4(a), may be released for public consumption.

(iii)   I will advise CBP promptly of any knowledge of or reason to ·suspect that the covered merchandise poses any health or safety risk to U.S. consumers pursuant to 19 C.F.R. 165.7(a).

Signature: _____

Date:  August 10, 2020

GOV0002503

# Table of Contents

I.   PROCEDURAL HISTORY AND FACTS OF THE CASE, 19 C.F.R. § 165.41(F)(3). ......................1

II.  STANDARD OF REVIEW ............................................................................................7

   A.   De novo Review, 19 U.S.C. § 1517(f)(1); 19 CFR § 165.45..................................7

   B.   Substantial Evidence. ...............................................................................8

III. SUMMARY OF ARGUMENT............................................................................................9

IV.  ARGUMENT ...................................................................................................10

   A.   Happy Home Had Motive and Opportunity to Produce Hardwood Plywood in
        Cambodia.. .................................................................................................10

   B.   CBP's Undisclosed Documents from an Undisclosed Inquiry, Review, or
        Investigation Cannot Be the Foundation of Substantial Evidence in EAPA Inv.
        7321.......................................................................................................14

   C.   CBP's Analysis Regarding Respondents' Production and Sales Records is
        Flawed, and CBP's Conclusions are Without Merit.......................................18

      1.   Reconciliation of Payment Records and Invoices. ...................................18

      2.   Reconciliation of Payroll Sheets, Trial Balances, and Monthly Financial
           Reports. ...............................................................................................19

      3.   Entry Documentation. ..........................................................................19

      4.   Entry 9612...........................................................................................21

      5.   Entry 2459...........................................................................................24

      6.   Entry 6467...........................................................................................25

      7.   Entry 7529...........................................................................................25

   D.   The Trade Data on the Record of This Investigation is Unreliable. ..........................27

   E.   CBP's Reliance on Secret Information from an Unrelated Proceeding Must Be
        Rejected.....................................................................................................29

V.   CONCLUSION.....................................................................................................30

i

GOV0002504

## Table of Authorities

**CASES**

*A. L. Patterson, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ........................................7, 8

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ...........................................14

*Armstrong v. Manzo*, 380 U.S. 545; 14 L. Ed. 2d 62; 85 S. Ct. 1187 (1965) ...............................18

*Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ...............12

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) ..................................................8

*Dickinson v. Zurko*, 527 U.S. 150; 119 S. Ct. 1816; 144 L. Ed. 2d 143 (1999) ...........................8

*Diversified Products Corp. v. United States*, 6 C.I.T. 155 (1983) ..................................................14

*Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357 (Fed. Cir. 2006) ...................................................8

*Huvis Corp. v. United States*, 570 F.3d 1347 (Fed. Cir. 2009) .......................................................8

*Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017) ........................... 12-13

*JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011) .....................................................7

*Mathews v. Eldridge*, 424 U.S. 319; 47 L. Ed. 2d 18; 96 S. Ct. 893 (1976) ...............................18

*Patrick v. Miller*, 953 F.2d 1240 (10th Cir. 1992) ........................................................................18

*SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ....................................29

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ..... 8-9

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ..........................................................8, 14

*USX Corp. v. United States*, 11 C.I.T. 82 (1987) ...........................................................................8

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ..........................................................................................................7

19 U.S.C. § 1517(f) .......................................................................................................................1, 7

ii

PR 002505

GOV0002505

**REGULATIONS**

19 CFR § 165.41 ...................................................................................................................1

19 CFR § 165.44 ...................................................................................................................8

19 CFR § 165.45 ...................................................................................................................7

19 CFR 351.401(i) ..............................................................................................................26

**ADMINISTRATIVE DECISIONS**

*Certain Hardwood Plywood from the People's Republic of China: Antidumping Order*, 83
Fed. Reg. 504 (Dept. Commerce, Jan. 4, 2018)....................................................................1

*Certain Hardwood Plywood from the People's Republic of China: Countervailing Duty
Order*, 83 Fed. Reg. 513 (Jan. 4, 2018) ..............................................................................1

*Certain Quartz Surface Products From India: Final Determination of Sales at Less Than
Fair Value and Final Negative Determination of Critical Circumstances*, 85 Fed. Reg.
25,391 (May 1, 2020)..........................................................................................................22

*Certain Quartz Surface Products From the Republic of Turkey: Final Determination of
Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*,
85 Fed. Reg. 25,389 (May 1, 2020) ...................................................................................22

*Certain Steel Threaded Rod From the People's Republic of China: Final Results of
Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016–
2017*, 83 Fed. Reg. 57,430 (November 15, 2018)...............................................................20

PR 002506

GOV0002506

REQUEST FOR ADMINISTRATIVE REVIEW

This request for review pursuant to 19 U.S.C. § 1517(f) and 19 CFR § 165.41 of U.S.

Customs and Border Protection ("CBP"), Trade Remedy & Law Enforcement Directorate's

("TRLED') initial determination as to evasion in EAPA Inv. 7321 is filed on behalf of

Cambodian Happy Home Wood Products Co., Ltd. ("Happy Home"), a Cambodian manufacturer

of hardwood plywood, and U.S. Global Forest, Inc. ("USG"), an importer of hardwood plywood

from Cambodia (together: "Respondents").  Respondents base their request for administrative

review upon factual information submitted on the administrative record of EAPA Inv. No. 7321

that is relevant to TRLED's determination in this case.  *See* 19 CFR § 165.41.

**I.      PROCEDURAL HISTORY AND FACTS OF THE CASE, 19 CFR § 165.41(F)(3).**

On either April 12, 2019, April 15, 2019, or May 1, 2019,[1] the Coalition for Fair Trade of

Hardwood Plywood (the "Coalition") submitted to CBP an allegation that USG was evading the

antidumping and countervailing orders on hardwood plywood from China[2] by transshipping

Chinese hardwood plywood through Cambodia for import into the United States.  *See* TRLED,

Notice of Determination as to Evasion (June 29, 2020) at 1-2, note 2 ("TRLED Final Det.").  On

June 5, 2019, TRLED acknowledged receipt of the evasion allegations to the Coalition, and on

June 26, 2019, TRLED initiated EAPA Inv. 7327 against USG.  For the next three months,

TRLED conducted its secret investigation against USG and two other U.S. importers, Interglobal

---

[1] CBP states in its Final Determination as to Evasion that the Coalition first filed an allegation against USG on April 12, 2019, but cites to an allegation received on April 15, 2019.  *See* CBP, Notice of Determination as to Evasion (June 29, 2020) at 1-2, note 2 ("CBP Final Det.").  Counsel for Respondents received as record documents only the allegations against USG from May 1, 2019 and May 10, 2019. CBP has not explained these discrepancies.

[2] *See Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 504 (January 4, 2018) (AD order); *see also Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 513 (January 4, 2018) (CVD order) (collectively, the "Orders").

1

GOV0002507

*PUBLIC VERSION*

Forest LLC "(IGF"), and American Pacific Plywood, Inc. ("APPI") in EAPA investigations 7321 and 7323.  On October 1, 2019, TRLED informed USG, IGF, and APPI that during its secret investigation, TRLED had developed a record giving rise to a "reasonable suspicion" of evasion of the Orders by the Respondents and consolidating EAPA investigations 7323 and 7327 with EAPA Inv. 7321.  *See* TRLED, Notice of Initiation of Investigation and Interim Measures – EAPA Cons. Case 7321 (Oct. 1, 2019) (TRLED Initiation Notice").  As the title suggests, TRLED also imposed interim measures on the Respondents by suspending liquidation of Respondents' entries of hardwood plywood from Cambodia, rate-adjusting these entries as subject to the Orders and cash deposits imposed on hardwood plywood from China as of June 26, 2019, and extending the liquidation period for unliquidated entries before June 26, 2019.

After TRLED released its Initiation Notice, on October 2, 2019, TRLED released to Respondents the letters from the Coalition alleging Respondents' evasion of the Orders, and the following public versions of documents TRLED put on the record of this case on the dates indicated:  (i) CBP Memorandum, "Adding Certain Documents to the Administrative Record (Sept. 12, 2019) ("Sept. 12, 2019 Memo");[3] (ii) CBP Memorandum, "Adding Certain Documents to the Administrative Record" (Sept. 13, 2019) ("Sept. 13, 2019 Memo"); and (iii) CBP Memorandum, "Adding Certain Documents to the Administrative Record" (Sept. 16, 2019 Memo).[4]

In its allegations against USG, the Coalition claimed that Chinese exports of hardwood plywood to the U.S. decreased from 2017 to 2018, and Chinese exports of hardwood plywood to

---

[3] The Sept. 12, 2019 Memo documents concern the June 6, 2018 site visits that CBP personnel conducted at LB Wood Cambodia Co., Ltd.'s (LB Wood) and Cambodia Happy Home Wood Products Co. Ltd.'s (Happy Home) facilities in Cambodia.

[4] CBP's Sept. 13 Memo and Sept. 16, 2019 Memo documents concern Happy Home's shipments of engineered flooring to an unknown importer.

GOV0002508

Cambodia and Cambodian exports of hardwood plywood to the U.S. increased during the same period of time, suggesting that Chinese-origin plywood had been transshipped through Cambodia to the United States.  *See* Coalition Ltr. re: Request for an Investigation of U.S. Global Forest, Inc. under the Enforce and Protect Act (May 10, 2019) at 6-7.  With respect to importer-specific allegations, the Coalition alleged that USG sourced its plywood from Happy Home, a Cambodian company located in a special Economic Zone, which "was purposefully designed to link Chinese and Cambodian trading partners and facilitate the global dissemination of their products."  *Id*. at 10-12.

In its Initiation Notice, TRLED based its conclusion of a reasonable suspicion of evasion partly on the trade data that the Coalition put on the record of this case and the Coalition's claim that Happy Home and USG had motive and opportunity to evade the Orders due to the high cash deposits on U.S. imports of hardwood plywood from China and Happy Home's location in Cambodia's Sihanoukville Special Economic Zone ("SSEZ").  *See* Initiation Notice at 6.

TRLED also claimed in its Initiation Notice that the evidence contained in its September 12, 13, and 16, 2019 memoranda provided additional evidence of USG's evasion of the Orders.  *See* TRLED Initiation Notice at 8-9.  These documents show, however, that they have nothing to do with USG or EAPA Inv. 7321.  In its Initiation Notice, TRLED claims that the documents were created in the context of a review of preferential tariff treatment for Cambodian plywood under the Generalized System of Preferences ("GSP").  *Id*. at 8.  They were also created well before the Coalition submitted its first allegations against USG in April or May 2019.  *See id*. at 2, note 7, listing the Coalition's allegation submissions against USG and Sept. 12, 2019 Memo, Sept. 13, 2019 Memo, and Sept. 16, Memo.  TRLED also incorrectly claims in its Initiation Notice that the documents contained in its Sept. 13 and Sept. 16 Memos pertain to

3

GOV0002509

documentation concerning both LB Wood and Happy Home.  Initiation Notice at 8.  These memoranda, however, make no mention of LB Wood.  *See* Sept. 13, 2019 Memo and Sept. 16, 2019 Memo.  TRLED has not explained this discrepancy.

The actual context in which the documents contained in CBP's September 2019 memoranda also remains unclear.  Whereas in its Initiation Notice, TRLED claims that the documentation was created in the context of a GSP review of Cambodian plywood, TRLED claims in its Final Determination that the documentation was generated in a review of whether Cambodian engineered wood flooring was subject to the antidumping and countervailing duties on Multilayered Wood Flooring from China.  *Compare* Initiation Notice at 8 *with* Final Det. at 12.  TRLED has not explained this discrepancy.  In any case, the context, parties, and statements upon which TRLED drew its initial and final conclusions in EAPA 7321 remain completely unknown to Respondents.  Respondents vehemently contest any relevancy or truth vis-à-vis Respondents of alleged statements from an unidentified person in a murky context that has nothing to do with TRLED's instant investigation.

After TRLED's Initiation Notice, TRLED issued questionnaires to USG and Happy Home, to which Respondents responded in detail, providing TRLED with all documents requested concerning Happy Home's purchases of raw materials, production process, sales to USG, and USG's sales transactions with Happy Home and its own U.S. customers.  *See* Happy Home Questionnaire Response (Nov. 8, 2019) ("HH Qre. Rsp."); Happy Home Supplemental Questionnaire Response (Dec. 16, 2019) ("HH Supp. Qre. Rsp."), U.S. Global Forest, Inc. Questionnaire Response (Oct. 30, 2019) ("USG Qre Rsp."), and U.S. Global Forest, Inc. Supplemental Questionnaire Response (Dec. 12, 2019) ("USG Supp. Qre Rsp.").  TRLED issued no further questionnaires to Respondents, and Respondents believed they had fully complied

GOV0002510

with TRLED's requirements for submission of information.

After receiving these questionnaire responses, TRLED initially scheduled verification at Happy Home's manufacturing facilities in Cambodia for February 17-22, 2020.  On February 11, 2020, TRLED postponed its verification of Happy Home due to the Corona Virus outbreak ("COVID-19"), first in China and then in the U.S.  TRLED finally cancelled verification altogether due to travel restrictions and health risks associated with COVID-19.  On May 14, 2020, Respondents USG and Happy Home, together with the other respondents in EAPA Inv. 7321, LB Wood (Cambodia) Co., Ltd., Interglobal Forest LLC, and American Pacific Plywood, Inc., submitted written arguments, and the Coalition submitted a response to the written arguments on May 29, 2020.  *See* TRLED Email, "EAPA 7321 - Extension of the Written Arguments Deadline" (Feb. 11, 2020); *See* Letter from TRLED, "Notice of Extension of Final Determination" (Feb. 11, 20200; Email from TRLED, "RE: EAPA 7321 - Extension of the Written Arguments Deadline" (May 8, 2020) Letter from Respondents, "EAPA Con. Case No. 7321 – Respondents' Written Arguments," May 14, 2020 ("Resp. Case Brief"); Coalition Ltr. "EAPA Investigation No. 7321: Rebuttal Comments" (May 29, 2020).

Most notably, during the five months between Respondents' last questionnaire response on December 12, 2019 and Respondents' submission of written argument, TRLED asked no further questions of Respondents nor indicated in any way that TRLED found discrepancies in Respondents' questionnaire responses, despite TRLED's evident need to prepare for verification, and, as during the months of January through May 2020, it became increasingly obvious that verification would necessarily be cancelled because restrictions for U.S. citizens and Government officials for travel to Cambodia remained in place.  For Respondents' part, they prepared their questionnaire responses in full knowledge that TRLED intended to verify their

PR 002511

GOV0002511

responses through an on-site verification in Cambodia. Respondents therefore carefully and truthfully prepared all responses in light of the anticipated verification of these responses.

In their written argument, submitted to TRLED on May 14, 2020 as a case brief, Respondents showed that the trade information that the Coalition and TRLED put on the record was inconsistent and unreliable and not specific to Respondents. *See* Resp. Case Brief. at 5-8. Further, observations by the Coalition and TRLED of Respondents' motive and opportunity to move production of hardwood plywood from China to Cambodia was immaterial without specific instances of transshipment by Respondents, which the record could not support. *See id.* at 8-11. Respondents then set forth the record evidence showing that the Cambodian producers Happy Home and LB Wood produced all of the plywood shipped to the United States at their production facilities in Cambodia. *Id.* at 11-15. Respondents also pointed out in their case brief that TRLED's reliance on the documents included in CBP's September 2019 memoranda could not even support a reasonable suspicion of evasion. *Id.* at 15-20. Finally, Respondents pointed out TRLED's procedural irregularities in administering the EAPA law in this case, including the lack of transparency and defense opportunities for Respondents due to TRLED's reliance on secret documents in its decision to initiate EAPA Inv. 7321 and impose punitive interim measures on Respondents. *Id.* at 20-30.

In its Final Determination, TRLED found that "substantial evidence indicates that InterGlobal's, American Pacific's, and U.S. Global's imports were entered through evasion, . . .." Final Det. at 5. As discussed below, TRLED's understanding of what constitutes "substantial evidence" is, however, apparently deficient. TRLED cites only a portion of the discussion of substantial evidence in the 2014 decision of the U.S. Court of Appeals for the Federal Circuit in *A. L. Patterson:* "the Federal Circuit has stated that 'substantial evidence means such relevant

6

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. at note 32, *citing A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781-82 (Fed. Cir. 2014). Respondents provide below the full quotation from the Federal Circuit's decision in *A.L. Patterson*, which begins with the observation that substantial evidence must be more than a mere scintilla and based <u>on the record</u> as a whole, not just on an agency official's subjective "reasonable mind."

As it did in its Initiation Notice, TRLED relied on Respondents' motive and opportunity as well as TRLED's and the Coalition's trade statistics and CBP's three September, 2019 secret memoranda as substantial evidence of Respondent's evasion of the Orders.  Final Det. at 10-12 & 15-17.  TRLED could not however point to even one instance of actual transshipment of Chinese plywood through Happy Home to USG in the United States.  Regarding Respondents' record evidence of production and sales of Cambodian plywood, TRLED reviewed four entries of Happy Home's merchandise imported by USG and claimed that inconsistencies in Respondents' records made these documents unreliable.  *Id*. at 13-15.

## II.    STANDARD OF REVIEW

### A. De novo Review, 19 U.S.C. § 1517(f)(1); 19 CFR § 165.45.

According to the *A.L. Patterson* decision cited above "{w}e review the Court of International Trade's decisions concerning Commerce's scope determinations de novo, 'stepping into its shoes and applying the same standard of review.' *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011). We thus hold unlawful any determination found 'to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law.' 19 U.S.C. § 1516a(b)(1)(B)(i)." *A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781 (Fed. Cir. 2014).

In addition to a de novo administrative review of TRLED's application of the law by

GOV0002513

CBP's Office of Rules & Regulations ("ORR"), the administrative review can also encompass a de novo review of TRLED's fact-finding, including new factual information that ORR may request from the parties.  19 CFR § 165.44.

### B.  Substantial Evidence.

As mentioned above, the Federal Circuit's consideration of what constitutes "substantial evidence" is much more discerning than merely consideration of what CBP's agents' subjective minds might consider "adequate."

> "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). . . .. While respecting agency expertise, the Supreme Court "has stressed the importance of not simply rubber-stamping agency fact-finding." *Dickinson v. Zurko*, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999). Our review "requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78, 71 S. Ct. 456, 95 L. Ed. 456 (1951).

*A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781-82 (Fed. Cir. 2014).

Moreover, the agency's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence."  *USX Corp. v. United States*, 11 C.I.T. 82, 84 (1987).  The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'"  *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Universal Camera*, 340 U.S. at 487).  Further, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009) *quoting Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 985

PR 002514

GOV0002514

(Fed. Cir. 1994).

In this investigation, the Coalition and CBP bear a burden of proof to establish, based on substantial evidence, that Respondents transshipped covered merchandise from China through Cambodia and on to the United States. Respondents submit that such burden has not been met on this record, as explained more fully below.

## III.    SUMMARY OF ARGUMENT

1.    TRLED's reliance on trade data, the business operation adjustments that companies in general make in light of trade cases against particular products from particular countries, and the location of Happy Home's production facilities cannot serve as a basis for substantial evidence. Substantial evidence must be specific to Happy Home and link Happy Home with the alleged act of transshipment to evade the Orders. TRLED has provided no evidence in any instance in which Happy Home transshipped hardwood plywood from China to Cambodia for import into the United States in order to evade the Orders. TRLED's general, generic, observations and comments on trade data, the effect of the Orders, and factory location are not specific as to evasion and do not link Respondents with the alleged evasion and cannot serve as a foundation for substantial evidence.

2.    TRLED's reliance on undisclosed statements from unknown individuals in an undisclosed proceeding unrelated to EAPA Inv. 7321 cannot be considered substantial evidence for any determination in EAPA 7321. Respondents unequivocally deny the relevance and veracity of such statements and conclusions vis-à-vis Respondents and this instant investigation. The undisclosed statements are taken out of context of the unrelated proceeding, and TRLED's rendition of such statements are unintelligible to Respondents. TRLED's use of this information seriously violates such due process principles as full disclosure, transparency, and Respondents' right to be heard and defend against the agency's allegations.

PR 002515

GOV0002515

3.      The alleged discrepancies that TRLED found in its review of Respondents' books and records are either irrelevant or of a nature that cannot discredit the overall reliability of Respondents' production and sales records.  Most significantly, TRLED found no evidence of transshipment of Chinese plywood in Respondents' records.  Respondents responded to all of TRLED's questions completely and truthfully in the expectation that CBP officials would verify their responses at an on-site verification in Cambodia of Happy Home's manufacturing processes and equipment as well as Respondents' production and sales records.  TRLED's analyses of Respondents' documentation cannot serve as a basis for establishing substantial evidence of evasion of the Orders against Respondents.

## IV.   ARGUMENT

### A.    Happy Home Had Motive and Opportunity to Produce Hardwood Plywood in Cambodia.

Happy Home is owned by a [          ] individual, [                ], who also owns a [

                                       ].  *See* HH Qre Rsp. at 5-9 & Ex. 2.  [


                                       ].  *Id.*  Happy Home [


                                       ].  *Id.*  Happy Home is the only company in this group that produces hardwood plywood.  Happy Home was first registered in [          ] and started producing plywood in [               ].  *See* HH Supp. Qre. Rsp. at 3.

As TRLED indicates in its final determination, Happy Home sources [

            ].  Final Det. at 11; HH Qre. Rsp. at 12-14 and Ex. 11.  *See also* HH Supp. Qre. Rsp at Ex. SQ1-1 for Happy Home's domestic purchases of [          ].  For raw materials purchased

GOV0002516

from [                          ], Happy Home submitted [

                              ].  *See* HH Qre Rsp. at Ex. 11.  Happy Home also

provided [                                  ] its raw material purchases.  *See* HH Supp. Qre. Rsp at

Ex. SQ1-2.  For veneers sourced locally, Happy Home submitted [

                          ].  *See Id.* at Ex. SQ1-1.  TRLED also notes that Happy Home's

production facilities are located in the Sihanoukville Special Economic Zone, which is near

Cambodia's only deep-water port, which facilitates Happy Home's access to raw materials

shipped from China.  *See* Final Det. at 11.  TRLED's observation is an obvious one - access to a

deep-water port facilitates trade in goods, not only in Cambodia, but is also characteristic of the

growth of industrial centers on the coasts of the United States and most other countries.

TRLED also correctly notes that Commerce's imposition of the Orders and attendant

cash deposits on Chinese hardwood plywood provided a business opportunity for Happy Home's

owners to establish a plywood factory in Cambodia.  Final Det. at 11.  This fact establishes only

that the Chinese plywood industry is embroiled in uncertainty and turmoil caused by the trade

cases against Chinese plywood, and Happy Home is taking advantage of this situation to

profitably produce plywood in Cambodia and sell the finished merchandise to the United States.

Indeed, Cambodia has experienced unprecedented growth generally over the past few years,

fueled by foreign investment and exports, as is the case specifically for plywood.  For insights

into Cambodia's overall economic growth, Respondents suggest that ORR consult the World

Bank's reports on Cambodia, available at

https://www.worldbank.org/en/country/cambodia/publication/cambodia-economic-monitor-

reports.

PR 002517

GOV0002517

*PUBLIC VERSION*

Indeed, TRLED's observations on Happy Home's motives and opportunities to produce plywood in Cambodia and export its finished merchandise to the U.S. do not amount to any evidence whatsoever that Happy Home is shipping finished plywood from China to the United States. The fact that manufacturers and traders generally take advantage of profitable business opportunities is acknowledged in court decisions of the U.S. Court of International Trade. *See* discussion in Respondents' Case Brief at 8-9.

In a recent case decided by the U.S. Court of International Trade (CIT), in the context of a circumvention inquiry of minor alterations before the Department the Commerce, the Court held that export and import data alone is not sufficient for Commerce to initiate a minor alternation circumvention inquiry. *See Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283, 1295 (Ct. Int'l Trade 2019) ("The court acknowledges that evidence demonstrate that, since the initiation of the {Antidumping and Countervailing Duty} investigation, import volumes of plywood with both veneers of softwood increased drastically…. Although a substitution effect may be indicative of circumvention, it is not a sufficient cause for Commerce to initiate a minor alternations inquiry."). After the AD and CVD Orders were imposed on plywood from China, any reasonable business person would start purchasing plywood from other countries with lower tariffs and taxes, such as Cambodia, as a substitute for Chinese plywood.

The CIT has also recognized that production and exports naturally flow to companies with lower AD tax rate burdens. *See Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017). By extension, production and exports also naturally flow to countries with lower AD tax rate burdens and lower tariffs in general. In *Inmax SDN*, two affiliated Malaysian steel nails producers received very different AD rates because Commerce refused to collapse them in the first instance. *Id.*, at 1369. In a public statement from the affiliates' parent company

12

GOV0002518

that the petitioners in that case put on the administrative record, the parent holding company announced that it would only continue export activities from the company with the lower AD rate. The petitioners requested that Commerce conduct a Changed Circumstances Review ("CCR"), allegedly to prevent the companies from evading AD duties, to which Commerce agreed. *Id.*, at 1370. The CIT overturned Commerce's CCR determination and criticized Commerce's underlying rationale that production and export by companies with low AD rates necessarily constitutes evasion of AD duties:

> Commerce found that the Inmax companies did not illegally co-mingle subject merchandise in their exports, and that their parent publicly, and transparently, communicated a change in their export behavior due to the differing assigned rates. Commerce does acknowledge that "this avoidance could be seen by some as a reasonable corporate resources decision. . . ." The court would go one step further and add that not just "some" but **all** would view such a production change as a reasonable corporate resource decision. What were Inmax Holding's other options? Continue to export through Inmax at 39.95%?

*Id.*, at 1372-73 {emphasis in original}. The Court gave no credence to Commerce's unreasonable and unsubstantiated conclusions of manipulation and evasion.

As summarized in the CIT's decisions, it is perfectly normal for production and exportation to flow from a company with high AD duties to a company with low AD duties. Likewise, it is normal for production and exportation to flow from a country (China) with high AD duties to a country (Cambodia) with low AD duties. TRLED's observations on Commerce's imposition of high AD and CVD duties on hardwood plywood from China and on the physical location of Happy Home's production facilities in Cambodia indicate only that Respondents had a motive and opportunity to produce hardwood plywood in Cambodia. These facts allow no conclusion, much less amount to substantial evidence, of transshipment of Chinese plywood through Cambodia to the United States.

GOV0002519

**B.     TRLED's Undisclosed Documents from an Undisclosed Inquiry, Review, or Investigation Cannot Be the Foundation of Substantial Evidence in EAPA Inv. 7321.**

As discussed above in the section on the procedural history and facts of this case, TRLED also claimed in its Initiation Notice that the evidence contained in its September 12, 13, and 16, 2019 memoranda provided evidence of USG's evasion of the Orders.  *See* TRLED Initiation Notice at 8-9.  TRLED continued to rely on these documents as substantial evidence in its Final Determination.  *See* Final Det. at 11-12 & 15.  However, these "tidbits" of information from unknown sources made in an unknown context in an unknown CBP inquiry or review or investigation with an unknown result cannot stand as substantial evidence for EAPA Inv. 7321.  First, a fundamental principle of finding substantial evidence is that it must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the {agency's} decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {its} view.'"  *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 161 (1983) (*quoting Universal Camera*, 340 U.S. at 488).

Here, TRLED did not put the whole record of its mystery proceeding on the record of EAPA 7321 for TRLED, Respondents, or any other party or a court to judge whether TRLED's tidbits of information gleaned from the unrelated case can even serve as a basis for substantial evidence of TRLED's conclusions in that case, much less in EAPA Inv. 7321.  Further, as noted above in the procedural history and facts section of this brief, TRLED's understanding of what type of proceeding the documents pertain to and the identification of the parties to that case are

14

GOV0002520

contradictory or even wrong.  As noted above, TRLED claims in its Initiation Notice that the

documents were created in the context of a GSP review of preferential tariff treatment for

Cambodian plywood, but claims in its Final Determination that the documentation was generated

in a review of whether Cambodian engineered wood flooring was subject to the antidumping and

countervailing duties on *Multilayered Wood Flooring from China*.  *Compare* Initiation Notice at

8 *with* Final Det. at 12.  Further, TRLED also claims in its Initiation Notice that the documents

contained in its Sept. 13 and Sept. 16 Memos pertain to documentation concerning both LB

Wood and Happy Home.  Initiation Notice at 8.  These memoranda, however, make no mention

of LB Wood.  *See* Sept. 13, 2019 Memo and Sept. 16, 2019 Memo.  As stated above,

Respondents unequivocally contest any relevancy or truth vis-à-vis Respondents of alleged

statements from an unidentified person in a murky context that has nothing to do with TRLED's

instant investigation.

**Specifically, CBP's Sept. 12, 2019 Memo Regarding a Site Visit to Happy Home**.

In its Final Determination, TRLED relies heavily on observations that a CBP agent made

on a site visit to Happy Home on June 6, 2018, one year before the initiation of EAPA 7321 and

in the context of some other inquiry.  *See* Final Det. at 11-12.  In its written argument submitted

before TRLED's Final Determination, Respondents sharply called into question the procedural

propriety of using such an account in this instant proceeding, considering that Respondents have

no idea what CBP's agent was looking at or how the agent came to the false conclusion that

Happy Home's facilities, machinery, and labor force were too unsophisticated to produce the

finished plywood that the CBP agent observed on the companies' premises.  *See* Resp. Case Br.

at 17-19.  Rather than disclose further details that could substantiate the veracity of any of the

statements of the agent, TRLED maintains that further details or corroboration is not necessary

because "[      ]'s position as CBP's [         ] for wood products utilizes her subject matter

GOV0002521

expertise on wood products. This position carries with it the ability to make authoritative pronouncements pertaining to whether wood products are in or out of scope." Final Det. at 6, note 45. Holding forth such conclusory remarks as substantial evidence is unacceptable.

A "position" cannot impart ability or expertise to the holder of that position. Only the position-holder's own education, experience, cognitive ability, research, corroboration, reliance on outside sources, objectivity, and attention to detail can contribute to the authority of conclusions made from the agent's observations. But even attributes such as education and experience are of little value if the opportunity for observation, investigation, and evidence collection are not sufficiently extensive to come to an authoritative conclusion regarding the questions asked. This is the situation here. CBP's agent provides no specific information that could lend her conclusions credible. TRLED did not explain further the difference between "sophisticated" equipment and "non-sophisticated" production equipment. For instance, based on the photographs of its production facilities that Happy Home provided in its questionnaire response in this investigation, what are the features of that equipment that enable Happy Home to produce hardwood plywood in the quantity and quality required by its U.S. customers? *See* HH Qre. Rsp. at Ex. 13. What makes the equipment sophisticated or un-sophisticated? CBP's agent provided no such analysis. Further, what were the linguistic abilities of CBP's agent? Was Happy Home provided a reasonable opportunity to arrange for its own translator and its legal counsel to be present for the visit? Did the agent give Happy Home prior notice of its visit and time to prepare? Did CBP's agent review documents? Did she research the process and equipment required for the production of plywood during and after her visit? What objective, scholarly sources did she use to corroborate her conclusions? Where are the citations to such sources? What documents establish the agent's ability to assess Happy Home's machinery

16

GOV0002522

operations or the production capacity of Happy Home's production facilities?  *See also*
Respondents' Case Br. at 17-20.

CBP's agent also observed finished plywood made from temperate wood that she
believed was of Chinese origin.  Final Det. at 11.  Indeed, the record of this instant investigation
confirms that Chinese suppliers were a primary source for Happy Home's veneer.  *See* HH Qre.
Rsp. at Ex. 11 for documentation of Happy Home's veneer purchases.  Any conclusion,
however, that Happy Home's plywood was manufactured in China is simply false.

Indeed, the most troubling conclusion in this case is TRLED's statement and conclusion:

After the site visit, CBP determined that Happy Home "[    ]."[93] While the [    ]
of Happy Home disagreed with CBP's determination in this matter, the response
also stated that "[    ]."[94] This statement clearly indicates that Happy Home
purchases Chinese-origin plywood to some extent and comingles it with
Cambodian-origin plywood.

Final Det. at 11-12, *citing to* CBP's Sept 13, 2019 and Sept. 16, 2019 Memos.  TRLED's
statement above takes some undisclosed statement cited in an undisclosed document completely
out of context for that proceeding, and most assuredly for this instant proceeding, and TRLED
bases its final determination for EAPA primarily on that one conclusory statement:
"Consequently, record evidence shows that some portion of the 'Cambodian-origin' plywood
was comingled with Chinese-origin plywood and that these co-mingled goods were then
exported to U.S. Global and entered as [          ] entries that evaded the payment of AD/CVD
duties on plywood from China."  Final Det. at 15.

In sum, CBP's documentation included in its Sept. 12, 13, and 16 memoranda do not
even meet the requirements of substantial evidence in the proceeding in which they were
generated because the full record of that proceeding remains undisclosed and cannot be

PR 002523

GOV0002523

reviewed.  TRLED's reliance on these documents also violates the essential elements of procedural due process.  "The essence of procedural due process is fair play; hence, the fundamental due process requirement 'is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965))." *Patrick v. Miller*, 953 F.2d 1240, 1244 (10th Cir. 1992).  *See also* Resp. Case Br. at 22-30 concerning procedural due process concerns, including the opportunity to retain legal counsel at an early stage of the proceedings, the need for a translator at all site visits, and protective orders for access to confidential information.

TRLED's conclusions in EAPA Inv. 7321 are not based on substantial evidence, violate the principles of due process, and cannot stand.

**C.     TRLED's Analysis Regarding Respondents' Production and Sales Records is Flawed, and TRLED's Conclusions are Without Merit.**

**1.  Reconciliation of Payment Records and Invoices.**

Regarding USG's payments to Happy Home for its plywood purchases, TRLED claims that Happy Home's statement that [

] was incorrect.  Final Det. at 13.  TRLED points to USG's accounts payable leger and bank statements that USG put on the record as evidence that USG made direct payments to [                    ] for purchases from Happy Home. *See Id.* and USG Qre. Rsp. at Ex. 12 & 13.  A closer review of USG's Exhibit 12, however, reveals that the accounts on which [          ] is listed are not Happy Home's accounts but those of [

]. [          ], for its part, [

GOV0002524

].  USG's bank statements in Exhibit 13 also show that direct payments were made to [          ] only for merchandise manufactured by [                    ].  For merchandise supplied by [

          ], payments were made [                    ].  *See* USG Qre Rsp. at Ex. 13.

Regarding Happy Home's reconciliation of its production quantity to sales during the POI, Happy Home can provide a detailed reconciliation at ORR 's request.

**2.  Reconciliation of Payroll Sheets, Trial Balances, and Monthly Financial Reports.**

TRLED claims that Happy Home's monthly balance sheets are inconsistent with the total of Happy Home's payroll sheets over the same period.  Final Det. at 13.  Although TRLED claims that it could not account for this discrepancy, as with almost all perceived inconsistencies and discrepancies in the documentation provided by Respondents for the record of this case, TRLED failed to ask Respondents for an explanation of such perceived inconsistencies or a reconciliation of its worksheets and ledgers with its balance sheets and financial statements.

Respondents do not know which figures in Happy Home's balance sheets TRLED used.  The correct comparison for Happy Home's payroll figures is to compare the debit column of "salary payable" in the company's trial balances with the company's payroll sheets, with one-month lag.  That is, Happy Home's June 2018 payroll must be reconciled to the salary payable debit column in the July 2018 trial balance because the June 2018 payroll was actually paid in July 2018.  Discrepancies may arise where [

].  Happy Home can provide a more detailed reconciliation at ORR 's request.

**3.  Entry Documentation.**

TRLED claims that CBP's confidential entry records indicate the USG imported more

19

GOV0002525

entries during the period of investigation than USG reported in response to TRLED's request for documentation. Final Det. at 13. TRLED therefore concludes that USG did not report all of its entries of Happy Home's merchandise. *Id*. TRLED is wrong. USG reported all of its entries of plywood from Cambodia manufactured by Happy Home. USG had entries of other merchandise from other producers and other countries, so perhaps CBP's entry data included such imports. TRLED did not make CBP's entry records for USG available to legal counsel under an administrative protective order, and Respondents and their legal counsel have no way to review CBP's records relevant to USG's entries. Legal counsel knows for a fact, however, that CBP's entry records sometimes contain errors that might lead CBP to believe that certain entered shipments contained certain merchandise from a certain supplier, or that CBP interprets the entry information incorrectly, which a closer look at the entry documents reveals to be untrue. As Respondents mentioned in their case brief, this is an all too common occurrence in antidumping proceedings, where Commerce must solicit CBP for entry data to establish whether AD or CVD reviews should be continued or rescinded for exporters alleged to have made sales during the period of review. For instance, in a Commerce administrative review of *Steel Threaded Rod from China*, legal counsel's review of CBP data under APO revealed that CBP's data was inaccurate as to the producer and exporter of the subject merchandise, and the respondents' certification of no sales during the period of review was confirmed as correct. Commerce therefore rescinded the review as to those respondents. *See* Resp. Case Br. at 26, *citing Certain Steel Threaded Rod From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016–2017*, 83 Fed. Reg. 57,430 (November 15, 2018) and accompanying Issues and Decision Memorandum for the Final Results of the Eighth Administrative Review. Until and unless CBP establishes an APO in this

PR 002526

GOV0002526

instant proceeding, TRLED must assume that its records on the number of USG entries of plywood manufactured by Happy Home are incorrect. Certainly, TRLED cannot base its decision on secret, unconfirmed information and allegations.

TRLED also chose four of USG's entries for a detailed review. *See* Final Det. at 13. This is also a typical exercise that Commerce performs at an antidumping or countervailing duty verification, whereby respondents prepare production and sales packages and a reconciliation of the documents in advance of verification with the opportunity to present any corrections of minor errors found in the preparation of the documents. At verification, Commerce also presents respondents with a list of "surprise" sales, for which respondents must prepare and present the documents on the next day. In every case, respondents are given the opportunity to explain any perceived discrepancies or unusual aspects of the sales during verification. TRLED has not given Respondents such an opportunity in this investigation, but instead summarily determined that Respondents' discrepancies in documentation meant that Happy Home could not have produced all the merchandise it claimed to have produced in Cambodia. Final Det. at 17. TRLED's conclusions are not justified. Respondents discuss each of TRLED's reviewed entries below.

### 4. Entry 9612.

This is Entry No. [

                    ]. USG's sales packages for this transaction are found in its initial questionnaire response at Exhibit 3, no. [      ], and Happy Home's sales package for this entry is found in its initial questionnaire response at Exhibit 1 [              ]. TRLED claims that (a) TRLED cannot tie HH's payments received with USG's payment information or to the invoice; (b) HH's monthly production records cannot be tied to this shipment or to the payment information; (c) the production records do not identify the manufacturer's name; and (d) the

PR 002527

GOV0002527

production records do not tie to raw material purchases.  Final Det. at 13-14.  TRLED's

deficiency claims have no merit.

      Regarding USG's rolling payments to Happy Home [

  ], such payments on a periodic or rolling basis are commonly found in antidumping

cases.  (*See, however*, USG's Supp. Qre Rsp at Ex. SQ1-3 for sample reconciliations of

payments with specific invoices.)  For instance, in the antidumping investigation of *Quartz*

*Surface Products from India*, the petitioner in that case requested that Commerce apply adverse

facts available to respondent's home market credit expenses reporting because certain payments

Respondent received from its customer could not be tied to specific sales as a result of the

customer's rolling payments; this request was rejected by Commerce because the respondent's

home market payment data reporting was "generally accurate."  *Certain Quartz Surface*

*Products From India: Final Determination of Sales at Less Than Fair Value and Final Negative*

*Determination of Critical Circumstances*, 85 Fed. Reg. 25,391 (May 1, 2020) and accompanying

I&D Memorandum (April 27, 2020) at Cmt 8.  *See also Certain Quartz Surface Products From*

*the Republic of Turkey: Final Determination of Sales at Less Than Fair Value and Final*

*Negative Determination of Critical Circumstances*, 85 Fed. Reg. 25,389 (May 1, 2020) and

accompanying I&D Memorandum (April 27, 2020) at Cmt 2.  In *Quartz Surface Products From*

*Turkey*, Commerce determined: "{a}t verification, we confirmed that Belenco receives payment

from its customers on a rolling basis through a series of endorsed checks…and the accounts

receivable and payable accounts for endorsed checks are kept on a rolling basis. Thus, Belenco's

statement that it cannot associate any given check with any given sale is accurate based on our

experience at its sales verification…Therefore, AFA is not warranted."

      Happy Home does not maintain, and under GAAP is not required to maintain its

GOV0002528

production, accounting, and payment records in a manner that anticipates a CBP audit for an

EAPA investigation.  Neither Cambodian nor international GAAP rules include any

requirements on how a company should generate its production records or how payment for its

sales should be made.  As TRLED is certainly aware, some companies may generate production

records to order, and some companies may generate production records periodically. Some

customers make payment against each invoice, some against multiple invoices, and some just

make running payment, *i.e.* make one payment every few days or weeks, but not against certain

specific invoices.  In Commerce's antidumping cases, Commerce encounters these circumstances

all of the time without labelling one record-keeping method right or wrong, and without asserting

that such differences compromise the overall integrity of a company's books and records.

Like Happy Home, most Southeast Asian companies do not actually track production

according to purchase orders.  Most companies group the same model or product from different

orders and produce these together. For example, if a company has three purchase orders for

plywood (#1 orders 18mm 5000 pieces, 5mm 5000 pieces and 12mm 5000 pieces; #2 orders

18mm 1000 pieces and 12mm 1000 pieces; #3 orders 18mm 6000 pieces and 5mm 4000 pieces),

the production manager would arrange to group production by plywood thickness, not produce

order by order.  For a few days, the production manager may arrange to only produce 18mm

plywood, and even if the ordered quantity is 12,000 (5000+1000+6000), the production manager

may arrange to produce 15,000 pieces of plywood, and put the remaining pieces back into

finished merchandise inventory.  Happy Home does track, however, the finished merchandise by

order.  For example, the first 5000 pieces would be put in a spot for PO #1, the second 1000

pieces would be put in a spot for PO #2, the third 6000 would be put in a spot for PO #3, and the

remaining 3000 pieces would be put in a spot for inventory.  Thus, when a later order for 18mm

PR 002529

GOV0002529

plywood comes in, this order would be completely or partially filled from inventory. Similarly, when the production manager arranged production for 5mm plywood, the first 5000 pieces would be put in the same spot for PO #1, etc.

It is Happy Home's – and each company's - own decision as to how to arrange production and generate production records. TRLED cannot assume that all companies generate and keep records in the same way.  As mentioned above, Commerce must adapt its AD and CVD proceedings to each company's record keeping method, as long as the record can allow a reasonable and accurate margin calculation.  TRLED's determination implies that CBP can find evasion unless a Respondents' production records are kept according to specific purchase orders. Even though Happy Home's production records are not maintained against individual purchase orders, the production quantities cover all sales.

Finally, it is not clear why a company's own records must all bear the company's name. This cannot be a discrepancy.

## 5.  Entry 2459.

This is Entry No. [

                                ].  USG's sales packages for this transaction are found in its initial questionnaire response at Exhibit 3, no. [        ], and Happy Home's sales package for this entry is found in its initial questionnaire response at Exhibit 1 [          ].

In addition to the alleged discrepancies listed under Entry 9612, (a)-(d) above, TRLED claims that the declared quantity on the entry form does match the cubic meter quantity on the invoice, packing list, and bill of lading.  Final Det. at 14.  In order to understand this allegation, USG compared the quantities provided on various documents in CBM, MSF (1,000 sq. ft.), net kg, gross kg, pieces, and packages (or cartons).  The entry summary reports (1) a gross weight of [            ]kg, which is the same as the packing list and B/L; [      ] packages, which is the same as

PR 002530

GOV0002530

the invoice, purchase order total, and B/L; and [       ] CBM, which differs from the [        ] CBM recorded on the invoice, packing list, P.O. total, and B/L.

The seeming discrepancy on the entry summary is apparently due to the fact that Form 7501 requires that the net quantity be reported in HTSUS units, *i.e.*, CBM. As shown on the packing list, the gross weight of the shipment is [        ]kg, but the net weight is only [        ] kg. Thus, also for the quantity, where the gross quantity is recorded on the sales and entry documents as [        ] CBM, the net quantity (*i.e.*, the plywood minus packaging) must be less. We do not know how CBP or the broker calculated the net CBM to arrive at [       ]. The figure may be CBP's estimate or maybe CBP somehow calculated the net CBM from the net weight. In any event, the figure on the entry documents reflects only the requirements of Form 7501 and is not a discrepancy in USG's documentation.

### 6. Entry 6467.

This is Entry No. [

]. USG's sales packages for this transaction are found in its initial questionnaire response at Exhibit 3, no. [       ], and Happy Home's sales package for this entry is found in its initial questionnaire response at Exhibit 1 [              ]. For this entry, TRLED repeats only its allegations listed under above under Entry 9612 (a)-(d). Final Det. at 14. Please refer to Respondents' discussion under Entry 9612.

### 7. Entry 7529.

This is Entry No. [

]. USG's sales packages for this transaction are found in its initial questionnaire response at Exhibit 3, no. [       ], and Happy Home's sales package for this entry is found in its initial questionnaire response at Exhibit 1 [               ].

PR 002531

GOV0002531

In addition to the alleged discrepancies listed under Entry 9612, (a)-(d) above, TRLED notes that in Happy Home's sales documents the quantity and value of P.O. No. [          ] differ.  Final Det. at 14.  The quantity shown in Happy Home's sales documents is [     ] PCS and [          ] MSF with a value of [               ].  USG's invoices, on the other hand, show a quantity of [      ] PCS and [         ] MSF with a value of [               ].  TRLED notes that no explanation for this increase was provided.

First, Respondents note that USG's copy of the original purchase order dated January 29, 2018 is included in USG's supplemental questionnaire response at Exhibit SQ1-4.  This is clearly an instance in which Respondents changed the quantity and value of the order at some time between the order date and the invoice date.  As CBP is certainly aware, the purchase order is not the sales contract, and the final essential elements of the sales contract - quantity and price - was not fixed between Happy Home and USG until the merchandise in the quantity and at the price ultimately agreed upon was packed and ready for shipment and the invoice was generated.  Whether or not the change in the order was committed to writing is irrelevant for the conclusion of the sales contract.  The invoice for a quantity of [      ] PCS and [        ] MSF and with a value of [            ] reflected the sales contract and is the only relevant document for evidencing the quantity and value of the sale.  The fact that the quantity and value of the purchase order changed before the sales contract was finalized is irrelevant.  Indeed, in AD cases, Commerce's regulations designate the date of the invoice as the normal date of sale.  *See* 19 CFR 351.401(i): "In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business."  Important in this instance is that the invoice value matches the entered value on CBP's Form 7501, which it does. *See* USG Qre Rsp.

GOV0002532

at Ex. 3, no. [     ].  TRLED's supposed "discrepancy" is irrelevant.

In conclusion, the Respondents submitted complete and accurate production and sales data for all of Happy Home's production of hardwood plywood and for each sale between the two respondents.  *See also* Resp. Case Br. at 13-15.  TRLED attempts to discredit Respondents' production and sales records must fail because these records contain no gaps, are completely verifiable, and prove that Happy Home sold only plywood manufactured in Cambodia to USG.

### D.    The Trade Data on the Record of This Investigation is Unreliable.

In its case brief, Respondents demonstrated that the trade data that the Coalition and TRLED put on the record, and upon which TRLED relied in its Initiation Notice is unreliable. *See* Coalition re: Request for an Investigation of U.S. Global Forest, Inc. Under the Enforce and Protect Act (May 10, 2019) at 8-9 and Ex. 5 (UN FAOStat Forestry Yearbook 2016); Ex. 6 (Chinese Export Statistics); and Ex. 7, (USITC Data); and CBP Memorandum, Adding Information to the Administrative Record of EAPA Cons. Case 7321, 2017 Forestry Yearbook (Jan. 9, 2020).  *See also* Initiation Notice at 2-6 and Resp. Case Br. at 5-8.  For instance, Respondents pointed out that "based on the Forestry Yearbook, in 2017, Cambodia's total plywood exports to the world is only 4,000 cubic meters, but the U.S. alone imported 20,452 cubic meters according to the ITC data.  Further, the purported Chinese Export Statistics[5] show that China exported 106,267 cubic meters of plywood to Cambodia in 2017, while the total Cambodian imports of plywood from the whole world were only 70,000 cubic meters.  With respect to the 2018 data, the Coalition's Exhibit 6 shows that China exported 1,137,071 cubic meters of plywood to the U.S., while the Coalition's Exhibit 7 shows the U.S. only imported 181,288 cubic meters of plywood from China."  Resp. Case Br. at 7-8.

---

[5] The Coalition's Chinese Export Statistics provided no source citation.

GOV0002533

In its Final Determination, TRLED remained steadfast, in particular, in clinging to its Cambodian production data, which show total production of plywood in both 2016 and 2017 as 27,000CBM.  TRLED stated:

> With reference to the Cambodian figures, the Importers and Manufacturers argue that the figures are unreliable, not contemporaneous, and therefore, should be dismissed.[135] CBP notes that the Forestry Yearbook is a publication of the Food and Agriculture Organization of the United Nations (FAO) and obtains most of its information from government replies to its questionnaires.[136] Whether some of its figures are identical to Chinese export statistics or United States' import statistics does not necessarily indicate unreliability but rather another data source. Because the FAO's Forestry Yearbook sources its production figures directly from the Cambodian government, and the Cambodian government possesses the expertise and geographic proximity to most efficiently collect Cambodian plywood production figures, the figures are authoritative and reliable for our investigation's purposes.

Final Det. at 16.

Regarding the official nature of the Cambodian statistics, Respondents suggest that ORR consult the UN FAOStat online database, which normally includes a descriptive flag on the source of the published figures.  ORR may find that the 2016 Cambodia plywood production data were unofficial, and the production figures for 2017 and 2018 are flagged as simply repeated from 2016.  In addition, ORR may find that all of the Cambodian import and export data for 2016-2018 are unofficial figures.  Should ORR decide to properly and fairly attempt to corroborate the Cambodian trade data, he or she will see that these statistics cannot be the basis for concluding that Happy Home could not have produced plywood in its recorded quantity.  Such generic information, in particular, fatally flawed trade data, can never serve as an indictment of an individual company's production and sales practice.  CBP cannot rely on this data as substantial evidence of evasion.

Moreover, the trade courts do not condone an agency's refusal to consider conflicting information in its determinations.  In *Solar World Ams.*, for instance, the U.S. Court of Appeals

28

GOV0002534

for the Federal Circuit overturned Commerce's antidumping administrative review decision in

*Crystalline Silicon Photovoltaic Cells from China*, where Commerce found the Thai import data

published by the Global Trade Atlas (GTA) reliable even though it did not reconcile with other

data placed on the record.  *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir.

2020).  The Court of Appeal stated:

> Commerce has also failed to explain how the Thai GTA data can be reconciled
> with data from the United States International Trade Commission's ("ITC")
> Dataweb website, which records exports from the United States to other countries.
> …
> The ITC data and the Thai GTA data cannot both be correct, as Commerce
> appears to admit. Commerce has not explained why the Thai GTA data is a more
> accurate record of these transactions than the ITC data, admitting that it "just
> do[es]n't know" which is accurate. …
>
> [] Commerce's preference for GTA data does not excuse its failure to reconcile
> the admitted inconsistency.

*See id.*, 962 F.3d 1351, 1358 (internal citation omitted).

### E.    TRLED's Reliance on Secret Information from an Unrelated Proceeding Must Be Rejected.

As discussed above in relation to CBP's site visit, Respondents strenuously object to

TRLED's reliance on undisclosed statements from unknown parties in a proceeding unrelated to

this instant investigation.  TRLED includes the following incomprehensible rendition of what

Respondents presume TRLED believes to be a discussion of substantial evidence:

> Happy Home claimed that it produced plywood from individual veneers.[129]
> However, other evidence on the record indicates that it also produced plywood
> from [      ] imported from [ ] as well.[130]  Additionally, contracts translated from
> [      ] indicate that Happy Home purchased "[      ]" from a [      ] supplier
> named [      ].[131] Though the contract indicates "[         ]," several other
> documents associated with these raw material purchases, such as the [         ]
> indicate that Happy Home imported "[         ]" into Cambodia from [         ].[132]
> Furthermore, apart from the translation of the contract's [            ], there is no
> indication that the "[    ]" was [         ].  If the [         ] are taken at face value,
> Happy Home imported completed [    ] plywood that it could comingle with any
> Cambodian-origin plywood.

GOV0002535

Final Det. at 15. Respondents have no idea what TRLED is talking about in the above paragraph. TRLED references CBP's Sept. 13 & 16 memos in note 130, which as discussed above, TRLED has not disclosed to Respondents nor to legal counsel. In note 131 and 132, TRLED cites to Happy Home's Exhibit 11, including specific pages in Exhibit 11. These pages include documentation on raw material purchases and transportation, which Happy Home also listed on its summary spreadsheet in Exhibit 11. The cited pages do not provide information that fits into the above paragraph. Such an incomprehensible statement of evidence and argument as that from TRLED cited above cannot pass the requirements of substantial evidence.

## V.    CONCLUSION

For the reasons set forth above, Respondents submit that TRLED has not met its burden to establish, based on substantial evidence and taking into account all that detracts from that evidence, that Respondents Happy Home and U.S. Global evaded the Hardwood Plywood AD/CVD orders by transshipping covered merchandise to the United States through Cambodia. Accordingly, Respondents request that ORR reverse TRLED's determination of evasion, terminate the investigations, and order CBP to liquidate the affected entries without regard to AD/CVD duties.

Respectfully Submitted,
/s/ Gregory S. Menegaz

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
*Counsel to Happy Home Wood Products*
August 10, 2020                    *Co., Ltd. and U.S. Global Forest, Inc.*

PR 002536

GOV0002536

Public Document No. 101

PR 002537

GOV0002537

LAW OFFICES OF

deKIEFFER & HORGAN, PLLC
1090 VERMONT AVENUE, N.W.
SUITE 410
WASHINGTON, D.C.  20005

| | | |
|---|---|---|
| GREGORY S. MENEGAZ<br>TEL 202-783-6900 | AFFILIATED OFFICE:<br>SAARBRÜCKEN, GERMANY | GMENEGAZ@DHLAW.COM<br>DHLAW.COM |

August 10, 2020

<u>ELECTRONIC FILING BY EMAIL:</u>
eapafad@cbp.dhs.gov

Office of Trade
Regulations and Rulings
Penalties Branch
U.S. Customs and Border Protection

EAPA Investigation No. 7321
(Certain Hardwood Plywood)
POI: June 5, 2018 Onwards

**PUBLIC VERSION**

Business Proprietary information
contained within brackets deleted on
pages 10, 11, 18, 19, 21-27.

   *RE: EAPA Con. Case No. 7321 – Request for Administrative Review*

Dear Office of Trade, Regulations & Rulings,

   On behalf of Interglobal Forest LLC ("IGF") and American Pacific Plywood, Inc.

("APPI"), U.S. importers of hardwood plywood from Cambodia (together: "Respondents"),

interested parties pursuant to 19 C.F.R. § 165.1, we hereby request an administrative review in

accordance with 19 U.S.C. § 1517(f) and 19 CFR § 165.41 of U.S. Customs and Border

Protection ("CBP"), Trade Remedy & Law Enforcement Directorate's ("TRLED') initial

determination as to evasion in EAPA Inv. 7321.

   IGF's address is 2190 W. 11ᵗʰ Ave., Ste 231, Eugene OR 97402; email contact:

deborah@interglobalforest.com; APPI's address is 414 First St., Solvang, CA, email contact:

mark@appiwood.com, pat@appiwood.com.

   We are submitting a confidential version and a public version of Respondents' request in

accordance with 19 C.F.R. § 165.26.

*     *     *

In accordance with 19 C.F.R. § 165.4, Respondents request confidential treatment of the information contained herein as business confidential and commercial data that is proprietary to Respondents and their suppliers, service providers, and customers.  The information contained in this request to CBP that is marked confidential has never been released in any manner to a person who is not an employee or in a confidential relationship with the companies.  The confidential information is not commonly known within the industry or readily ascertainable by outside persons with a minimum of time and effort.  Disclosure of this information would cause substantial competitive and commercial harm to Respondents and their suppliers, service providers, and customers.  The confidential information in this request for administrative review is enclosed in brackets ("[ ]") to indicate the confidential nature of the information contained herein.

Specifically, this submission contains the following confidential information:

| Page | Reason for Confidential Treatment |
|---|---|
| Page 10, 11 | Details on Respondents' legal structure and business operations that are not available to the general public. |
| Page 11 | Description of Respondents' business records that are not available to the general public |
| Pages 18 | CBP's undisclosed confidential information |
| Pages 19 | Details on Respondents' business operations that are not available to the general public |
| Pages 21 - 27 | Details on Respondents' sales documentation that are not available to the general public |

2

GOV0002539

Accordingly, for the above reasons, Respondents requests confidential treatment of the information enclosed in brackets ("[ ]") that are deleted in the public version.

Please contact the undersigned if you have any questions regarding the information included in this submission.

Very truly yours,

*/s/ Gregory S. Menegaz*

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
DEKIEFFER & HORGAN, PLLC
1090 Vermont Ave., NW
Suite 410
Washington, D.C.  20005
202-783-6900

3

PR 002540

GOV0002540

### ATTORNEY CERTIFICATION

I, **Gregory S. Menegaz,** with **deKieffer & Horgan,** Counsel to LB Wood (Cambodia) Co., Ltd., Cambodian Happy Home Wood Products Co., Ltd., Interglobal Forest LLC, American Pacific Plywood, Inc., and U.S. Global Forest, Inc., certify the following:

(i)     All statements in this submission (and any attachments) are accurate and true to the best of my knowledge and belief.

(ii)    Any information for which I have not requested business confidential treatment pursuant to 19 CFR 165.4(a), may be released for public consumption.

(iii)   I will advise CBP promptly of any knowledge of or reason to ·suspect that the covered merchandise poses any health or safety risk to U.S. consumers pursuant to 19 C.F.R. 165.7(a).

Signature:   

Date:  August 10, 2020

GOV0002541

**Table of Contents**

I.    PROCEDURAL HISTORY AND FACTS OF THE CASE, 19 C.F.R. § 165.41(F)(3). ......................1

II.   STANDARD OF REVIEW ..........................................................................................7

      A.    De novo Review, 19 U.S.C. § 1517(f)(1); 19 CFR § 165.45.................................7

      B.    Substantial Evidence. .....................................................................................8

III.  SUMMARY OF ARGUMENT....................................................................................9

IV.   ARGUMENT ......................................................................................................10

      A. LB Wood Had Motive and Opportunity to Produce Hardwood Plywood in
         Cambodia. ....................................................................................................10

      B. CBP's Visit on the Occasion of an Unrelated Proceeding Cannot Establish
         Substantial Evidence of Evasion in EAPA Inv. 7321 ................................14

         1.  TRLED's Reliance on CBP's June 6, 2018 Visit to LB Wood's Facilities..........14

         2.  The Record of this Instant Investigations Disproves the Observations and
             Conclusions Contained in CBP's Sept. 12, 2019 Memo. .....................................16

      C. CBP's Analyses Regarding Respondents' Production and Sales Records are
         Flawed and Without Merit. ..........................................................................20

         1.  IGF Entry 6164 ...................................................................................21

         2.  IGF Entry 7576. ..................................................................................22

         3.  IGF Entry 8194. ..................................................................................23

         4.  IGF 8376 Entry. ..................................................................................23

         5.  APPI Entry 5163. .................................................................................25

         6.  APPI Entry 1600. .................................................................................26

      D. The Trade Data on the Record of This Investigation is Unreliable. ..............................28

V.    CONCLUSION.......................................................................................................30

PR 002542

GOV0002542

## Table of Authorities

**CASES**

*A. L. Patterson, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ........................................7, 8

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)............................................14

*Armstrong v. Manzo*, 380 U.S. 545; 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965) ...............................20

*Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ...............12

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) .................................................8

*Dickinson v. Zurko*, 527 U.S. 150; 144 L. Ed. 2d 143 (1999) ........................................................8

*Diversified Products Corp. v. United States*, 6 C.I.T. 155 (1983)........................................... 14-15

*Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357 (Fed. Cir. 2006) ...................................................8

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ...............................................9

*Huvis Corp. v. United States*, 570 F.3d 1347 (Fed. Cir. 2009) .........................................................9

*Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017)...................................13

*JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011)......................................................8

*Mathews v. Eldridge*, 424 U.S. 319; 47 L. Ed. 2d 18; 96 S. Ct. 893 (1976) ...............................20

*Myland Indus., Ltd. v. United States*, 31 Ct. Int'l Trade 1696 (U.S. 2007)...................................21

*Patrick v. Miller*, 953 F.2d 1240 (10th Cir. 1992)........................................................................20

*SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020)............................... 29-30

*Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978 (Fed. Cir. 1994) ........9

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .................................................... 9, 14-15

*USX Corp. v. United States*, 11 C.I.T. 82 (1987)........................................................................ 8-9

PR 002543

GOV0002543

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i).................................................................................8

19 U.S.C. § 1517(f)..........................................................................................1, 7

**REGULATIONS**

19 CFR § 165.41 ..............................................................................................1

19 CFR § 165.44 ..............................................................................................8

19 CFR § 165.45 ..............................................................................................7

**ADMINISTRATIVE DECISIONS**

*Certain Hardwood Plywood from the People's Republic of China: Antidumping Order*, 83 Fed. Reg. 504 (Dept. Commerce, Jan. 4, 2018)..............................................1

*Certain Hardwood Plywood from the People's Republic of China: Countervailing Duty Order*, 83 Fed. Reg. 513 (Jan. 4, 2018) .......................................................1

PR 002544

GOV0002544

**REQUEST FOR ADMINISTRATIVE REVIEW**

This request for review pursuant to 19 U.S.C. § 1517(f) and 19 CFR § 165.41 of U.S. Customs and Border Protection ("CBP"), Trade Remedy & Law Enforcement Directorate's ("TRLED") initial determination as to evasion in EAPA Inv. 7321 is filed on behalf of Interglobal Forest LLC ("IGF") and American Pacific Plywood, Inc. ("APPI"), U.S. importers of hardwood plywood from Cambodia (together: "Respondents").

**I.     PROCEDURAL HISTORY AND FACTS OF THE CASE, 19 CFR § 165.41(F)(3).**

On April 12, 2019 and May 1, 2019, the Coalition for Fair Trade of Hardwood Plywood (the "Coalition") submitted to CBP allegations that IGF and APPI were evading the antidumping and countervailing orders on hardwood plywood from China[1] by transshipping Chinese hardwood plywood through Cambodia for import into the United States. *See* TRLED, Notice of Determination as to Evasion (June 29, 2020) at 1-2, note 2 ("Final Det."). On June 5, 2019, TRLED acknowledged receipt of the evasion allegations to the Coalition, and on June 26, 2019, TRLED initiated EAPA investigations 7321 and 7323 against IGF and APPI as well as EAPA Inv. 7327 against a third U.S. importer, U.S. Global Forest, Inc. ("USG"). For the next three months, TRLED conducted its secret investigation against IGF and APPI. On October 1, 2019, TRLED informed IGF and APPI that during its secret investigation, TRLED had developed a record giving rise to a "reasonable suspicion" of evasion of the Orders by the Respondents and consolidating EAPA investigations 7323 and 7327 with EAPA Inv. 7321. *See* TRLED, Notice of Initiation of Investigation and Interim Measures – EAPA Cons. Case 7321 (Oct. 1, 2019) ("Initiation Notice"). As the title suggests, TRLED also imposed interim measures on the

---

[1] *See Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 504 (January 4, 2018) (AD order); *see also Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 513 (January 4, 2018) (CVD order) (collectively, the "Orders").

1

GOV0002545

Respondents by suspending liquidation of Respondents' entries of hardwood plywood from Cambodia, rate-adjusting these entries as subject to the Orders and cash deposits imposed on hardwood plywood from China as of June 26, 2019, and extending the liquidation period for unliquidated entries before June 26, 2019.

After TRLED released its Initiation Notice, on October 2, 2019, TRLED released to Respondents the letters from the Coalition alleging Respondents' evasion of the Orders, and the public version of a document:  CBP Memorandum, "Adding Certain Documents to the Administrative Record (Sept. 12, 2019) ("Sept. 12, 2019 Memo").  The documents in this memorandum concern a June 6, 2018 site visit that CBP personnel conducted at the production facilities of LB Wood (Cambodia) Co., Ltd. ("LB Wood"), a Cambodian producer of hardwood plywood, who supplied hardwood plywood manufactured in Cambodia to Respondents during the period of investigation, June 5, 2018 through the pendency of this investigation.  *See* Initiation Notice at 2.  As noted, the visit of CBP's agent took place one year before TRLED initiated EAPA Inv. 7321 in June 2019, and as revealed in TRLED's initiation notice and final determination, the agent's visit had nothing to do with EAPA 7321.  *See* Initiation Notice at 8 and Final Det. at 12.  CBP did not invite a representative from IGF or APPI or their legal counsel to be present at this visit.

In its allegations against IGF and APPI, the Coalition claimed that Chinese exports of hardwood plywood to the U.S. decreased from 2017 to 2018, and Chinese exports of hardwood plywood to Cambodia and Cambodian exports of hardwood plywood to the U.S. increased during the same period of time.  The Coalition therefore inferred and alleged that Chinese-origin plywood had been transshipped through Cambodia to the United States.  *See* Coalition Ltrs. concerning IGF and APPI re: Request for an Investigation under the Enforce and Protect Act

GOV0002546

(May 1, 2019) at 8-10.  With respect to importer-specific allegations, the Coalition alleged that IGF and APPI sourced plywood from LB Wood, a Cambodian company located in a special Economic Zone, which "was purposefully designed to link Chinese and Cambodian trading partners and facilitate the global dissemination of their products."  *Id*. at 10-12.

In its Initiation Notice, TRLED based its conclusion of a reasonable suspicion of evasion partly on the trade data that the Coalition put on the record of this case and the Coalition's claim that LB Wood, IGF, and APPI had motive and opportunity to evade the Orders due to the high cash deposits on U.S. imports of hardwood plywood from China and LB Wood's location in Cambodia's Sihanoukville Special Economic Zone ("SSEZ").  *See* Initiation Notice at 6.

TRLED also claimed in its Initiation Notice that the evidence contained in its Sept. 12, 2019 memorandum provided additional evidence of IGF's and APPI's evasion of the Orders. *See* Initiation Notice at 8-9.  The documents included in CBP's Sept. 12, 2019 memo show, however, that these documents have nothing to do with IGF or APPI or EAPA Inv. 7321.  In its Initiation Notice, TRLED claims that the documents were created in the context of a review of preferential tariff treatment for Cambodian plywood under the Generalized System of Preferences ("GSP").  *Id*. at 8.  They were also created well before the Coalition submitted its first allegations against IGF and APPI in April and May 2019.  *See id*. at 2, note 7, listing the Coalition's allegation submissions against IGF and APPI and CBP Sept. 12, 2019 Memo. TRLED also incorrectly claims in its Initiation Notice that documents contained in two additional CBP memoranda pertain to documentation concerning both LB Wood and Happy Home.  Initiation Notice at 8; *compare* CBP Memorandum, "Adding Certain Documents to the Administrative Record" (Sept. 13, 2019) ("Sept. 13, 2019 Memo") and CBP Memorandum, "Adding Certain Documents to the Administrative Record" (Sept. 16, 2019 Memo).  These

3

GOV0002547

memoranda, however, make no mention of LB Wood.  *See* Sept. 13, 2019 Memo and Sept. 16, 2019 Memo.  TRLED has not explained this discrepancy.

The actual context in which the documents contained in CBP's September 2019 memoranda were created also remains unclear.  Whereas in its Initiation Notice, TRLED claims that the documentation was created in the context of a GSP review of Cambodian plywood, TRLED claims in its Final Determination that the documentation was generated in a review of whether Cambodian engineered wood flooring was subject to the antidumping and countervailing duties on *Multilayered Wood Flooring from China*.  *Compare* Initiation Notice at 8 *with* Final Det. at 12.  TRLED has not explained this discrepancy.  In any case, the context, parties, and statements from the unrelated proceeding and upon which TRLED relied in its initial and final conclusions in EAPA 7321 remain completely unknown to Respondents.  Respondents unequivocally contest any relevancy or truth vis-à-vis Respondents of alleged statements from an unidentified person in a murky context that has nothing to do with TRLED's instant investigation.

After TRLED's Initiation Notice, TRLED issued questionnaires to IGF, APPI, and LB Wood, to which Respondents responded in detail by providing TRLED with all documents requested concerning LB Wood's purchases of raw materials, production process, sales to IGF and APPI, and IGF's and APPI's sales transactions with LB Wood and their own U.S. customers.  *See* LB Wood Questionnaire Response to Initial Request for Information (Nov. 8, 2019) ("LB Wood Qre Rsp."); LB Wood Response to Supplemental Request for Information (Dec. 16, 2019) ("LB Wood Supp. Qre Rsp."), IGF Questionnaire Response to Initial Request for Information (Oct. 28, 2019) ("IGF Qre Rsp."); IGF Response to Supplemental Request for Information (Dec. 16, 2019) ("IGF Supp. Qre Rsp."), APPI Questionnaire Response to Initial

4

GOV0002548

Request for Information (Oct. 28, 2019) ("APPI Qre Rsp."); APPI Response to Supplemental

Request for Information (Dec. 9, 2019) ("APPI Supp. Qre Rsp.").  TRLED issued no further

questionnaires to Respondents, and Respondents believed they had fully complied with

TRLED's requirements for submission or clarification of information.

  After receiving these questionnaire responses, TRLED initially scheduled verification at

LB Wood's manufacturing facilities in Cambodia for February 17-22, 2020.  On February 11,

2020, TRLED postponed its verification of LB Wood due to the Corona Virus outbreak

("COVID-19") in the United States.  TRLED finally cancelled verification altogether due to

associated travel restrictions and health risks.  On May 14, 2020, Respondents IGF, APPI, and

LB Wood, together with the other respondents in EAPA Inv. 7321, Cambodian Happy Home

Wood Products Co., Ltd. and U.S. Global Forest, Inc., submitted written arguments, and the

Coalition submitted a response to the written arguments on May 29, 2020.  *See* TRLED Email,

"EAPA 7321 - Extension of the Written Arguments Deadline" (Feb. 11, 2020); *See* Letter from

TRLED, "Notice of Extension of Final Determination" (Feb. 11, 20200; Email from TRLED,

"RE: EAPA 7321 - Extension of the Written Arguments Deadline" (May 8, 2020); Letter from

Respondents, "EAPA Con. Case No. 7321 – Respondents' Written Arguments" (May 14, 2020)

("Resp. Case Brief"); Coalition Ltr.  "EAPA Investigation No. 7321: Rebuttal Comments" (May

29, 2020).

  Most notably, during the five months between Respondents' last questionnaire response

on December 16, 2019 and Respondents' submission of written argument, TRLED asked no

further questions of Respondents nor indicated in any way that TRLED found discrepancies in

Respondents' questionnaire responses.  TRLED's failure to seek further information is

inexplicable in light of TRLED's evident need to prepare for verification and as during the

PR 002549

GOV0002549

*PUBLIC VERSION*

months of January through May 2020 it became increasingly obvious that verification would necessarily be cancelled due to restrictions for U.S. citizens and Government officials for travel to Cambodia. TRLED could have, and should have, carried out its verification agenda with requests for reconciliation packages from Respondents. As it turns out, TRLED attempted to carry out its own reconciliations resulting in conclusions of little value because TRLED did not ask for Respondents' input. *See* Final Det. at 8-10 & 13-15. For Respondents' part, they prepared their questionnaire responses in full knowledge that TRLED intended to verify their responses through an on-site verification in Cambodia. Respondents therefore carefully and truthfully prepared all responses in light of the anticipated verification of these responses.

In their written argument, submitted to TRLED on May 14, 2020 as a case brief, Respondents showed that the trade information that the Coalition and TRLED put on the record was inconsistent and unreliable and *not specific* to Respondents. *See* Resp. Case Brief. at 5-8. Further, observations by the Coalition and TRLED of Respondents' motive and opportunity to move production of hardwood plywood from China to Cambodia was immaterial without specific instances of transshipment by Respondents, which the record could not support. *See id.* at 8-11. Respondents then set forth the record evidence showing that the Cambodian producers LB Wood and Happy Home produced all of the plywood shipped to the United States at their production facilities in Cambodia. *Id.* at 11-15. Respondents also pointed out that TRLED's reliance on the documents included in CBP's September 2019 memoranda could not even support a "reasonable suspicion" of evasion. *Id.* at 15-20. Finally, Respondents pointed out TRLED's procedural irregularities in administering the EAPA law in this case, including the lack of transparency and defense opportunities for Respondents due to TRLED's reliance on secret documents in its decision to initiate EAPA Inv. 7321 and impose punitive interim measures on

6

GOV0002550

Respondents.  *Id*. at 20-30.

In its Final Determination, TRLED found that "substantial evidence indicates that InterGlobal's, American Pacific's, and U.S. Global's imports were entered through evasion, . . .." Final Det. at 5.  As discussed below, TRLED's understanding of what constitutes "substantial evidence" is deficient.  TRLED cites only a portion of the discussion on substantial evidence in the 2014 decision of the U.S. Court of Appeals for the Federal Circuit in *A. L. Patterson:* "the Federal Circuit has stated that 'substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id*. at note 32, *citing A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781-82 (Fed. Cir. 2014).  Respondents provide below the full quotation from the Federal Circuit's decision in *A.L. Patterson*, which begins with the observation that substantial evidence must be more than a mere scintilla and based <u>on the record</u> as a whole, not just on an agency official's subjective "reasonable mind."

As it did in its Initiation Notice, TRLED relied on Respondents' *mere* motive and opportunity as well as TRLED's and the Coalition's flawed trade statistics and CBP's three September, 2019 secret memoranda as substantial evidence of Respondent's evasion of the Orders.  Final Det. at 10-12 & 15-17.  TRLED could not however point to even one instance of actual transshipment of Chinese plywood through LB Wood to IGF and APPI in the United States.  Regarding Respondents' record evidence of production and sales of Cambodian plywood, TRLED reviewed four entries of LB Wood's merchandise imported by IGF and two entries imported by APPI and claimed that inconsistencies in Respondents' records made Respondents' documents unreliable.  *Id*. at 13-15.

## II.    STANDARD OF REVIEW

### A.  De novo Review, 19 U.S.C. § 1517(f)(1); 19 CFR § 165.45.

According to the *A.L. Patterson* decision cited above "{w}e review the Court of

PR 002551

GOV0002551

International Trade's decisions concerning Commerce's scope determinations de novo, 'stepping into its shoes and applying the same standard of review.' *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011). We thus hold unlawful any determination found 'to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law.' 19 U.S.C. § 1516a(b)(1)(B)(i)." *A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781 (Fed. Cir. 2014).

In addition to a de novo administrative review of TRLED's application of the law by CBP's Office of Rules & Regulations ("ORR"), the administrative review can also encompass a de novo review of TRLED's fact-finding, including new factual information that ORR may request from the parties. 19 CFR § 165.44.

## B. Substantial Evidence.

As mentioned above, the Federal Circuit's consideration of what constitutes "substantial evidence" is much more discerning than merely consideration of what CBP's agents' subjective minds might consider "adequate."

> "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). . . .. While respecting agency expertise, the Supreme Court "has stressed the importance of not simply rubber-stamping agency fact-finding." *Dickinson v. Zurko*, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999). Our review "requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78, 71 S. Ct. 456, 95 L. Ed. 456 (1951).

*A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781-82 (Fed. Cir. 2014).

Moreover, the agency's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 C.I.T. 82, 84 (1987). The substantial evidence standard "requires more than mere assertion of

GOV0002552

'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Universal Camera*, 340 U.S. at 487). Further, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009) *quoting Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).*

In this investigation, the Coalition and CBP bear a burden of proof to establish, based on substantial evidence, that Respondents transshipped covered merchandise from China through Cambodia and on to the United States. Respondents submit that such burden has not been met on this record, as explained more fully below.

## III.   SUMMARY OF ARGUMENT

1.      TRLED's reliance on trade data, the business operation adjustments that companies in general make in light of trade cases against particular products from particular countries, and the location of LB Wood's production facilities cannot serve as a basis for substantial evidence. Substantial evidence must be specific to Respondents and link Respondents with the alleged act of transshipment to evade the Orders. TRLED has provided no evidence in any instance in which LB Wood transshipped hardwood plywood from China to Cambodia for import into the United States in order to evade the Orders. TRLED's general and generic observations and comments on trade data, the effect of the Orders, and factory location are not specific as to evasion and do not link Respondents with the alleged evasion and cannot serve as a foundation for substantial evidence.

2.      TRLED's reliance on undisclosed statements from CBP's agent in an undisclosed

PR 002553

GOV0002553

proceeding unrelated to Respondents and EAPA Inv. 7321 cannot be considered substantial evidence for any determination in EAPA 7321. Respondents unequivocally deny the relevance and veracity of such statements and conclusions vis-à-vis Respondents and this instant investigation. The undisclosed statements are taken out of context of the unrelated proceeding, and TRLED's rendition of such statements are unintelligible to Respondents. TRLED's use of this information seriously violates such due process principles as full disclosure, transparency and Respondents' right to be heard and defend against the agency's allegations.

3.    The alleged discrepancies that TRLED found in its review of Respondents' books and records are either incorrect, irrelevant, or of a nature that cannot discredit the overall reliability of Respondents' production and sales records. Most significantly, TRLED found no evidence of transshipment of Chinese plywood in Respondents' records. Respondents responded to all of TRLED's questions completely and truthfully. TRLED's analyses of Respondents' documentation cannot serve as a basis for establishing substantial evidence of evasion of the Orders against Respondents.

IV.  **ARGUMENT**

A.    **LB Wood Had Motive and Opportunity to Produce Hardwood Plywood in Cambodia.**

LB Wood is owned by a [        ] entity, [

]. *See* LB Wood Qre Rsp. at 4-8 & Ex. 2. LB Wood was first registered in [          ] and started producing plywood in [              ]. *See* LB Wood Supp. Qre. Rsp. at 3. As is typical for a start-up company, LB Wood's [

10

GOV0002554

]. *See* Final Det. at 7; LB Wood Qre Rsp. at 6 & Ex. 2.

As TRLED indicates in its final determination, LB Wood sources [

]. Final Det. at 3; LB Wood Qre Rsp. at 2 and Ex. 12.1 & 12.2.  For raw materials

imported into Cambodia from [                              ], LB Wood submitted [

].  *See* LB Wood Qre Rsp. at Ex. 12.1.  LB Wood also provided warehouse-in tickets

for inventory of its imported raw material purchases.  *See* LB Wood Supp. Qre Rsp at Ex. SQ1-

1.  For veneers sourced locally, LB Wood submitted [

].  *See* LB Wood Qre Rsp. at Ex. 12.2.  TRLED also notes that LB Wood's

production facilities are located in the Sihanoukville Special Economic Zone, which is near

Cambodia's only deep-water port, which facilitates LB Wood's access to imported raw

materials.  *See* Final Det. at 6.  TRLED's observation is an obvious one - access to a deep-water

port facilitates trade in goods, not only in Cambodia, but is also characteristic of the growth of

industrial centers along the coasts of the United States and most other countries throughout

history.

TRLED also correctly notes that the imposition of the Orders by the U.S. Department of

Commerce ("Commerce") and attendant cash deposits on Chinese hardwood plywood provided a

business opportunity for LB Wood's owner to establish a plywood factory in Cambodia.  Final

Det. at 5.  This fact establishes only that the Chinese plywood industry is embroiled in

uncertainty and turmoil caused by the trade cases against Chinese plywood, and LB Wood took

11

GOV0002555

advantage of this situation to profitably produce plywood in Cambodia and sell the finished merchandise to the United States.  Indeed, Cambodia has experienced unprecedented growth generally over the past few years, fueled by foreign investment and exports, as is the case specifically for plywood.  For insights into Cambodia's overall economic growth, Respondents suggest that ORR consult the World Bank's reports on Cambodia, available at https://www.worldbank.org/en/country/cambodia/publication/cambodia-economic-monitor-reports.

Indeed, TRLED's observations on LB Wood's motives and opportunities to produce plywood in Cambodia and export its finished merchandise to the U.S. do not amount to any evidence whatsoever that LB Wood is shipping finished plywood from China to the United States.  The fact that manufacturers and traders generally take advantage of profitable business opportunities is acknowledged in court decisions of the U.S. Court of International Trade.  *See* discussion in Respondents' Case Brief at 8-9.

In a recent case decided by the U.S. Court of International Trade (CIT), in the context of a circumvention inquiry of minor alterations before the Department the Commerce, the Court held that export and import data alone is not sufficient for Commerce to initiate a minor alternation circumvention inquiry.  *See Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283, 1295 (Ct. Int'l Trade 2019) ("The court acknowledges that evidence demonstrate that, since the initiation of the {Antidumping and Countervailing Duty} investigation, import volumes of plywood with both veneers of softwood increased drastically….  Although a substitution effect may be indicative of circumvention, it is not a sufficient cause for Commerce to initiate a minor alternations inquiry.").  After the AD and CVD Orders were imposed on plywood from China, any reasonable business person would start purchasing plywood from other countries with

PR 002556

GOV0002556

lower tariffs and taxes, such as Cambodia, as a substitute for Chinese plywood.

The CIT has also recognized that production and exports naturally flow to companies with lower AD tax rate burdens.  *See Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017).  By extension, production and exports also naturally flow to countries with lower AD tax rate burdens and lower tariffs in general.  In *Inmax SDN*, two affiliated Malaysian steel nails producers received very different AD rates because Commerce refused to collapse them in the first instance.  *Id.*, at 1369.  The affiliates' parent company then publicly announced that it would continue export activities with shipments only from the company with the lower AD rate.  Referring to Inmax's public statement, the U.S. industry requested that Commerce conduct a Changed Circumstances Review ("CCR"), allegedly to prevent the companies from evading AD duties, to which Commerce agreed.  *Id.*, at 1370.  The CIT overturned Commerce's CCR determination and sharply criticized Commerce's underlying rationale that production and export by companies with low AD rates necessarily constitutes evasion of AD duties:

> Commerce found that the Inmax companies did not illegally co-mingle subject merchandise in their exports, and that their parent publicly, and transparently, communicated a change in their export behavior due to the differing assigned rates. Commerce does acknowledge that "this avoidance could be seen by some as a reasonable corporate resources decision. . . ." The court would go one step further and add that not just "some" but **all** would view such a production change as a reasonable corporate resource decision. What were Inmax Holding's other options? Continue to export through Inmax at 39.95%?

*Id.*, at 1372-73 {emphasis in original}.  The Court concluded that Inmax made a "reasonable corporate resource decision" and gave no credence to Commerce's unreasonable and unsubstantiated conclusions of manipulation and evasion.

As summarized in the CIT's decisions, it is perfectly normal for production and exportation to flow from a company with high AD duties to a company with low AD duties. Likewise, it is normal for production and exportation to flow from a country (China) with high

GOV0002557

AD duties to a country (Cambodia) with low AD duties.  TRLED's observations on Commerce's imposition of high AD and CVD duties on hardwood plywood from China and on the physical location of LB Wood's production facilities in Cambodia indicate only that Respondents had a motive and opportunity to produce hardwood plywood in Cambodia.  These facts allow no conclusion, much less amount to substantial evidence, of transshipment of Chinese plywood through Cambodia to the United States.

    **B.**    **CBP's Visit on the Occasion of an Unrelated Proceeding Cannot Establish Substantial Evidence of Evasion in EAPA Inv. 7321.**

        **1.**    **TRLED's Reliance on CBP's June 6, 2018 Visit to LB Wood's Facilities.**

As discussed above in the section on the procedural history and facts of this case, TRLED also claimed in its Initiation Notice that the evidence contained in its September 12, 2019 memorandum provided evidence of IGF and APPI's evasion of the Orders.  *See* Initiation Notice at 8-9.  TRLED continued to rely on these documents as substantial evidence in its Final Determination.  *See* Final Det. at 6-7 & 10.  However, these "tidbits" of information from this source, undisclosed to IGF and APPI, collected one full year before the initiation of EAPA Inv. 7321, made in an unknown context in an unknown CBP inquiry or review or investigation with an unknown result cannot stand as substantial evidence for EAPA Inv. 7321.  First, a fundamental principle of finding substantial evidence is that it must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the {agency's} decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {its} view.'"  *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 161 (1983) (*quoting Universal Camera*, 340 U.S.

PR 002558

GOV0002558

at 488).

Here, TRLED did not put the whole record of its mystery proceeding on the record of EAPA 7321 for TRLED, Respondents, or any other party or a court to judge whether TRLED's tidbits of information gleaned from the unrelated case can even serve as a basis for substantial evidence of TRLED's conclusions in that case, much less in EAPA Inv. 7321. Further, as noted above in the procedural history and facts section of this brief, TRLED's understanding of what type of proceeding the CBP agent's statements pertain to and the identification of the parties to that case are contradictory or even wrong. TRLED claims in its Initiation Notice that CBP's visit was made in the context of a GSP review of preferential tariff treatment for Cambodian plywood, but claims in its Final Determination that the agent's visit was made during a review of whether Cambodian engineered wood flooring was subject to the antidumping and countervailing duties on *Multilayered Wood Flooring from China*. *Compare* Initiation Notice at 8 *with* Final Det. at 12. Further, TRLED also claims in its Initiation Notice that the documents contained in its Sept. 13 and Sept. 16 Memos pertain to documentation concerning both LB Wood and Happy Home. Initiation Notice at 8. These memoranda, however, make no mention of LB Wood. *See* Sept. 13, 2019 Memo and Sept. 16, 2019 Memo. As stated above, Respondents unequivocally contest any relevancy or truth vis-à-vis Respondents of alleged statements from an unidentified CBP agent in a murky context that has nothing to do with TRLED's instant investigation.

Specifically, the only information that is disclosed to Respondents from CBP's Sept. 12, 2019 Memo regarding a site visit to LB Wood on June 6, 2018 is an email exchange between two undisclosed parties from July 2019, more than a year after the agent's visit. *See* CBP Sept. 12, 2019 Memo. Notably, the July 26, 2019 exchange clarifies that "{v}eneers are significantly

15

GOV0002559

different products from plywood, so, when made into plywood, a substantial transformation

takes place, and where the plywood is made is the c/o {country of origin}." Since the record of

this case proves that LB Wood imported only veneer from China, EAPA Inv. 7321 must be

concluded with a finding of no evasion.

Nevertheless, TRLED relies heavily on statements included in a July 18, 2019 email,

presumably from CBP's agent, concerning her recollections a year later on what she observed

during her *ex parte* site visit to LB Wood on June 6, 2018 in the context of some other inquiry.

*See* Final Det. at 6-7. The agent appears to refer to pictures taken on June 6, 2018, referring to

some machine that was small, broken into pieces, and covered in dust. Respondents note here

that CBP's agent was visiting an operating plywood manufacturing plant, which manufactures

with wood, including sawing, sanding, and finishing operations, and which generates mountains

of dust during these operations. Also, the machine is not identified, and Respondents cannot

assess whether the machine was being installed, in pieces for cleaning, or in its normal state for

operation. Further, Respondents unequivocally reject the agent's and TRLED's conclusory

statement, without proof or corroborating sources, that "Cambodian factories lack the

sophistication to produce plywood that is even, without veneer overlaps, gaps, and voids." Final

Det. at 6; CBP Sept. 12, 2019 Memo.

## 2. The Record of this Instant Investigations Disproves the Observations and Conclusions Contained in CBP's Sept. 12, 2019 Memo.

Indeed, LB Wood's Cambodian operations as presented on the record of this instant

investigation prove that its plywood factory is capable of producing plywood in the quantity and

quality required by its U.S. customers. Both IGF and APPI visited LB Wood in 2018 to ensure

the integrity of LB Wood's operations. *See* APPI Qre Rsp. at 3-4 and Ex. 4, documenting

APPI's visit to LB Wood in October 2018; and IGF Qre Rsp. at 3-4 & Ex. 2, documenting IGF's

16

GOV0002560

visits to LB Wood in March, July, and December, 2018.  During these visits, Respondents were able to ascertain that no finished plywood was shipped from China, and that LB Wood's production processes and facilities had the capacity and sophistication to produce plywood in the quantity and quality that Respondents required.  The photographs that LB Wood provided to TRLED show a sophisticated, fully operational plywood manufacturing plant.  *See* LB Wood Qre Rsp. at Ex. 14; APPI Qre Rsp. at 3-4 and Ex. 4, documenting APPI's visit to LB Wood in October 2018; *and* IGF Qre Rsp. at 3-4 & Ex. 2, documenting IGF's visits to LB Wood in March, July, and December, 2018; *see also* LB Wood Ex. 15 & 16, showing the company's factory layout and production instructions, as discussed above.

Respondents provided TRLED with this evidence of LB Wood's production capabilities and processes in full expectation that TRLED would fully verify the information in an on-site verification of Respondents' questionnaire responses.  Yet, in its final determination analysis, TRLED makes no mention of this evidence concerning the quantity and quality of LB Wood's production process.  Regarding LB Wood's production capacity, TRLED remarks only that LB Wood's production manager would have a "significant incentive for bias," and that the company's "productions figures are unreliable when they originate from company personnel estimates and lack substantiating evidence."  Final Det. at 7; *but see* LB Wood Qre Rsp. at Ex. 14 and LB Wood Supp. Qre Rsp. at Ex. SQ1-2 (production reports) and SQ1-12 (raw material consumption calculation).  To repeat, LB Wood provided this documentation in full expectation that TRLED would conduct an in-depth and thorough on-site verification of its production facilities and books and records.  LB Wood had zero incentive to insert any bias into its statements to TRLED.

Notably, TRLED provides not one iota of evidence that substantiates the agent's

17

GOV0002561

observations on the sophistication and production capacity of LB Wood's plywood factory. In its written argument submitted before TRLED's Final Determination, Respondents sharply called into question the procedural propriety of using such an *ex parte* account in this instant proceeding, considering that Respondents do not know what CBP's agent was looking at or how the agent came to the false conclusion that LB Wood's facilities, machinery, and labor force were too unsophisticated to produce the finished plywood that the CBP agent observed on the companies' premises. *See* Resp. Case Br. at 17-19. Rather than disclose further details that could substantiate the veracity of any of the statements of the agent, TRLED maintains that further details or corroboration is not necessary because "[   ]'s position as CBP's [       ] for wood products utilizes her subject matter expertise on wood products. This position carries with it the ability to make authoritative pronouncements pertaining to whether wood products are in or out of scope." Final Det. at 6, note 45. Holding forth such conclusory remarks as substantial evidence is unacceptable.

A "position" cannot impart ability or expertise to the holder of that position. Only the position-holder's own education, experience, cognitive ability, research, corroboration, reliance on outside sources, objectivity, and attention to detail can contribute to the authority of conclusions made from the agent's observations. But even attributes such as education and experience are of little value if the opportunity for observation, investigation, and evidence collection are not sufficiently extensive to come to an authoritative conclusion regarding the questions asked. This is the situation here. CBP's agent provides no specific information that could lend credibility to her conclusions based on a brief visual inspection of one of two LB Wood factories. TRLED did not explain further the difference between "sophisticated" equipment and "unsophisticated" production equipment. For instance, based on the photographs

PR 002562

GOV0002562

of its production facilities that LB Wood, IGF, and APPI provided in their questionnaire responses in this investigation, what are the features of that equipment that enable LB Wood to produce hardwood plywood in the quantity and quality required by its U.S. customers?  *See* LB Wood Qre Rsp. at Ex. 14, APPI Qre Rsp. at Ex. 4, and IGF Qre Rsp. at Ex. 2.  What makes the equipment sophisticated or unsophisticated?  Further, was LB Wood provided a reasonable opportunity to arrange for its own translator and its legal counsel to be present for the visit?  Did the agent give LB Wood prior notice of its visit and time to prepare?  Did CBP's agent review documents?  Did she research the process and equipment required for the production of plywood during and after her visit?  What objective, scholarly sources did she use to corroborate her conclusions?  Where are the citations to such sources?  What documents establish the agent's ability to assess LB Wood's machinery operations or the production capacity of LB Wood's production facilities?  *See also* Respondents' Case Br. at 17-20.

CBP's agent also observed finished plywood made from temperate wood that she believed was of Chinese origin.  Final Det. at 6.  Indeed, the record of this case confirms that [                                        ] for LB Wood's veneer.  *See* LB Wood Qre Rsp. at Ex. 12.1 and 12.2 for documentation of LB Wood's veneer purchases.  Any conclusion, however, that LB Wood's *plywood* was manufactured in China or that Chinese plywood was co-mingled with Cambodian-origin plywood is simply entirely unsubstantiated.  Final Det. at 10.

As discussed, CBP's documentation included in its Sept. 12, 2019 memorandum does not even meet the requirements of substantial evidence in the proceeding in which they were generated because the full record of that proceeding remains undisclosed and cannot be reviewed.  TRLED's reliance on these documents also violates the essential elements of procedural due process.  "The essence of procedural due process is fair play; hence, the

19

GOV0002563

fundamental due process requirement 'is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965))." *Patrick v. Miller*, 953 F.2d 1240, 1244 (10th Cir. 1992). *See also* Resp. Case Br. at 22-30 concerning procedural due process concerns, including the opportunity to retain legal counsel at an early stage of the proceedings, the need for a translator at all site visits, and protective orders for access to confidential information.

TRLED's conclusions in EAPA Inv. 7321 are not based on substantial evidence; they violate the principles of due process and cannot stand.

### C.     TRLED's Analyses and Conclusions Regarding Respondents' Sales Records are Flawed and Without Merit.

TRLED reviewed several of Respondents' sales packages in detail, four concerning IGF purchases and two concerning APPI's purchases. Final Det. at 9-10. Respondents contend that TRLED's alleged inconsistencies are either no discrepancy at all or else can be explained by the circumstances of the transaction. TRLED commented that for each of the reviewed transactions, TRLED was unable to tie LB Wood's production records to its raw material records. *Id*. at 10. TRLED's comment is without merit because it fails to consider normal manufacturing practices. For manufacturing operations such as LB Wood's production of plywood, an exact match of raw material purchases to specific production runs is not possible because companies, including LB Wood, maintain inventory of most raw materials since their customers normally order generic products that share common raw materials. LB Wood imports a good portion of its raw materials, and LB Wood cannot plan raw material purchases only after receiving each order and still guarantee a timely delivery. Thus, LB Wood does not purchase raw materials according to each individual order, but rather maintains inventory of its raw materials, and the company has

GOV0002564

no means of tying each production run to specific raw material purchases.  This is common in the manufacturing industry unless the purchase order concerns a highly customized product.  LB Wood's plywood shipments are not of highly customized merchandise.  In antidumping proceedings, Commerce regularly accepts a reasonable allocation methodology of raw materials to subject merchandise.  *See, e.g.*, *Myland Indus., Ltd. v. United States*, 31 Ct. Int'l Trade 1696, 1703 (U.S. 2007) ("Before Commerce uses a respondent's cost allocation methodology, Commerce must ensure that the reported costs capture all of the costs incurred by the respondent in producing the subject merchandise.").

TRLED also alleged that in every reviewed transaction, the manufacturing dates did not match LB Wood's production dates.  Final Det. at 9.  This allegation is discussed below separately for each reviewed transaction.

### 1.  IGF Entry 6164.

IGF entered the merchandise included in this sale into the United States as Entry No.

[                                                          ].  IGF Qre Rsp. at Ex. 16.  LB Wood's sales documents for this transaction are found in LB Wood's initial questionnaire response at Exhibit 1, sales [

].  For this sale, TRLED's only complaint is that the CARB manufacturing dates are

[                    ] LB Wood's production documents dates.  *See* Final Det. at 9; LB Wood Supp. Qre Rsp. at Ex. SQ1-2; and IGF Supp. Qre Rsp. at Ex. SQ1-4.  As shown in IGF's and LB Wood's documents, LB Wood's CARB certificates are always specific to the customer's order and the lot number of the production run.  LB Wood Supp. Qre Rsp. at Ex. SQ1-2; and IGF Supp. Qre Rsp. at Ex. SQ1-4.

Generally, the manufacturing dates on the CARB certificates either overlap or differ only slightly from the complete production run because the manufacturer randomly selects board samples during production and sends them to the testing company.  In this case, the CARB

GOV0002565

manufacturing dates are recorded as [                    ], whereas production began [

                    ].  LB Wood Supp. Qre Rsp. at Ex.

SQ1-2; and IGF Supp. Qre Rsp. at Ex. SQ1-4.  The reason is that in [              ], LB Wood

was running its production at full capacity, and the CARB testing could sometimes be arranged

only very close to the scheduled shipping date. If LB Wood picked samples during the

production of that order, not be enough time would remain for the testing company to finish the

testing and issue its CARB certificate before shipping because LB Wood must mail the sample

boards to a certified testing company in China, and the testing takes a certain amount of time.  In

such instances, LB Wood selects the materials (veneers and glue) for the production of the order,

produces sample boards, and sends these for testing before the scheduled production of the full

order begins.  In the case of IGF Entry 6164, the manufacturing date on the CARB certificate is

the manufacturing date of the sample boards, which is slightly before the production of the full

order. There is no instance of CARB failure on the record re LB Wood's production.

### 2.  IGF Entry 7576.

IGF entered the merchandise included in this sale into the United States as Entry No.

[                                    ].  IGF Qre Rsp. at Ex. 16.  LB Wood's sales documents

for this transaction are found in LB Wood's initial questionnaire response at Exhibit 1, sales [

      ].  For this sale, TRLED again claims that the CARB certificate does not match LB

Wood's production dates. Final Det. at 9.  The manufacturing dates in the documentation,

however, overlap; the CARB certificates bear the manufacturing dates of [

      ], and the production dates of the order are [                    ].  LB Wood Supp. Qre

Rsp. at Ex. SQ1-2; and IGF Supp. Qre Rsp. at Ex. SQ1-4.  It is thus clear, that the sample boards

were prepared for testing at the beginning of production, and were tested during production; but

LB Wood's entire production process, including quality control and packing, extended beyond

GOV0002566

the production of the sample boards.

In addition, CBP claims that the amount of merchandise packaged and shipped for this sale was greater than the production amount. This circumstance arises because LB Wood sometimes manufactures more plywood of a specific type and dimensions than is needed to fill a particular customer order so as to maximize the use of its production capacity. The additional plywood that is not needed for the purchase order at the end of production is then put back into inventory as finished goods. Such finished plywood can then be used to fill a later order, such as here, and would not appear in the production amount of a particular production run. This practice is also common when manufacturing generic merchandise such as plywood and cannot be held as a deficiency in LB Wood's production records.

### 3. IGF Entry 8194.

IGF entered the merchandise included in this sale into the United States as Entry No.

[                                      ]. IGF Qre Rsp. at Ex. 16. LB Wood's sales documents for this transaction are found in LB Wood's initial questionnaire response at Exhibit 1, sales [

]. For this sale, TRLED's only complaint is again that the CARB manufacturing dates are

[                    ] LB Wood's production documents dates. The CARB manufacturing dates are recorded as [                                      ], whereas production ran from [

]. *See* Final Det. at 9; LB Wood Supp. Qre Rsp. at Ex. SQ1-2; and IGF Supp. Qre Rsp. at Ex. SQ1-4. The explanation for the difference in dates is the same as that provided above for Entry No. 6164. Due to the number of customer orders, and with LB Wood's manufacturing plant running at capacity, LB Wood set aside the raw materials for the production run of this order and prepared its sample boards for testing before actual production for the order.

### 4. IGF 8376 Entry.

IGF entered the merchandise included in this sale into the United States as Entry No.

GOV0002567

[                                              ].  IGF Qre Rsp. at Ex. 16.  LB Wood's sales documents for this transaction are found in LB Wood's initial questionnaire response at Exhibit 1, sales [           ].  The CARB manufacturing dates for this sale are recorded as [                       ], and production for the order ran from [                              ].  *See* Final Det. at 9; LB Wood Supp. Qre Rsp. at Ex. SQ1-2; and IGF Supp. Qre Rsp. at Ex. SQ1-4.  As can be seen from the production documentation, the CARB manufacturing dates of the sample boards overlap with the production dates of the entire order.  The CARB manufacturing dates reflect the dates the boards for sample testing were manufactured, whereas the production dates cover the entire order.

      CBP also states that the date on the bill of lading ("B/L") that IGF provided does not match the B/L that LB Wood provided.  Final Det. at 9.  In this case, only IGF provided the actual B/L, dated [              ].  The document that LB Wood provided, on the other hand is a "sea waybill," and is dated [              ].  A sea waybill is also known as an "express release bill of lading" or "straight bill of lading" and is used when the shipper decides to release ownership of the cargo immediately. This means that the goods can be delivered to the person identified in the document, and they will simply have to verify his or her identity instead of presenting a document to claim the freight.  The sea waybill only plays an evidentiary function and does not give title to the goods (nonnegotiable), as in this case.  The sea waybill that LB Wood provided in this case functioned as a confirmation copy between LB Wood and the shipping agent (a "COPY" mark on the sea waybill can be seen) for LB Wood to review the information on the B/L, such as shipper, consignee, notify party, goods description, and quantity, to ensure that the information is correct.  Thus, the different dates on IGF's B/L and LB Wood's sea waybill is not a discrepancy.  These are two different documents.

PR 002568

GOV0002568

### 5. APPI Entry 5163.

APPI entered the merchandise included in this sale into the United States as Entry No.

[                                    ].  APPI Qre Rsp. at Ex. 17.  LB Wood's sales documents for

this transaction are found in LB Wood's initial questionnaire response at Exhibit 1, sale [    ].

The CARB manufacturing date for this sale is recorded as [                ], and production for

the order ran from [                    ].  *See* Final Det. at 9; LB Wood Supp. Qre Rsp. at Ex.

SQ1-2; and APPI Supp. Qre Rsp. at Ex. SQ1-7.  As discussed above, sometimes when LB

Wood's production is arranged very close to the shipping date, in order to ensure that the

shipping date can be honored, LB Wood will lock the materials for production and produce

sample boards for CARB testing. The manufacturing date on the CARB certification is the date

the sample boards were produced.

For this entry CBP also noted that the vessel identified on the entry summary and B/L

that APPI provided did not match the vessel on the B/L that LB Wood submitted. Namely, the

entry summary and B/L that APPI provided show [                    ], (*i.e.*, voyage or "v."

[      ]), as the importing carrier, whereas LB Wood's records identify [            ] as the

vessel on the B/L.  ORR may be able to find the voyage details for each of these shipment stages,

and may find that [            ] left Sihanoukville on [                ] and arrived at Tanjung

Pelepas, MY on [                ].  Such information may show that the ship's route covered only

the ports of Yantian, CN, Ho Chi Minh City, VN, Sihanoukville, and Tanjung Pelepas.  [

                    ], on the other hand, may have stopped at several Chinese ports, including Yantian

on [                ], and then proceeded to the Panama Canal and [                ].  It would

thus be clear that [            ] ran only a feeder voyage around Southeast Asia, and LB Wood's

25

GOV0002569

containers were reloaded onto the vessel [        ] in SE Asia to make the trans-Pacific voyage. Important is that B/L numbers on the two bills of lading and the entry summary are the same, and the container numbers for LB Wood's shipment of merchandise as listed on the packing list and two B/L's are identical. Respondents suggest that ORR also consult Maersk's website at https://www.maersk.com/local-information/asia-pacific-feeder-shipping-routes, where ORR may find that Maersk runs several Intra-Asian feeder routes such as that [        ] may have run on [              ]. In other words, the shipping route for this shipment of LB Wood's merchandise, using an initial feeder voyage for the first leg of the journey and then reloading the containers onto a different vessel for the trans-oceanic route is a common method of combining containers bound for the same overseas port on a single vessel. This is not a discrepancy.

### 6. APPI Entry 1600.

APPI entered the merchandise included in this sale into the United States as Entry No. [                      ]. APPI Qre Rsp. at Ex. 17. LB Wood's sales documents for this transaction are found in LB Wood's initial questionnaire response at Exhibit 1, sale no. [    ]. The CARB manufacturing dates for this sale are recorded as [              ], and production for the order ran from [                  ]. *See* Final Det. at 9; LB Wood Supp. Qre Rsp. at Ex. SQ1-2; and APPI Supp. Qre Rsp. at Ex. SQ1-7. Thus, the sample boards for CARB testing were prepared during the production run, and no discrepancy in the production dates is present for this sales package.

CBP also notes that APPI's purchase order lists [        ] under the "routing" column. In its supplemental questionnaire response, APPI explained that this routing designation was a clerical error. APPI Supp. Qre Rsp at 6. TRLED argues, however, that LBW's suppliers are also located in [        ] {Respondents believe that this is the meaning of TRLED's observation

GOV0002570

that: "CBP noticed that LB Wood's [        ] suppliers [        ] as well."} *See* Final Det. at 9

and note 77, referring to LB Wood's imports of raw materials listed in Ex. 12.1. The record

confirms, on the other hand, that APPI's purchase order was sent to LB Wood in Cambodia, and

the plywood was exported from Cambodia, not China. Respondents believe that TRLED must

accept that sometimes preparers of documents make mistakes and clerical errors occur. For

instance, on this very same page 9 of its determination, TRLED makes a clerical error in footnote

75 in referring to LB Wood's Exhibit SQ1-7, when the reference should be in fact to APPI's

Exhibit SQ1-7. Respondents have pointed out other errors in TRLED's final determination, and

no good cause exists for TRLED not to accept that the designation of [        ] on APPI's

purchase order was a clerical error. All other documentation for this transaction confirms that

APPI sent its purchase order to LB Wood in Cambodia, where the plywood was produced, and

from where it was shipped for import into the United States.

 Finally, TRLED notes the LB Wood's production records show that the [        ]

stage of production for this lot was completed on [        ] {Respondents

believe this is the meaning of [        ] on p. 9 of TRLED's final determination, in the next-to-

last sentence} and packaging was later that the invoice and packing list date of [        ].

Final Det. at 9. The merchandise was not shipped, however, until [        ]. *See* LB

Wood Qre Rsp. at Ex. 1. The fact that the final production stage and packaging dates are later

than the invoice date is not a "discrepancy." The date on the invoice is the date on which the

sales person prepared the invoice. Even if the goods have not been packed, LB Wood's packing

method in this instance was pre-determined. The sales person knew all details on how many

plywood pieces would be packed on one pallet and how many pallets fit into one container,

which is a routine process. No mandatory rule exists prohibiting a sales person from preparing

PR 002571

GOV0002571

an invoice and packing list earlier than the final stages of production and packaging if he or she already possesses all necessary information that must be included on the invoice.

In conclusion, none of TRLED's discrepancy allegations concerning Respondents' production and sales documentation are valid.  TRLED's allegations discussed above do not support a finding of transshipment of Chinese plywood through Cambodia for import into the United States or a finding of Respondents' evasion of the Orders.

### D.    The Trade Data on the Record of This Investigation is Unreliable.

In its case brief, Respondents demonstrated that the trade data that the Coalition and TRLED put on the record, and upon which TRLED relied in its Initiation Notice is unreliable. *See* Coalition re: Request for an Investigation of U.S. Global Forest, Inc. Under the Enforce and Protect Act (May 10, 2019) at 8-9 and Ex. 5 (UN FAOStat Forestry Yearbook 2016); Ex. 6 (Chinese Export Statistics); and Ex. 7, (USITC Data); and CBP Memorandum, Adding Information to the Administrative Record of EAPA Cons. Case 7321, 2017 Forestry Yearbook (Jan. 9, 2020).  *See also* Initiation Notice at 2-6 and Resp. Case Br. at 5-8.  For instance, Respondents pointed out that "based on the Forestry Yearbook, in 2017, Cambodia's total plywood exports to the world is only 4,000 cubic meters, but the U.S. alone imported 20,452 cubic meters according to the ITC data.  Further, the purported Chinese Export Statistics[2] show that China exported 106,267 cubic meters of plywood to Cambodia in 2017, while the total Cambodian imports of plywood from the whole world was only 70,000 cubic meters.  With respect to the 2018 data, the Coalition's Exhibit 6 shows that China exported 1,137,071 cubic meters of plywood to the U.S., while the Coalition's Exhibit 7 shows the U.S. only imported 181,288 cubic meters of plywood from China."  Resp. Case Br. at 7-8.

---

[2] The Coalition's Chinese Export Statistics provided no source citation.

GOV0002572

In its Final Determination, TRLED remained steadfast, in particular, in clinging to its Cambodian production data, which show total production of plywood in both 2016 and 2017 as 27,000CBM.  TRLED stated:

> With reference to the Cambodian figures, the Importers and Manufacturers argue that the figures are unreliable, not contemporaneous, and therefore, should be dismissed.[135] CBP notes that the Forestry Yearbook is a publication of the Food and Agriculture Organization of the United Nations (FAO) and obtains most of its information from government replies to its questionnaires.[136] Whether some of its figures are identical to Chinese export statistics or United States' import statistics does not necessarily indicate unreliability but rather another data source. Because the FAO's Forestry Yearbook sources its production figures directly from the Cambodian government, and the Cambodian government possesses the expertise and geographic proximity to most efficiently collect Cambodian plywood production figures, the figures are authoritative and reliable for our investigation's purposes.

Final Det. at 16.

Regarding the official nature of the Cambodian statistics, Respondents suggest that ORR consult the UN FAOStat online database, which normally includes a descriptive flag on the source of the published figures.  ORR may find that the 2016 Cambodia plywood production data were unofficial, and the production figures for 2017 and 2018 are flagged as simply repeated from 2016.  In addition, ORR may find that all of the Cambodian import and export data for 2016-2018 are unofficial figures.  Should ORR decide to properly and fairly attempt to corroborate the Cambodian trade data, he or she will see that these statistics cannot be the basis for concluding that LB Wood could not have produced plywood in its recorded quantity.  Such generic information, and in particular fatally flawed trade data, can never serve as an indictment of an individual company's production and sales practice.  CBP cannot rely on this data as substantial evidence of evasion.

Moreover, the trade courts do not condone an agency's refusal to consider conflicting information in its determinations.  In *Solar World Ams.*, for instance, the U.S. Court of Appeals

GOV0002573

for the Federal Circuit overturned Commerce's antidumping administrative review decision in

*Crystalline Silicon Photovoltaic Cells from China*, where Commerce found the Thai import data

published by the Global Trade Atlas (GTA) reliable even though it did not reconcile with other

data placed on the record. *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir.

2020).  The Court of Appeal stated:

> Commerce has also failed to explain how the Thai GTA data can be reconciled
> with data from the United States International Trade Commission's ("ITC")
> Dataweb website, which records exports from the United States to other countries.
> …
> The ITC data and the Thai GTA data cannot both be correct, as Commerce
> appears to admit. Commerce has not explained why the Thai GTA data is a more
> accurate record of these transactions than the ITC data, admitting that it "just
> do[es]n't know" which is accurate. …
>
> [] Commerce's preference for GTA data does not excuse its failure to reconcile
> the admitted inconsistency.

*See id.*, 962 F.3d 1351, 1358 (internal citation omitted).

**V.    CONCLUSION**

For the reasons set forth above, Respondents submit that TRLED has not met its burden

to establish, based on substantial evidence and taking into account all that detracts from that

evidence, that Respondents IGF or APPI evaded the Hardwood Plywood AD/CVD orders by

transshipping covered merchandise to the United States through Cambodia.  Accordingly,

Respondents request that ORR reverse TRLED's determination of evasion, terminate the

investigations, and order CBP to liquidate the affected entries without regard to AD/CVD duties.

Respectfully Submitted,
/s/ Gregory S. Menegaz

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
*Counsel to Interglobal Forest LLC and*
*American Pacific Plywood, Inc.*

August 10, 2020

30

Public Document No. 102

PR 002575

GOV0002575

LAW OFFICES OF

## deKIEFFER & HORGAN, PLLC
1090 VERMONT AVENUE, N.W.
SUITE 410
WASHINGTON, D.C. 20005

GREGORY S. MENEGAZ                AFFILIATED OFFICE:              GMENEGAZ@DHLAW.COM
TEL 202-783-6900                  SAARBRÜCKEN, GERMANY                      DHLAW.COM

August 10, 2020

ELECTRONIC FILING BY EMAIL:                    EAPA Investigation No. 7321
eapafad@cbp.dhs.gov                            (Certain Hardwood Plywood)
                                               POI: June 5, 2018 Onwards
Office of Trade
Regulations and Rulings                        **PUBLIC VERSION**
Penalties Branch
U.S. Customs and Border Protection             Business Proprietary information
                                               contained within brackets deleted on
                                               pages 2, 11, 18, 19, 21-24 and in Att. 1.


**RE:    EAPA Con. Case No. 7321 – Request for Administrative Review**


Dear Office of Trade, Regulations & Rulings,

On behalf of LB Wood (Cambodia) Co., Ltd. ("LB Wood" or "Respondent"), a

Cambodian producer of hardwood plywood and interested party pursuant to 19 C.F.R. § 165.1,

we hereby request an administrative review in accordance with 19 U.S.C. § 1517(f) and 19 CFR

§ 165.41 of U.S. Customs and Border Protection ("CBP"), Trade Remedy & Law Enforcement

Directorate's ("TRLED') initial determination as to evasion in EAPA Inv. 7321.

LB Wood's address is Building No. D44-20, Sihanoukville Special Economic Zone,

Cambodia; and its contact email is: lbwood@yahoo.com.

We are submitting a confidential version and a public version of Respondents' request in

accordance with 19 C.F.R. § 165.26.

\*        \*        \*

In accordance with 19 C.F.R. § 165.4, Respondents request confidential treatment of the information contained herein as business confidential and commercial data that is proprietary to Respondents and their suppliers, service providers, and customers.  The information contained in this request to CBP that is marked confidential has never been released in any manner to a person who is not an employee or in a confidential relationship with the companies.  The confidential information is not commonly known within the industry or readily ascertainable by outside persons with a minimum of time and effort.  Disclosure of this information would cause substantial competitive and commercial harm to Respondents and their suppliers, service providers, and customers.  The confidential information in this request for administrative review is enclosed in brackets ("[ ]") to indicate the confidential nature of the information contained herein.

Specifically, this submission contains the following confidential information:

| Page | Reason for Confidential Treatment |
|---|---|
| Pages 2, 18-19 | Details on Respondent's recollection of CBP's visit on in a proceeding unrelated to EAPA Inv. 7321 and not available to the general public. |
| Page 11 | Details on Respondent's legal structure and operations that are not available to the general public |
| Pages 21, 22 | Details on Respondents' business operations that are not available to the general public |
| Pages 23, 24 | Details on Respondent's books and records that are not available to the general public |

Accordingly, for the above reasons, Respondents requests confidential treatment of the information enclosed in brackets ("[ ]") that are deleted in the public version.

Please contact the undersigned if you have any questions regarding the information

2

included in this submission.

Very truly yours,

*/s/ Gregory S. Menegaz*

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
DEKIEFFER & HORGAN, PLLC
1090 Vermont Ave., NW
Suite 410
Washington, D.C.  20005
202-783-6900

3

PR 002578

GOV0002578

### *ATTORNEY CERTIFICATION*

I, **Gregory S. Menegaz,** with **deKieffer & Horgan,** Counsel to LB Wood (Cambodia) Co., Ltd., Cambodian Happy Home Wood Products Co., Ltd., Interglobal Forest LLC, American Pacific Plywood, Inc., and U.S. Global Forest, Inc., certify the following:

(i)     All statements in this submission (and any attachments) are accurate and true to the best of my knowledge and belief.

(ii)    Any information for which I have not requested business confidential treatment pursuant to 19 CFR 165.4(a), may be released for public consumption.

(iii)   I will advise CBP promptly of any knowledge of or reason to ·suspect that the covered merchandise poses any health or safety risk to U.S. consumers pursuant to 19 C.F.R. 165.7(a).

*Signature:*

*Date:*  August 10, 2020

GOV0002579

**Table of Contents**

I.     PROCEDURAL HISTORY AND FACTS OF THE CASE, 19 C.F.R. § 165.41(F)(3). .......................1

II.    STANDARD OF REVIEW ......................................................................................8

       A.    De novo Review, 19 U.S.C. § 1517(f)(1); 19 CFR § 165.45...................................8

       B.    Substantial Evidence. ..................................................................................8

III.   SUMMARY OF ARGUMENT...................................................................................9

IV.    ARGUMENT .....................................................................................................11

       A.  LB Wood Had Motive and Opportunity to Produce Hardwood Plywood in
           Cambodia. ..................................................................................................11

       B.  CBP's Visit on the Occasion of an Unrelated Proceeding Cannot Establish
           Substantial Evidence of Evasion in EAPA Inv. 7321 .................................14

           1.   TRLED's Reliance on CBP's June 6, 2018 Visit to LB Wood's Facilities...........14

           2.   The Record of this Instant Investigations Disproves the Observations and
                Conclusions Contained in CBP's Sept. 12, 2019 Memo. ......................................17

       C.  TRLED's Analysis Regarding LB Wood's Production Records is Flawed, and
           TRLED's Conclusions are Without Merit. ....................................................22

           1.   Involvement of LB Wood's Shareholder in the Company's Production and
                Sales. ..................................................................................................22

           2.   Reconciliation of LB Wood's Payroll Sheets. ........................................................23

           3.   Reconciliation of LB Wood's Warehouse-In Tickets, Warehouse-Out
                Tickets, Inventory, and Production Quantities. ......................................................25

       D.  The Trade Data on the Record of This Investigation is Unreliable. ............................26

V.     CONCLUSION....................................................................................................28

PR 002580

GOV0002580

**Table of Authorities**

## CASES

*A. L. Patterson, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ................................... 7, 8-9

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .......................................15

*Armstrong v. Manzo*, 380 U.S. 545; 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965) ...............................21

*Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ...............13

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) ................................................8

*Dickinson v. Zurko*, 527 U.S. 150; 144 L. Ed. 2d 143 (1999) ........................................................8

*Diversified Products Corp. v. United States*, 6 C.I.T. 155 (1983)................................................15

*Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357 (Fed. Cir. 2006) ................................................ 8-9

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ..............................................9

*Huvis Corp. v. United States*, 570 F.3d 1347 (Fed. Cir. 2009) ........................................................9

*Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017)............................ 13-14

*JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011)......................................................8

*Mathews v. Eldridge*, 424 U.S. 319; 47 L. Ed. 2d 18; 96 S. Ct. 893 (1976) ...............................21

*Patrick v. Miller*, 953 F.2d 1240 (10th Cir. 1992)........................................................................21

*SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020).....................................28

*Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978 (Fed. Cir. 1994) .........9

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .........................................................9, 15

*USX Corp. v. United States*, 11 C.I.T. 82 (1987)............................................................................9

PR 002581

GOV0002581

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................................8

19 U.S.C. § 1517(f)........................................................................................1, 8

**REGULATIONS**

19 CFR § 165.41 ...........................................................................................1

19 CFR § 165.44 ...........................................................................................8

19 CFR § 165.45 ...........................................................................................8

**ADMINISTRATIVE DECISIONS**

*Certain Hardwood Plywood from the People's Republic of China: Antidumping Order*, 83 Fed. Reg. 504 (Dept. Commerce, Jan. 4, 2018)..............................................................1

*Certain Hardwood Plywood from the People's Republic of China: Countervailing Duty Order*, 83 Fed. Reg. 513 (Jan. 4, 2018) ......................................................................1

PR 002582

GOV0002582

**REQUEST FOR ADMINISTRATIVE REVIEW**

This request for review pursuant to 19 U.S.C. § 1517(f) and 19 CFR § 165.41 of U.S. Customs and Border Protection ("CBP"), Trade Remedy & Law Enforcement Directorate's ("TRLED') initial determination as to evasion in EAPA Inv. 7321 is filed on behalf of LB Wood (Cambodia) Co., Ltd. ("LB Wood" or "Respondent"), a Cambodian producer of hardwood plywood.

## I.    PROCEDURAL HISTORY AND FACTS OF THE CASE, 19 C.F.R. § 165.41(F)(3).

On April 12, 2019 and May 1, 2019, the Coalition for Fair Trade of Hardwood Plywood (the "Coalition") submitted to CBP allegations that two U.S. importers, Interglobal Forest LLC ("IGF") and American Pacific Plywood, Inc. ("APPI"), had entered hardwood plywood manufactured by LB Wood in Cambodia and were evading the antidumping and countervailing orders on hardwood plywood from China[1] by transshipping Chinese hardwood plywood through Cambodia for import into the United States.  *See* TRLED, Notice of Determination as to Evasion (June 29, 2020) at 1-2, note 2 ("Final Det.").  On June 5, 2019, TRLED acknowledged receipt of the evasion allegations to the Coalition, and on June 26, 2019, TRLED initiated EAPA investigations 7321 and 7323 against IGF and APPI as well as EAPA Inv. 7327 against a third U.S. importer, U.S. Global Forest, Inc. ("USG").  For the next three months, TRLED conducted its secret investigation against IGF and APPI.  On October 1, 2019, TRLED informed IGF and APPI that during its secret investigation, TRLED had developed a record giving rise to a "reasonable suspicion" of evasion of the Orders by the Respondents and consolidating EAPA investigations 7323 and 7327 with EAPA Inv. 7321.  *See* TRLED, Notice of Initiation of

---

[1] *See Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 504 (January 4, 2018) (AD order); *see also Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 513 (January 4, 2018) (CVD order) (collectively, the "Orders").

1

GOV0002583

*PUBLIC VERSION*

Investigation and Interim Measures – EAPA Cons. Case 7321 (Oct. 1, 2019) ("Initiation Notice").  As the title suggests, TRLED also imposed interim measures on the Respondents by suspending liquidation of Respondents' entries of hardwood plywood from Cambodia, rate-adjusting these entries as subject to the Orders and cash deposits imposed on hardwood plywood from China as of June 26, 2019, and extending the liquidation period for unliquidated entries before June 26, 2019.

After TRLED released its Initiation Notice, on October 2, 2019, TRLED released to Respondents the letters from the Coalition alleging Respondents' evasion of the Orders, and the public version of a document:  CBP Memorandum, "Adding Certain Documents to the Administrative Record (Sept. 12, 2019) ("Sept. 12, 2019 Memo"). The documents in this memorandum concern a June 6, 2018 site visit that CBP personnel conducted at LB Wood's production facilities in Cambodia.  As noted, the visit of CBP's agent took place one year before TRLED initiated EAPA Inv. 7321 in June 2019, and as revealed in TRLED's initiation notice and final determination, the agent's visit had nothing to do with EAPA 7321.  *See* Initiation Notice at 8 and Final Det. at 12.  LB Wood recalls that the agent's visit [

] about LB Wood's plywood production.  LB Wood does not know whether details on its discussion with CBP's agent is on the record of this case, since TRLED's public version of the visit that TRLED made available to Respondents does not include the agent's original report.

In its allegations against IGF and APPI, the Coalition claimed that Chinese exports of hardwood plywood to the U.S. decreased from 2017 to 2018, and Chinese exports of hardwood plywood to Cambodia and Cambodian exports of hardwood plywood to the U.S. increased during the same period of time.  The Coalition therefore inferred and alleged that Chinese-origin

2

GOV0002584

plywood had been transshipped through Cambodia to the United States. *See* Coalition Ltr. concerning IGF re: Request for an Investigation under the Enforce and Protect Act (May 1, 2019) at 8-10 and Coalition Ltr. concerning APPI re: Request for an Investigation under the Enforce and Protect Act (May 1, 2019) at 8-10. With respect to importer-specific allegations, the Coalition alleged that IGF and APPI sourced its plywood from LB Wood, a Cambodian company located in a special Economic Zone, which "was purposefully designed to link Chinese and Cambodian trading partners and facilitate the global dissemination of their products." *Id.* at 10-12.

In its Initiation Notice, TRLED based its conclusion of a reasonable suspicion of evasion partly on the trade data that the Coalition put on the record of this case and the Coalition's claim that LB Wood, IGF, and APPI had motive and opportunity to evade the Orders due to the high cash deposits on U.S. imports of hardwood plywood from China and LB Wood's location in Cambodia's Sihanoukville Special Economic Zone ("SSEZ"). *See* Initiation Notice at 6.

TRLED also claimed in its Initiation Notice that the evidence contained in its Sept. 12, 2019 memorandum provided additional evidence of IGF's and APPI's evasion of the Orders. *See* Initiation Notice at 8-9. The documents included in CBP's Sept. 12, 2019 memo show, however, that they have nothing to do with IGF or APPI or EAPA Inv. 7321. In its Initiation Notice, TRLED claims that the documents were created in the context of a review of preferential tariff treatment for Cambodian plywood under the Generalized System of Preferences ("GSP"). *Id.* at 8. They were also created well before the Coalition submitted its first allegations against IGF and APPI in April and May 2019. *See id.* at 2, note 7, listing the Coalition's allegation submissions against IGF and APPI and CBP Sept. 12, 2019 Memo. TRLED also incorrectly claims in its Initiation Notice that documents contained in two additional CBP memoranda

PR 002585

GOV0002585

pertain to documentation concerning both LB Wood and Happy Home.  Initiation Notice at 8;
*compare* CBP Memorandum, "Adding Certain Documents to the Administrative Record" (Sept.
13, 2019) ("Sept. 13, 2019 Memo") and CBP Memorandum, "Adding Certain Documents to the
Administrative Record" (Sept. 16, 2019 Memo).  These memoranda, however, make no mention
of LB Wood.  *See* Sept. 13, 2019 Memo and Sept. 16, 2019 Memo.  TRLED has not explained
this discrepancy.

The actual context in which the documents contained in CBP's September 2019
memoranda also remains unclear.  Whereas in its Initiation Notice, TRLED claims that the
documentation was created in the context of a GSP review of Cambodian plywood, TRLED
claims in its Final Determination that the documentation was generated in a review of whether
Cambodian engineered wood flooring was subject to the antidumping and countervailing duties
on *Multilayered Wood Flooring from China*.  *Compare* Initiation Notice at 8 *with* Final Det. at
12.  TRLED has not explained this discrepancy.  In any case, the context, parties, and statements
upon which TRLED drew its initial and final conclusions in EAPA 7321 remain completely
unknown to Respondents.  Respondents vehemently contest any relevancy or truth vis-à-vis
Respondents of alleged statements from an unidentified person in a murky context that has
nothing to do with TRLED's instant investigation.

After TRLED's Initiation Notice, TRLED issued questionnaires to IGF, APPI, and LB
Wood, to which Respondents responded in detail, providing TRLED with all documents
requested concerning LB Wood's purchases of raw materials, production process, sales to IGF
and APPI, and IGF's and APPI's sales transactions with LB Wood and their own U.S.
customers.  *See* LB Wood Questionnaire Response to Initial Request for Information (Nov. 8,
2019) ("LB Wood Qre Rsp."); LB Wood Response to Supplemental Request for Information

4

GOV0002586

(Dec. 16, 2019) ("LB Wood Supp. Qre Rsp."), IGF Questionnaire Response to Initial Request for Information (Oct. 28, 2019) ("IGF Qre Rsp."); IGF Response to Supplemental Request for Information (Dec. 16, 2019) ("IGF Supp. Qre Rsp."), APPI Questionnaire Response to Initial Request for Information (Oct. 28, 2019) ("APPI Qre Rsp."); APPI Response to Supplemental Request for Information (Dec. 9, 2019) ("APPI Supp. Qre Rsp.").  TRLED issued no further questionnaires to Respondents, and Respondents believed they had fully complied with TRLED's requirements for submission of information.

After receiving these questionnaire responses, TRLED initially scheduled verification at LB Wood's manufacturing facilities in Cambodia for February 17-22, 2020.  On February 11, 2020, TRLED postponed its verification of LB Wood due to the Corona Virus outbreak ("COVID-19"), first in China and then in the U.S.  TRLED finally cancelled verification altogether due to travel restrictions and health risks associated with COVID-19.  On May 14, 2020, Respondents IGF, APPI, and LB Wood, together with the other respondents in EAPA Inv. 7321, Cambodian Happy Home Wood Products Co., Ltd. and U.S. Global Forest, Inc., submitted written arguments, and the Coalition submitted a response to the written arguments on May 29, 2020.  *See* TRLED Email, "EAPA 7321 - Extension of the Written Arguments Deadline" (Feb. 11, 2020); *See* Letter from TRLED, "Notice of Extension of Final Determination" (Feb. 11, 20200; Email from TRLED, "RE: EAPA 7321 - Extension of the Written Arguments Deadline" (May 8, 2020); Letter from Respondents, "EAPA Con. Case No. 7321 – Respondents' Written Arguments" (May 14, 2020) ("Resp. Case Brief"); Coalition Ltr.  "EAPA Investigation No. 7321: Rebuttal Comments" (May 29, 2020).

Most notably, during the five months between Respondents' last questionnaire response on December 16, 2019 and Respondents' submission of written argument, TRLED asked no

PR 002587

GOV0002587

further questions of Respondents nor indicated in any way that TRLED found discrepancies in Respondents' questionnaire responses. TRLED's failure to seek further information is inexplicable in light of TRLED's evident need to prepare for verification. Later, during the months of January through May 2020, it became increasingly obvious that verification would necessarily be cancelled due to travel restrictions for U.S. citizens and Government officials. TRLED could have, and should have, carried out its verification agenda with requests for reconciliation packages from Respondents. As it turns out, TRLED attempted to carry out its own reconciliations resulting in conclusions of little value because TRLED did not ask for Respondents' input. *See* Final Det. at 8-10 & 13-15. For Respondents' part, they prepared their questionnaire responses in full knowledge that TRLED intended to verify their responses through an on-site verification in Cambodia. Respondents therefore carefully and truthfully prepared all responses in light of the anticipated verification of these responses.

In their written argument, submitted to TRLED on May 14, 2020 as a case brief, Respondents showed that the trade information that the Coalition and TRLED put on the record was inconsistent and unreliable and *not specific* to Respondents. *See* Resp. Case Brief. at 5-8. Further, observations by the Coalition and TRLED of Respondents' motive and opportunity to move production of hardwood plywood from China to Cambodia was immaterial without specific instances of transshipment by Respondents, which the record could not support. *See id.* at 8-11. Respondents then set forth the record evidence showing that the Cambodian producers LB Wood and Happy Home produced all of the plywood shipped to the United States at their production facilities in Cambodia. *Id.* at 11-15. Respondents also pointed out in their case brief that TRLED's reliance on the documents included in CBP's September 2019 memoranda could not even support a reasonable suspicion of evasion. *Id.* at 15-20. Finally, Respondents pointed

PR 002588

GOV0002588

out TRLED's procedural irregularities in administering the EAPA law in this case, including the lack of transparency and defense opportunities for Respondents due to TRLED's reliance on secret documents in its decision to initiate EAPA Inv. 7321 and impose punitive interim measures on Respondents. *Id*. at 20-30.

In its Final Determination, TRLED found that "substantial evidence indicates that InterGlobal's, American Pacific's, and U.S. Global's imports were entered through evasion, . . .." Final Det. at 5. As discussed below, TRLED's understanding of what constitutes "substantial evidence" is, however, apparently deficient. TRLED cites only a portion of the discussion on substantial evidence in the 2014 decision of the U.S. Court of Appeals for the Federal Circuit in *A. L. Patterson:* "the Federal Circuit has stated that 'substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. at note 32, *citing A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781-82 (Fed. Cir. 2014). Respondents provide below the full quotation from the Federal Circuit's decision in *A.L. Patterson*, which begins with the observation that substantial evidence must be more than a mere scintilla and based on the record as a whole, not just on an agency official's subjective "reasonable mind."

As it did in its Initiation Notice, TRLED relied on Respondents' motive and opportunity as well as TRLED's and the Coalition's trade statistics and CBP's three September 2019 secret memoranda as substantial evidence of Respondent's evasion of the Orders. Final Det. at 10-12 & 15-17. TRLED could not however point to even one instance of actual transshipment of Chinese plywood through LB Wood to IGF and APPI in the United States. Regarding Respondents' record evidence of production and sales of Cambodian plywood, TRLED reviewed four entries of LB Wood's merchandise imported by IGF and two entries imported by APPI and

7

claimed that inconsistencies in Respondents' records made Respondents' documents unreliable. *Id.* at 13-15.

## II.    STANDARD OF REVIEW

### A.  De novo Review, 19 U.S.C. § 1517(f)(1); 19 CFR § 165.45.

According to the *A.L. Patterson* decision cited above "{w}e review the Court of International Trade's decisions concerning Commerce's scope determinations de novo, 'stepping into its shoes and applying the same standard of review.' *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011). We thus hold unlawful any determination found 'to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law.' 19 U.S.C. § 1516a(b)(1)(B)(i)." *A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781 (Fed. Cir. 2014).

In addition to a de novo administrative review of TRLED's application of the law by CBP's Office of Rules & Regulations ("ORR"), the administrative review can also encompass a de novo review of TRLED's fact-finding, including new factual information that ORR may request from the parties.  19 CFR § 165.44.

### B.  Substantial Evidence.

As mentioned above, the Federal Circuit's consideration of what constitutes "substantial evidence" is much more discerning than merely consideration of what CBP's agents' subjective minds might consider "adequate."

> "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). . . .. While respecting agency expertise, the Supreme Court "has stressed the importance of not simply rubber-stamping agency fact-finding." *Dickinson v. Zurko*, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999). Our review "requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Falko-Gunter*

PR 002590

GOV0002590

*Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78, 71 S. Ct. 456, 95 L. Ed. 456 (1951).

*A. L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781-82 (Fed. Cir. 2014).

Moreover, the agency's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 C.I.T. 82, 84 (1987). The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Universal Camera*, 340 U.S. at 487). Further, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009) *quoting Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).*

In this investigation, the Coalition and CBP bear a burden of proof to establish, based on substantial evidence, that Respondents transshipped covered merchandise from China through Cambodia and on to the United States. Respondents submit that such burden has not been met on this record, as explained more fully below.

## III.    SUMMARY OF ARGUMENT

1.    TRLED's reliance on trade data, the business operation adjustments that companies in general make in light of trade cases against particular products from particular countries, and the location of LB Wood's production facilities cannot serve as a basis for substantial evidence. Substantial evidence must be specific to Respondents and link Respondents with the alleged act of transshipment to evade the Orders. TRLED has provided no

9

GOV0002591

*PUBLIC VERSION*

evidence in any instance in which LB Wood transshipped hardwood plywood from China to Cambodia for import into the United States in order to evade the Orders. TRLED's general and generic observations and comments on trade data, the effect of the Orders, and factory location are not specific as to evasion and do not link Respondents with the alleged evasion and cannot serve as a foundation for substantial evidence.

2.  TRLED's reliance on undisclosed statements from CBP's agent in an *ex parte* meeting concerning a proceeding unrelated to EAPA Inv. 7321 cannot be considered substantial evidence for any determination in EAPA 7321. Respondents unequivocally deny the relevance and veracity of such statements and conclusions vis-à-vis Respondents and this instant investigation. The undisclosed statements are taken out of context of the unrelated proceeding, and TRLED's rendition of such statements are unintelligible to Respondents. TRLED's use of this information seriously violates such due process principles as full disclosure, transparency and Respondents' right to be heard and defend against the agency's allegations.

3.  The alleged discrepancies that TRLED found in its review of Respondents' books and records are incorrect, irrelevant, or of a nature that cannot discredit the overall reliability of Respondents' production and sales records. Most significantly, TRLED found no evidence of transshipment of Chinese plywood in Respondents' records. Respondents responded to all of TRLED's questions completely and truthfully in the expectation that CBP officials would verify their responses at an on-site verification in Cambodia of LB Wood's manufacturing processes and equipment as well as Respondents' production and sales records. TRLED's analyses of Respondents' documentation cannot serve as a basis for establishing substantial evidence of evasion of the Orders against Respondents.

PR 002592

GOV0002592

IV.    ARGUMENT

    **A.    LB Wood Had Motive and Opportunity to Produce Hardwood Plywood in Cambodia.**

LB Wood is owned by a [          ] entity, [

        ]. *See* LB Wood Qre Rsp. at 4-8 & Ex. 2.  LB Wood was first registered

in [          ] and started producing plywood in [          ]. *See* LB Wood Supp.

Qre. Rsp. at 3.  As is typical for a start-up company, LB Wood's [

        ]. *See* Final Det. at 7; LB Wood Qre Rsp. at 6 & Ex. 2.

    As TRLED indicates in its final determination, LB Wood sources [

        ].  Final Det. at 3; LB Wood Qre Rsp. at 2 and Ex. 12.1 & 12.2.  For raw materials

imported into Cambodia from [          ], LB Wood submitted [

        ]. *See* LB Wood Qre Rsp. at Ex. 12.1.  LB Wood also provided warehouse-in tickets

for inventory of its imported raw material purchases.  *See* LB Wood Supp. Qre Rsp. at Ex. SQ1-

1.  For veneers sourced locally, LB Wood submitted [

        ]. *See* LB Wood Qre Rsp. at Ex. 12.2.  TRLED also notes that LB Wood's

production facilities are located in the Sihanoukville Special Economic Zone, which is near

PR 002593

GOV0002593

Cambodia's only deep-water port, which facilitates LB Wood's access to imported raw materials. TRLED's observation is an obvious one - access to a deep-water port facilitates trade in goods, not only in Cambodia, but is also characteristic of the growth of industrial centers along the coasts of the United States and most other countries throughout history. *See* Final Det. at 6.

TRLED also correctly notes that Commerce's imposition of the Orders and attendant cash deposits on Chinese hardwood plywood provided a business opportunity for LB Wood's owner to establish a plywood factory in Cambodia. Final Det. at 5. This fact establishes only that the Chinese plywood industry is embroiled in uncertainty and turmoil caused by the trade cases against Chinese plywood, and LB Wood took advantage of this situation to profitably produce plywood in Cambodia and sell the finished merchandise to the United States. Indeed, Cambodia has experienced unprecedented growth generally over the past few years, fueled by foreign investment and exports, as is the case specifically for plywood. For insights into Cambodia's overall economic growth, Respondents suggest that ORR consult the World Bank's reports on Cambodia, available at https://www.worldbank.org/en/country/cambodia/publication/cambodia-economic-monitor-reports.

Indeed, TRLED's observations on LB Wood's motives and opportunities to produce plywood in Cambodia and export its finished merchandise to the U.S. do not amount to any evidence whatsoever that LB Wood is shipping finished plywood from China to the United States. The fact that manufacturers and traders generally take advantage of profitable business opportunities is acknowledged in court decisions of the U.S. Court of International Trade. *See* discussion in Respondents' Case Brief at 8-9.

12

GOV0002594

In a recent case decided by the U.S. Court of International Trade (CIT), in the context of a circumvention inquiry of minor alterations before the Department the Commerce, the Court held that export and import data alone is not sufficient for Commerce to initiate a minor alternation circumvention inquiry. *See Columbia Forest Prods. v. United States*, 399 F. Supp. 3d 1283, 1295 (Ct. Int'l Trade 2019) ("The court acknowledges that evidence demonstrates that, since the initiation of the {Antidumping and Countervailing Duty} investigation, import volumes of plywood with both veneers of softwood increased drastically…. Although a substitution effect may be indicative of circumvention, it is not a sufficient cause for Commerce to initiate a minor alternations inquiry."). After the AD and CVD Orders were imposed on plywood from China, any reasonable business person would start purchasing plywood from other countries with lower tariffs and taxes, such as Cambodia, as a substitute for Chinese plywood.

The CIT has also recognized that production and exports naturally flow to companies with lower AD tax rate burdens. *See Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017). By extension, production and exports also naturally flow to countries with lower AD tax rate burdens and lower tariffs in general. In *Inmax SDN*, two affiliated Malaysian steel nails producers received very different AD rates because Commerce refused to collapse them in the first instance. *Id.*, at 1369. The affiliates' parent holding company then issued a public statement explaining that Inmax will continue export activities only from the company with the lower AD rate. The U.S. industry thereupon requested that Commerce conduct a Changed Circumstances Review ("CCR"), allegedly to prevent the Inmax companies from evading AD duties, to which Commerce agreed. *Id.*, at 1370. The CIT overturned Commerce's CCR determination and criticized Commerce's underlying rationale that production and export by companies with low AD rates necessarily constitutes evasion of AD duties:

PR 002595

GOV0002595

> Commerce found that the Inmax companies did not illegally co-mingle subject merchandise in their exports, and that their parent publicly, and transparently, communicated a change in their export behavior due to the differing assigned rates. Commerce does acknowledge that "this avoidance could be seen by some as a reasonable corporate resources decision. . . ." The court would go one step further and add that not just "some" but **all** would view such a production change as a reasonable corporate resource decision. What were Inmax Holding's other options? Continue to export through Inmax at 39.95%?

*Id.*, at 1372-73 {emphasis in original}.  The Court gave no credence to Commerce's unreasonable and unsubstantiated conclusions of manipulation and evasion.

As summarized in the CIT's decisions, it is perfectly normal for production and exportation to flow from a company with high AD duties to a company with low AD duties. Likewise, it is normal for production and exportation to flow from a country (China) with high AD duties to a country (Cambodia) with low AD duties.  TRLED's observations on Commerce's imposition of high AD and CVD duties on hardwood plywood from China and on the physical location of LB Wood's production facilities in Cambodia indicate only that Respondents had a motive and opportunity to produce hardwood plywood in Cambodia.  These facts allow no conclusion, much less amount to substantial evidence, of transshipment of Chinese plywood through Cambodia to the United States.

### B.    CBP's Visit on the Occasion of an Unrelated Proceeding Cannot Establish Substantial Evidence of Evasion in EAPA Inv. 7321.

#### 1.   TRLED's Reliance on CBP's June 6, 2018 Visit to LB Wood's Facilities.

As discussed above in the section on the procedural history and facts of this case, TRLED also claimed in its Initiation Notice that the evidence contained in its September 12, 2019 memorandum provided evidence of IGF and APPI's evasion of the Orders.  *See* Initiation Notice at 8-9.  TRLED continued to rely on these documents as substantial evidence in its Final Determination.  *See* Final Det. at 6-7 & 10.  However, these "tidbits" of information from this

14

GOV0002596

source's undisclosed report, collected one full year before the initiation of EAPA Inv. 7321, made in an unknown context in an unknown CBP inquiry or review or investigation with an unknown result cannot stand as substantial evidence for EAPA Inv. 7321.  First, a fundamental principle of finding substantial evidence is that it must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the {agency's} decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {its} view.'"  *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 161 (1983) (*quoting Universal Camera*, 340 U.S. at 488).

Here, TRLED did not put the whole record of its mystery proceeding on the record of EAPA 7321 for TRLED, Respondents, or any other party or a court to judge whether TRLED's tidbits of information gleaned from the unrelated case can even serve as a basis for substantial evidence of TRLED's conclusions in that case, much less in EAPA Inv. 7321.  Further, as noted above in the procedural history and facts section of this brief, TRLED's understanding of what type of proceeding the CBP agent's statements pertain to and the identification of the parties to that case are contradictory or even wrong.  As noted above, TRLED claims in its Initiation Notice that CBP's visit was made in the context of a GSP review of preferential tariff treatment for Cambodian plywood, but claims in its Final Determination that the agent's visit was made during a review of whether Cambodian engineered wood flooring was subject to the antidumping and countervailing duties on *Multilayered Wood Flooring from China*.  *Compare* Initiation Notice at 8 *with* Final Det. at 12.  Further, TRLED also claims in its Initiation Notice that the documents contained in its Sept. 13 and Sept. 16 Memos pertain to documentation concerning

15

GOV0002597

both LB Wood and Happy Home. Initiation Notice at 8. These memoranda, however, make no mention of LB Wood. *See* Sept. 13, 2019 Memo and Sept. 16, 2019 Memo. As stated above, Respondents unequivocally contest any relevancy or truth vis-à-vis Respondents of alleged statements from an unidentified CBP agent in a murky context that has nothing to do with TRLED's instant investigation.

Specifically, the only information that is disclosed to Respondents from CBP's Sept. 12, 2019 Memo regarding a site visit to LB Wood on June 6, 2018 is an email exchange between two undisclosed parties from July 2019, more than a year after the agent's visit. *See* CBP Sept. 12, 2019 Memo. Notably, the July 26, 2019 exchange clarifies that "{v}eneers are significantly different products from plywood, so, when made into plywood, a substantial transformation takes place, and where the plywood is made is the c/o {country of origin}." Since the record of this case proves that LB Wood imported only veneer from China, EAPA Inv. 7321 must be concluded with a finding of no evasion.

Nevertheless, TRLED relies heavily on statements included in a July 18, 2019 email, presumably from CBP's agent recalling a year later what she observed on her site visit to LB Wood on June 6, 2018 in the context of some other inquiry. *See* Final Det. at 6-7. The agent appears to refer to pictures taken on June 6, 2018, referring to a machine that was "small, broken into multiple pieces, and covered in a thick layer of dust." Respondents note here that CBP's agent was visiting an operating plywood manufacturing plant, which manufactures with wood, including sawing, sanding, and finishing operations, and which generates mountains of dust during these operations. As the machine is not identified in the version of CBP's Sept. 12, 2019 Memo released to Respondents, Respondents cannot identify such machine with certainty. As discussed below, however, LB Wood has some recollection of

PR 002598

GOV0002598

this visit.  In any event, Respondents unequivocally reject the agent's and TRLED's conclusory

statement, without proof or corroborating sources, that "Cambodian factories lack the

sophistication to produce plywood that is even, without veneer overlaps, gaps, and voids".  Final

Det. at 6; CBP Sept. 12, 2019 Memo.  Indeed, TRLED's conclusion is self-contradictory as the

Chinese ownership and management of the plant and operations is, at the same time, being held

against LB Wood.

>    **2.   The Record of this Instant Investigation Disproves the Observations and
>         Conclusions Contained in CBP's Sept. 12, 2019 Memo.**

Indeed, LB Wood's Cambodian operations as presented on the record of this instant

investigation prove that its plywood factory is capable of producing plywood in the quantity and

quality required by its U.S. customers.  The photographs that LB Wood provided to TRLED

show a sophisticated, fully operational plywood manufacturing plant.  *See* LB Wood Qre Rsp. at

Ex. 14; *see also* LB Wood Ex. 15 & 16, showing the company's factory layout and production

instructions; *see also* APPI Qre Rsp. at 3-4 and Ex. 4, documenting APPI's visit to LB Wood in

October 2018; and IGF Qre Rsp. at 3-4 & Ex. 2, documenting IGF's visits to LB Wood in

March, July, and December, 2018.  LB Wood provided TRLED with evidence of its production

capabilities and processes in full expectation that TRLED would fully verify the information in

an on-site verification of LB Wood's questionnaire responses.  Yet, in its final determination

analysis, TRLED makes no mention of this evidence of the quantity and quality of its production

process.  Regarding LB Wood's production capacity, TRLED remarks only that LB Wood's

production manager would have a "significant incentive for bias," and that the company's

"productions figures are unreliable when they originate from company personnel estimates and

lack substantiating evidence."  Final Det. at 7; *but see* LB Wood Qre Rsp. at Ex. 14 and LB

Wood Supp. Qre Rsp. at Ex. SQ1-2 (production reports) and SQ1-12 (raw material consumption

GOV0002599

*PUBLIC VERSION*

calculation). To repeat, LB Wood provided this documentation in full expectation that TRLED would conduct an in-depth and thorough on-site verification of its production facilities and books and records. LB Wood had zero incentive to insert any bias into its statements to TRLED.

Notably, TRLED provides not one iota of evidence that substantiates the agent's observations on the sophistication and production capacity of LB Wood's plywood factory. In its written argument submitted before TRLED's Final Determination, Respondents sharply called into question the procedural propriety of using such an account in this instant proceeding, considering that Respondents have no idea what CBP's agent was looking at or how the agent came to the false and superficial conclusion that LB Wood's facilities, machinery, and labor force were too unsophisticated to produce the finished plywood that the CBP agent observed on the companies' premises. *See* Resp. Case Br. at 17-19. As mentioned above, LB Wood recalls CBP's agent's visit on June 6, 2019, and requests that ORR accept LB Wood's statements below for the record of this case. Indeed, LB Wood's recollections may even already be part of the confidential record that was not made available to Respondents. In any event, CBP's agent's statements were made on the occasion of an *ex parte* visit to LB Wood, with no other witnesses to the visit than LB Wood representatives and employees. It is inappropriate for TRLED to rely on any *ex parte* meetings with the targeted exporter for its final determinations (much less to solely rely upon them to initiate cases). TRLED has deprived Respondents of any reasonable opportunity to defend the allegations, and TRLED has opened the door for misinterpretations, as is clearly evidenced in this case.

LB Wood recalls that [

PR 002600

GOV0002600

*PUBLIC VERSION*

], and LB Wood does not know why the agent would come to this conclusion, because the agent's statement is not true.  LB Wood's [

], but if CBP agent believed that [                                    ]," she is mistaken.  Regardless, a brief visit to a plywood production facility in full production can never serve as substantial evidence of transshipment; yet TRLED appears to have placed enormous weight on the agent's observations during that unannounced plant visit or her later recollections of same.  Moreover, TRLED unlawfully flipped the burden of proof onto LB Wood by rejecting LB Wood's uncontroverted statements concerning its machine capacity to manufacture plywood and instead placing weight on unsubstantiated speculation by the agent with respect to a single machine in the plant.

Rather than disclose further details that could substantiate the veracity of any of the statements of the CBP agent, TRLED maintains that further details or corroboration are not necessary because "[  ]'s position as CBP's [        ] for wood products utilizes her subject

PR 002601

GOV0002601

matter expertise on wood products. This position carries with it the ability to make authoritative pronouncements pertaining to whether wood products are in or out of scope." Final Det. at 6, note 45. Holding forth such conclusory remarks as substantial evidence is unacceptable.

A "position" cannot impart ability or expertise to the holder of that position. Only the position-holder's own education, experience, cognitive ability, research, corroboration, reliance on outside sources, objectivity, and attention to detail can contribute to the authority of conclusions made from the agent's observations. But even attributes such as education and experience are of little value if the opportunity for observation, investigation, and evidence collection are not sufficiently extensive to come to an authoritative conclusion regarding the questions asked. This is the situation here. CBP's agent provides no specific information that could lend credibility to her conclusions. TRLED did not explain further the difference between "sophisticated" equipment and "non-sophisticated" production equipment. For instance, based on the photographs of its production facilities that LB Wood provided in its questionnaire response in this investigation, what are the features of that equipment that enable LB Wood to produce hardwood plywood in the quantity and quality required by its U.S. customers? *See* LB Wood Qre Rsp. at Ex. 14. What makes the equipment sophisticated or un-sophisticated? CBP's agent provided no such analysis. Further, was LB Wood provided a reasonable opportunity to arrange for its own translator and its legal counsel to be present for the visit? Did the agent give LB Wood prior notice of its visit and time to prepare? Did CBP's agent review documents? Did she research the process and equipment required for the production of plywood during and after her visit? What objective, scholarly sources did she use to corroborate her conclusions? Where are the citations to such sources? What documents establish the agent's ability to assess LB Wood's machinery operations or the production capacity of LB Wood's production facilities?

20

GOV0002602

*See also* Respondents' Case Br. at 17-20.

CBP's agent also observed finished plywood made from temperate wood that she believed was of Chinese origin.  Final Det. at 6.  Indeed, the record of this instant investigation confirms that [                                        ] for LB Wood's veneer.  *See* LB Wood Qre Rsp. at Ex. 12.1 and 12.2 for documentation of LB Wood's veneer purchases.  Any conclusion, however, that LB Wood's *plywood* was manufactured in China or that Chinese plywood was co-mingled with Cambodian-origin plywood is simply unsubstantiated.  Final Det. at 10.

As discussed, CBP's documentation included in its Sept. 12, 2019 memorandum does not even meet the requirements of substantial evidence in the proceeding in which they were generated because the full record of that proceeding remains undisclosed and cannot be reviewed.  TRLED's reliance on these documents also violates the essential elements of procedural due process.  "The essence of procedural due process is fair play; hence, the fundamental due process requirement 'is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965))." *Patrick v. Miller*, 953 F.2d 1240, 1244 (10th Cir. 1992).  *See also* Resp. Case Br. at 22-30 concerning procedural due process concerns, including the opportunity to retain legal counsel at an early stage of the proceedings, the need for a translator at all site visits, and protective orders for access to confidential information.

TRLED's conclusions in EAPA Inv. 7321 are not based on substantial evidence, violate the principles of due process, and cannot stand.

21

**C.     TRLED's Analysis Regarding LB Wood's Production Records is Flawed, and TRLED's Conclusions are Without Merit.**

     **1.     Involvement of LB Wood's Shareholder in the Company's Production and Sales.**

TRLED maintains that LB Wood's statement that its shareholder was not involved in the company's production and sales is not entirely correct.  *See* Final Det. at 7-8; LB Wood Qre Rsp. at 7 & Ex. 2.  First, TRLED notes that LB Wood [

     ].  Final Det. at 7; LB Wood Suppl Qre Rsp at Ex. SQ1-4.  These [                                              ] the beginning of the period of investigation that TRLED set for EAPA Inv. 7321, June 5, 2018. Final Det. at 3.  From June 5, 2018 through the pendency of this investigation, [                                                            ].  As LB Wood clearly stated, however, [

     ] prior to the commencement of this instant investigation.  LB Wood Qre Rsp at 5-6.

     TRLED also claims that [          ] found in IGF's questionnaire response addressed to [                                                ] suggests that LB Wood's shareholder was [                                    ].  *See* Final Det. at 7 and IGF Qre Rsp. at Ex. 16, page 2198.  This [          ] is found in IGF's complete sales documentation of its transactions with LB Wood, comprising [       ] pages.  IGF Qre Rsp. at Ex. 16.  The [

     ].  *Id.* at pp. 2172-2369.  The referenced [

     ].  Similarly, TRLED notes that APPI [

GOV0002604

].  Final Det. at 7 and APPI Qre

Rsp. at pp. 35, 44, 54, 65 &128.  Each of these [

].

### 2.  Reconciliation of LB Wood's Payroll Sheets.

TRLED claims that it noticed some differences between LB Wood's payroll sheets and

the salary payable on the company's balance sheet.  Final Det. at 8; LB Wood Qre Rsp. at Ex.

10.  TRLED then somehow calculated that LB Wood did not employ the number of employees

that it claims to have employed at its production facility in Cambodia.  *Id*. and LB Wood Supp.

Qre Rsp. at SQ1-10 and SQ1-11.  Respondents do not know what figures or exhibit TRLED used

for its calculations, analysis, and conclusion.  *See* Final Det at 8., public version, which is the

only version TRLED made available to Respondents and their legal counsel.  TRLED cites to LB

Wood's Supp. Qre Rsp. at Exhibits SQ1-6 (money transaction worksheets), SQ1-7 (monthly

financial reports), and SQ1-8 (bank journals) as the source for its calculations.  These documents

are not relevant for comparing the monthly payroll figures found on LB Wood's payroll sheets in

LB Wood's Exhibit 10.  Rather, TRLED should have compared the figures found on LB Wood's

monthly payroll sheets with the <u>credit amount</u> ("current credit") of the salary payable account in

LB Wood's monthly trial balances found in LB Wood's Supp. Qre Rsp. at Ex. SQ1-3.  The

balance sheets found in Exhibit SQ1-7 show only the balances at the end of each month.  For

example, the salary payable in the balance sheet for December 2018 is zero because LB Wood

paid out all salary owed, so no balance was left at the end of the month.

LB Wood has attached to this brief as **Attachment 1**, a proper reconciliation of its

payroll sheets to its trial balances.  This reconciliation is based on record evidence submitted in

LB Wood Qre Rsp. at Ex. 10 and LB Wood Supp. Qre Rsp. at Exhibit SQ1-3.  In preparing this

PR 002605

GOV0002605

reconciliation, LB Wood found that the sub-totals on the payroll sheets were [



].  LB Wood's accountants, however, always double check the payroll

sheets to record the correct salary payable. For such cases, LB Wood highlighted the number in

yellow in **Attachment 1**, and created a separate summary sheet to show [

].  The small differences between the payroll sheets and the

credited amount in the trial balances is due to rounding of the figures.  Some months show larger

differences that cannot be attributed to rounding of figures only.  These differences arose

because some workers' wages were prepaid therefore the accountants deducted such a

prepayment when they booked the salary payable.  As shown in **Attachment 1**, the resulting

discrepancy between the wages recorded on LB Wood's payroll sheets and the "payroll payable"

recorded in the column "current credit" on LB Wood's monthly trial balances found in Exhibit

SQ1-3 is less than one percent, hardly enough to be considered a material discrepancy under any

proper understanding of accounting principles; and too small to undermine LB Wood's reporting

of its employee numbers engaged in plywood manufacturing at its Cambodian factory.

Finally, TRLED notes that a few of LB Wood's payroll sheets bear the heading [

].  This is because LB Wood rented an additional workshop from [            ] when LB

Wood expanded its production in October 2018.  Therefore, occasionally LB Wood's HR staff

used that name to identify workers working in [            ] workshop.  All recorded

employees however, were LB Wood's employees, working exclusively for LB Wood, and their

work time was recorded in LB Wood's payroll sheets and accounting ledgers.  Indeed, it is

highly doubtful that CBP looked in that additional workshop yet surmised out of nothing that LB

Wood lacked sufficient capacity.

PR 002606

GOV0002606

### 3. Reconciliation of LB Wood's Warehouse-In Tickets, Warehouse-Out Tickets, Inventory, and Production Quantities.

Regarding LB Wood's consumption of veneer and production quantities, TRLED bracketed key figures and information as confidential, so that Respondent do not know what figures TRLED used for its calculations and conclusions. Final Det. at 8-9. TRLED first stated that it compared LB Wood's warehouse-in tickets and warehouse-out tickets for veneer sheets and found a certain percentage difference. *Id.* at 8; LB Wood Supp. Qre Rsp. at Ex. SQ1-1 & SQ1-2. First, Respondents note that LB Wood submitted its warehouse-in tickets in two exhibits: the warehouse-in tickets for imported core veneers and face/back veneers were submitted in Exhibit SQ1-1, and the warehouse-in tickets for domestically purchased core veneers were submitted in Exhibit 12.2 in LB Wood's initial questionnaire response. TRLED's analysis gives no indication that it included all of the warehouse-in tickets. In addition, LB Wood also purchased logs to rotary-cut core veneers. TRLED provides no explanation as to how it accounted for core veneers cut from logs.

TRLED also admits that "it is uncertain whether the difference is due to existing inventory or whether it is a discrepancy," but TRLED just never asked. LB Wood commenced its plywood production in November 2017. *See* LB Wood Supp. Qre Rsp. at 3. LB Wood, obviously, had existing inventory in order to go into production, several months before the period of investigation began in June 2018. *See* LB Wood Qre Rsp. at Ex. 1, sales summary. Further, as seen in LB Wood's production reports, when LB Wood takes veneer from its inventory, each veneer must be inspected several times during the production process. *See* LB Wood Supp Qre Rsp. at Ex. SQ1-2. Veneer that is defective and cannot be used in a particular ongoing production step, must be put aside for repair at a later time. LB Wood must then substitute such veneer sheets. The defective veneer sheets will then be repaired and either put

25

GOV0002607

back into the same production run or put back into inventory for use in a subsequent production run. LB Wood also always inspects its finished plywood and takes any defective pieces out of the order or repairs such pieces. *See id*. and LB Wood Qre Rsp. at 11 and Ex. 11. LB Wood could have easily explained this aspect of its production process further if TRLED had asked the company. The circumstances explained above are also self-evident, and cannot be used as substantial evidence that LB Wood did not produce all of the plywood it sold to the United States. Certainly, TRLED improperly relied on its own hidden calculations without permitting LB Wood the opportunity to comment on them or correct and clarify them.

### D. The Trade Data on the Record of This Investigation is Unreliable.

In its case brief, Respondents demonstrated that the trade data that the Coalition and TRLED put on the record, and upon which TRLED relied in its Initiation Notice is unreliable. *See* Coalition re: Request for an Investigation of U.S. Global Forest, Inc. Under the Enforce and Protect Act (May 10, 2019) at 8-9 and Ex. 5 (UN FAOStat Forestry Yearbook 2016); Ex. 6 (Chinese Export Statistics); and Ex. 7, (USITC Data); and CBP Memorandum, Adding Information to the Administrative Record of EAPA Cons. Case 7321, 2017 Forestry Yearbook (Jan. 9, 2020). *See also* Initiation Notice at 2-6 and Resp. Case Br. at 5-8. For instance, Respondents pointed out that "based on the Forestry Yearbook, in 2017, Cambodia's total plywood exports to the world is only 4,000 cubic meters, but the U.S. alone imported 20,452 cubic meters according to the ITC data. Further, the purported Chinese Export Statistics[2] show that China exported 106,267 cubic meters of plywood to Cambodia in 2017, while the total Cambodian imports of plywood from the whole world were only 70,000 cubic meters. With respect to the 2018 data, the Coalition's Exhibit 6 shows that China exported 1,137,071 cubic

---

[2] The Coalition's Chinese Export Statistics provided no source citation.

GOV0002608

meters of plywood to the U.S., while the Coalition's Exhibit 7 shows the U.S. only imported

181,288 cubic meters of plywood from China." Resp. Case Br. at 7-8.

In its Final Determination, TRLED remained steadfast, in particular, in clinging to its

Cambodian production data, which show total production of plywood in both 2016 and 2017 as

27,000CBM. TRLED stated:

> With reference to the Cambodian figures, the Importers and Manufacturers argue
> that the figures are unreliable, not contemporaneous, and therefore, should be
> dismissed.[135] CBP notes that the Forestry Yearbook is a publication of the Food
> and Agriculture Organization of the United Nations (FAO) and obtains most of its
> information from government replies to its questionnaires.[136] Whether some of its
> figures are identical to Chinese export statistics or United States' import statistics
> does not necessarily indicate unreliability but rather another data source. Because
> the FAO's Forestry Yearbook sources its production figures directly from the
> Cambodian government, and the Cambodian government possesses the expertise
> and geographic proximity to most efficiently collect Cambodian plywood
> production figures, the figures are authoritative and reliable for our investigation's
> purposes.

Final Det. at 16.

Regarding the official nature of the Cambodian statistics, Respondents suggest that ORR

consult the UN FAOStat online database, which normally includes a descriptive flag on the

source of the published figures. ORR may find that the 2016 Cambodia plywood production

data were unofficial, and the production figures for 2017 and 2018 are flagged as simply

repeated from 2016. In addition, ORR may find that all of the Cambodian import and export

data for 2016-2018 are unofficial figures. Should ORR decide to properly and fairly attempt to

corroborate the Cambodian trade data, ORR will see that these statistics cannot be the basis for

concluding that LB Wood could not have produced plywood in its recorded quantity. Such

generic information, in particular fatally flawed trade data, can never serve as an indictment of

an individual company's production and sales practice. CBP cannot rely on this data as

27

substantial evidence of evasion.

Moreover, the trade courts do not condone an agencies' refusal to consider conflicting information in its determinations.  In *Solar World Ams.*, for instance, the U.S. Court of Appeals for the Federal Circuit overturned Commerce's antidumping administrative review decision in *Crystalline Silicon Photovoltaic Cells from China*, where Commerce found the Thai import data published by the Global Trade Atlas (GTA) reliable even though it did not reconcile with other data placed on the record.  *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020).  The Court of Appeals stated:

> Commerce has also failed to explain how the Thai GTA data can be reconciled with data from the United States International Trade Commission's ("ITC") Dataweb website, which records exports from the United States to other countries. …
>
> The ITC data indicated that about 136 times more nitrogen was exported from the United States into Thailand (roughly 586,305 kg) than the GTA data indicated was imported into Thailand from the United States (4,298 kg). And the ITC data indicated an average unit value for nitrogen of $0.16/kg, as opposed to the GTA value of $11.68/kg.
>
> The ITC data and the Thai GTA data cannot both be correct, as Commerce appears to admit. Commerce has not explained why the Thai GTA data is a more accurate record of these transactions than the ITC data, admitting that it "just do[es]n't know" which is accurate. …
>
> [] Commerce's preference for GTA data does not excuse its failure to reconcile the admitted inconsistency.

*See id.*, 962 F.3d 1351, 1358 (internal citation omitted).

## V.    CONCLUSION

For the reasons set forth above, Respondents submit that CBP has not met its burden to establish, based on substantial evidence and taking into account all that detracts from that evidence, that Respondents LB Wood, IGF, or APPI evaded the Hardwood Plywood AD/CVD orders by transshipping covered merchandise to the United States through Cambodia.

PR 002610

GOV0002610

*PUBLIC VERSION*

Accordingly, Respondents request that ORR reverse TRLED's determination of evasion, terminate the investigations, and order CBP to liquidate the affected entries without regard to AD/CVD duties.

Respectfully Submitted,
/s/ Gregory S. Menegaz

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
*Counsel to LB Wood, IGF, and APPI*

August 10, 2020

PR 002611

GOV0002611

Attachment 1

PR 002612

GOV0002612

Document Not Susceptible to Public Summary

PR 002613

GOV0002613

Public Document No. 103

PR 002614

GOV0002614

# wiley

**PUBLIC DOCUMENT**

August 25, 2020

| HQ Case No. H312952 (EAPA Case No. 7321) |
| Total Pages: 24 |
| **PUBLIC DOCUMENT** |

Mark A. Morgan
Acting Commissioner
Regulations and Rulings
Office of Trade
U.S. Customs and Border Protection
1300 Pennsylvania Avenue NW
Washington, DC 20229

**Re:    *HQ Case No. H312952, EAPA Inv. No. 7321*:** Coalition for Fair Trade in Hardwood Plywood Response to Request for Administrative Review

Dear Acting Commissioner Morgan:

On behalf of the Coalition for Fair Trade in Hardwood Plywood ("Coalition"), we hereby submit the following comments to U.S. Customs and Border Protection ("CBP") in response to the requests filed by LB Wood (Cambodia) Co., Ltd. ("LB Wood"),[1] Cambodian Happy Home Wood Products Co. Ltd. ("Cambodia Happy Home") and U.S. Global Forest, Inc. ("U.S. Global"),[2] and InterGlobal Forest LLC ("InterGlobal Forest") and American Pacific Plywood ("American Pacific")[3] (collectively, Respondents") for an administrative review of the June 29, 2020 determination in Enforce and Protect Act ("EAPA") Cons. Case No. 7321, an investigation

---

[1]       Letter from deKieffer & Horgan, PLLC to Off. Of Trade, Regulations & Rulings, re: *EAPA Con. Case No. 7321 – Request for Administrative Review* (Aug. 10, 2020) ("LB Wood Request").

[2]       Letter from deKieffer & Horgan, PLLC to Off. of Trade, Regulations & Rulings, re: *EAPA Con. Case No. 7321 – Request for Administrative Review* (Aug 10, 2020) ("Cambodian Happy Home & U.S. Global Request").

[3]       Letter from deKieffer & Horgan, PLLC to Off. of Trade, Regulations & Rulings, re: *EAPA Con. Case No. 7321 – Request for Administrative Review* (Aug 10, 2020) ("InterGlobal Forest & American Pacific Request").

---

Wiley Rein LLP  |  1776 K Street NW  |  Washington, DC 20006  |  202.719.7000      **wiley.law**

Director Brian M. Hoxie
August 25, 2020                                                    **PUBLIC DOCUMENT**
Page 2

into hardwood plywood imported into the United States.[4] This submission is timely filed in accordance with 19 C.F.R. § 165.42, no later than ten business days after the August 11, 2020 commencement of this administrative review.

If you have any questions concerning this submission, please do not hesitate to contact the undersigned.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.
John Allen Riggins, Esq.

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

---

[4]      *See* Letter from Brian M. Hoxie, Dir., Enforcement Operations Division, Trade Remedy & Law Enforcement Directorate, CBP Office of Trade to Gregory S. Menegaz & Timothy Brightbill, re: *Notice of Determination as to Evasion* ("Final Determination").

GOV0002616

PUBLIC DOCUMENT

## BEFORE UNITED STATES CUSTOMS AND BORDER PROTECTION

> **INVESTIGATION INTO EVASION OF THE ANTIDUMPING AND COUNTERVAILING DUTY ORDERS ON HARDWOOD PLYWOOD PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA**

**EAPA Case No. 7321**

**(Administrative Review *HQ Case No. H312952*)**
**Total Pages: 22**
**PUBLIC DOCUMENT**

## PETITIONER'S RESPONSE TO REQUEST FOR REVIEW

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.
John Allen Riggins, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000
trade@wileyrein.com

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

August 25, 2020

GOV0002617

PUBLIC DOCUMENT

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................................1

II.   IDENTIFICATION OF PARTIES AND THEIR COUNSEL ...........................1

III.  HISTORY OF THE PROCEEDING AND SUMMARY OF THE FACTS ......................2

IV.   SUMMARY OF ARGUMENT ...............................................................................7

V.    ARGUMENT .............................................................................................................9

      A.    CBP Properly Relied on Shifting Import Trends as Evidence of
            Transshipment ....................................................................................................9

      B.    TRLED Appropriately Relied on CBP's Prior Observations
            Regarding LB Wood's and Cambodian Happy Homes' Lack of
            Production Capabilities ....................................................................................12

      C.    TRLED's Analysis of Respondents' Reporting was Appropriate in
            Light of Observed Inconsistencies .................................................................15

      D.    CBP Should Reject Respondents' Attempts to Introduce New
            Factual Information Not on the Underlying Record .......................................17

VI.   CONCLUSION.........................................................................................................18

PR 002618

GOV0002618

PUBLIC DOCUMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Columbia Forest Prods. v. United States*,
    339 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ..........................................................................10

*Deacero S.A.P.I. De C.V. v. United States*,
    __ F. Supp. 3d __ (Ct. Int'l Trade Apr. 13, 2020) ...............................................................14

*Husteel Co. v. United States*,
    426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ......................................................................14

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)............................................................................................14

*US Magnesium LLC v. United States*,
    70 F. Supp. 3d 1321 (Ct. Int'l Trade 2015) ........................................................................14

**Regulations**

19 C.F.R. § 165.25(a)....................................................................................................................16

19 C.F.R. § 165.41(f)................................................................................................................9, 17

19 C.F.R. § 165.41(f)(2) ................................................................................................................1

19 C.F.R. § 165.42..........................................................................................................................1

**Administrative Materials**

*Certain Hardwood Plywood Products From the People's Republic of China*,
    83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) ................................................................2

*Certain Hardwood Plywood Products From the People's Republic of China*,
    83 Fed. Reg. 513 (Dep't Commerce Jan. 4, 2018) ................................................................2

*Fresh Garlic From the People's Republic of China*, 82 Fed. Reg. 27,230 (Dep't
    Commerce June 14, 2017) ....................................................................................................12

PR 002619

GOV0002619

## I.  <u>INTRODUCTION</u>

On behalf of the Coalition for Fair Trade in Hardwood Plywood ("Coalition"), we hereby submit the following comments to U.S. Customs and Border Protection ("CBP") in response to the requests filed by LB Wood (Cambodia) Co., Ltd. ("LB Wood"),[5] Cambodian Happy Home Wood Products Co. Ltd. ("Cambodia Happy Home") and U.S. Global Forest, Inc. ("U.S. Global"),[6] and InterGlobal Forest LLC ("InterGlobal Forest") and American Pacific Plywood ("American Pacific")[7] (collectively, "Respondents") for an administrative review of the June 29, 2020 determination reached in Enforce and Protect Act ("EAPA") Cons. Case No. 7321, an investigation into hardwood plywood imported into the United States, for the above-referenced EAPA investigation in accordance with 19 C.F.R. § 165.42.[8] CBP has assigned administrative case number HQ Case No. H312952 This submission is timely filed in accordance with 19 C.F.R. § 165.42, no later than ten business days after the August 11, 2020 commencement of this administrative review.

## II.  <u>IDENTIFICATION OF PARTIES AND THEIR COUNSEL</u>

Pursuant to 19 C.F.R. § 165.41(f)(2) through 19 C.F.R. § 165.42, we provide the name, address, and email address of the party responding to Respondents' request for review and its authorized counsel:

---

[5]      Letter from deKieffer & Horgan, PLLC to Off. Of Trade, Regulations & Rulings, re: *EAPA Con. Case No. 7321 – Request for Administrative Review* (Aug. 10, 2020) ("LB Wood Request").

[6]      Letter from deKieffer & Horgan, PLLC to Off. of Trade, Regulations & Rulings, re: *EAPA Con. Case No. 7321 – Request for Administrative Review* (Aug 10, 2020) ("Cambodian Happy Home & U.S. Global Request").

[7]      Letter from deKieffer & Horgan, PLLC to Off. of Trade, Regulations & Rulings, re: *EAPA Con. Case No. 7321 – Request for Administrative Review* (Aug 10, 2020) ("InterGlobal Forest & American Pacific Request").

[8]      *See* Letter from Brian M. Hoxie, Dir., Enforcement Operations Division, Trade Remedy & Law Enforcement Directorate, CBP Office of Trade, to Gregory S. Menegaz & Timothy Brightbill, re: *Notice of Determination as to Evasion* ("Final Determination").

GOV0002620

**Party Responding to Requests for Review**

Coalition for Fair Trade in Hardwood Plywood
42777 Trade West Dr., Sterling, VA 20166
KHowlett@decorativehardwoods.org

**Counsel for the Coalition**

Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.
John Allen Riggins, Esq.

Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
(202) 719-7000
trade@wiley.law

## III.    HISTORY OF THE PROCEEDING AND SUMMARY OF THE FACTS

On January 4, 2018, following an affirmative finding of material injury by the International Trade Commission, the U.S. Department of Commerce ("Department") imposed antidumping and countervailing duties on imports of hardwood plywood from China at dumping rates of 183.36% on all mandatory respondents and separate respondents and subsidy rates of up to 194.90%.[9] On April 12, 2019, the Coalition submitted credible allegations to CBP that InterGlobal Forest and American Pacific were evading the AD/CVD orders on hardwood plywood from China by importing Chinese-made hardwood plywood through Cambodia. On April 15, 2019, the Coalition submitted a similar allegation against U.S. Global. The Coalition submitted revised versions of allegations against these three importers on May 1, 2020, and a

---

[9]    *See Certain Hardwood Plywood Products From the People's Republic of China*, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) (amend. final deter. of sales at less than fair value & antidumping duty order); *Certain Hardwood Plywood Products From the People's Republic of China*, 83 Fed. Reg. 513 (Dep't Commerce Jan. 4, 2018) (countervailing duty order).

GOV0002621

second revised allegation against U.S. Global on May 10, 2019. With respect to its allegations as to InterGlobal Forest, U.S. Global, and American Pacific, the Coalition explained that the scope of the orders on Chinese hardwood plywood applied to Chinese hardwood plywood transshipped through Cambodia, and it was the Coalition's belief that these importers had entered Chinese-made hardwood plywood into the United States as non-subject plywood through Cambodian company LB Wood or Cambodia Happy Home. The Coalition further explained that this amounted to evasion of U.S. AD/CVD duties through transshipment. For InterGlobal Forest, in particular, the Coalition provided evidence that this importer had previously transshipped hardwood plywood from China.

CBP's Trade Remedy Law Enforcement Directorate ("TRLED") acknowledged receipt of these allegations on June 5, 2019 and initiated a formal investigation under Title IV, Section 421 of the Trade Facilitation and Enforcement Act of 2015, *i.e.,* EAPA, against these three importers on June 26, 2019. Upon initiation of these investigations, CBP issued CF-28 questionnaires to each U.S. importer regarding their entries of hardwood plywood. In addition to soliciting further information through these questionnaires, CBP also provided a memorandum in all three investigations detailing CBP's previous visit to Cambodia Happy Home's Cambodian facilities.[10] Specifically, this first-hand testimony from a CBP official described seeing a sophisticated hardwood plywood product, despite Cambodian Happy Home's factory "barely {having} any employees or much manufacturing."[11] While much of this information was

---

[10]    *See* Memorandum re: *Adding Certain Documents to the Administrative Record – EAPA Cases: 7321, 7323, 7327* (Sept. 12, 2019).

[11]    *Id.*

GOV0002622

confidential and redacted from public view, it is clear that crucial equipment was "small, broken up into multiple pieces, and {} covered in a thick layer of dust."[12]

On October 1, 2019, based on record information, CBP issued a notice of initiation of investigation and interim measures and consolidated the three investigations (*i.e.*, EAPA Inv. Nos. 7321, 7323, and 7327).[13]  In support of initiation, CBP noted that trade data trends were consistent with transshipment. That is, following the orders on hardwood plywood from China, shipments from China to the United States decreased, shipments from China to Cambodia increased, and correspondingly, shipments from Cambodia to the United States also increased.[14] Notably, Chinese shipments of hardwood plywood into Cambodia were far greater than the amounts required for Cambodian consumption.[15] Against this background, TRLED recognized that the Importers chose to trade heavily with LB Wood or Cambodia Happy Home, two Cambodian companies located in the Sihanoukville Special Economic Zone ("SSEZ").[16] The SSEZ was designed specifically to facilitate trade between China and Cambodia. Further, CBP recognized the InterGlobal Forest and American Pacific shifted from Chinese suppliers to Cambodian based LB Wood, which had potential connections to Chinese hardwood plywood

---

[12]    *Id.*

[13]    *See* Letter from Regina Walton, Acting Dir., Enf't Operations Division, Trade Remedy & Law Enforcement Directorate, CBP Office of Trade to Counsel and Representatives, re: *Notice of Initiation and Interim Measures – EAPA Cons. Case 7321* (Oct. 1, 2019).

[14]    *See id.* at 6.

[15]    *Id.*

[16]    *See id.*

PR 002623

GOV0002623

PUBLIC DOCUMENT

suppliers.[17] Finally, CBP discussed its prior visit to LB Wood and Cambodian Happy Home, where it recognized suspicious lack of capabilities to produce subject hardwood plywood.[18]

Once these interim measures were in place, CBP issued requests for information from LB Wood, Cambodia Happy Home, InterGlobal Forest, U.S. Global, and American Pacific. Due to the heavily bracketed nature of these responses, Petitioner is not privy to much of the information contained therein. Additionally, while CBP originally intended to verify the Cambodian companies, on May 8, 2020, it informed interested parties that it would be unable to do so.

CBP issued its Notice of Determination as to Evasion on June 29, 2020, determining that "{s}ubstantial evidence demonstrates that the Importers imported certain hardwood plywood products into the United States from {China} through Cambodia and claimed that the merchandise was Cambodian-origin."[19] As such, because the Importers did not indicate that this merchandise was subject to AD/CVD orders upon entry, cash deposits were not properly collected.[20]

CBP specifically found that "{t}he record evidence shows that not only was LB Wood likely established with a goal to avoid paying AD/CVD duties on Chinese plywood, its location in Cambodia helped facilitate such evasion."[21] LB Wood was registered as a Cambodian company shortly after the preliminary antidumping determination.[22] This company also

---

[17]    *Id.*

[18]    *See id.* at 8.

[19]    Final Determination at 1.

[20]    *Id.*

[21]    *Id.* at 5.

[22]    *Id.*

PR 002624

GOV0002624

maintained close ties with companies that "could easily supply LB Wood with Chinese-origin veneers, cores, or plywood."[23] CBP's determination was further corroborated by the account from its June 6, 2018 visit, showing that LB Wood's alleged Cambodian plywood was inconsistent with the company's capabilities.[24] Additionally, LB Wood's responses to CBP's questionnaires "contained various inconsistencies that cast doubt on their overall reliability" and LB Wood did not substantiate production figures based on estimates of its employees.[25] Notably, the information LB Wood provided regarding payroll sheets and financial reports corroborated CBP's prior observations that it likely did not have enough employees to produce the claimed amounts of plywood.[26] CBP also discovered inconsistencies in LB Wood's reported warehouse tickets, production quantities, and documentation proffered. As such, CBP determined that the record evidence suggests that InterGlobal Forest and American Pacific entered LB Wood's Chinese-origin plywood transshipped through Cambodia.[27]

Similarly, CBP determined that Cambodian Happy Home had the incentive, opportunity, and access to transship Cambodian hardwood plywood.[28] Like LB Wood, Cambodian Happy Home submitted contradictory, incomplete, and unreliable information regarding its payroll, prodition capacity, and certain invoices pertaining to entered plywood.[29] Additionally, CBP relied on evidence from its prior visit to Cambodian Happy Home's facilities, where it noticed

---

[23]     *Id.* at 6.

[24]     *Id.*

[25]     *Id.* at 7.

[26]     *Id*. at 8.

[27]     *Id.* at 10.

[28]     *Id.* at 11.

[29]     *See id.* at 12.

GOV0002625

**PUBLIC DOCUMENT**

production equipment that was inadequate to manufacture they types of products the company claimed to produce.[30] Based on this information, the Department determined that substantial evidence exists that U.S. Global entered Chinese-origin plywood transshipped through Cambodia by Cambodia Happy Home and failed to pay AD/CVD duties on this subject merchandise from China.[31]

Following these affirmative determinations as to evasion, Cambodian Happy Home/U.S. Global, InterGlobal Forest/American Pacific, and LB Wood filed requests for an administrative review of the original determination on August 10, 2020. CBP commenced the instant review on August 11, 2020.

## IV.    SUMMARY OF ARGUMENT

CBP should affirm its final determination because it properly determined that U.S. Global, InterGlobal Forest, and American Pacific: (1) entered covered merchandise into the United States, (2) through materially false statements and omissions, and (3) avoided the application of the requisite antidumping and countervailing duties. In their review requests, the Importers abandon many of the arguments previously presented to the TRLED, including various procedural concerns.[32] Instead, they focus their review requests of CBP's recognition of trade data, reliance on a prior observation of the Cambodian companies' facilities, and the agency's

---

[30]    *See id.* at 11.

[31]    *Id.* at 17.

[32]    *See* Letter from deKieffer & Horgan, PLLC to Tobias Vandall, Int'l Trade Specialist, Trade Remedy & Law Enforcement Directorate, CBP Office of Trade, re: *EAPA Con. Case No. 7321 – Respondents' Written Arguments* (May 14, 2020) at 20-30.

PR 002626

GOV0002626

identification of discrepancies in Respondents' books and records.[33] Each of these arguments is without merit and should be rejected.

First, CBP should reject Respondents' claim that TRLED's "general and generic observations and comments on trade data, the effect of the Orders, and factory location are not specific as to evasion and do not link Respondents with the alleged evasion and cannot serve as a foundation for substantial evidence."[34] As an initial matter, Respondents do not deny that a substitutionary pattern of trade occurred, which is consistent with transshipment. Instead, Respondents attempt to downplay the importance of these shifting trade patterns and overstate CBP's reliance on these data. Contrary to their claims, CBP properly relied on trade data, in addition to other record information, such as the Cambodian companies' relationships with Chinese companies and prior observations of these companies' facilities. Indeed, this additional record information corroborates the highly suspicious and evasive actions of Cambodian Happy Home and LB Wood.

Respondents are also incorrect that TRLED's reliance on CBP's first-hand observations at the Cambodian facilities was a violation of due process.[35] Respondents were aware that CBP was relying on this information as proof that the Cambodian companies were unable to manufacture the products that they claimed to produce. However, Respondents failed to provide credible, contemporaneous information to rebut this report. Further, CBP's reliance on this

---

[33]     *See* InterGlobal Forest & American Pacific Request at 9-10; LB Wood Request at 9-10; Cambodian Happy Home & U.S. Global Request at 9-10.

[34]     *See* InterGlobal Forest & American Pacific Request at 9; LB Wood Request at 9; Cambodian Happy Home & U.S. Global Request at 9.

[35]     *See* InterGlobal Forest & American Pacific Request at 9-10; LB Wood Request at 10; Cambodian Happy Home & U.S. Global Request at 9.

PR 002627

GOV0002627

information from a prior investigation is appropriate in the current investigation, particularly in light of Respondents' inconsistent and unreliable responses.

Furthermore, while Petitioner does not have access to the specific information contained in Respondents' books and records, CBP has articulated clear discrepancies that appear to render many of Respondents' responses in this investigation unreliable. Respondents have the responsibility to completely and accurately report all information to CBP in the course of the EAPA investigation, regardless of whether verification ultimately occurs. Because certain information was unreliable, CBP acted well within its discretion in weighing the credibility of this information and relying on available record information to make its evasion determination based on substantial evidence.

Finally, and as detailed below, Respondents have inappropriately attempted to introduce new factual information in their administrative review request. New factual information is not permitted pursuant to 19 C.F.R. § 165.41(f) and allow Respondents to provide this information would prejudice Petitioner. CBP should, therefore, reject Respondents' submissions and require them to refile their requests without the new factual information.

## V.     ARGUMENT

### A.     CBP Properly Relied on Shifting Import Trends as Evidence of Transshipment

Respondents argue that import and export trends "allow no conclusion, much less amount to substantial evidence, of transshipment of Chinese plywood through Cambodia to the United States."[36] Respondents do not deny that trade patterns consistent with transshipment occurred,

---

[36]     *See* Cambodian Happy Home & U.S. Global Request at 13; InterGlobal Forest & American Pacific Request at 14.

GOV0002628

Acting Commissoner Morgan
August 25, 2020

PUBLIC DOCUMENT

and instead attempt to provide alternative explanations for these patterns. As an initial matter, Respondents seemingly suggest that because the trade data alone is insufficient to satisfy the substantial evidence standard, the standard has not been met. This is plainly a misrepresentation of CBP's finding. As Respondents recognize elsewhere, "a fundamental principle of finding substantial evidence is that it must be measured by a review of the record as a whole."[37] Indeed, the Court of International Trade has recognized that "a substitution effect may be indicative of circumvention," where, as here, there is additional evidence that corroborates the reasons for this effect.[38]

Looking to the record as a whole is precisely what CBP did in this case. CBP recognized that import trends existed that were consistent with transshipment following the imposition of the AD/CVD orders; that is, hardwood plywood shipments from China to the United States fell precipitously at the same time that shipments from China to Cambodia increased and shipments from Cambodia increased. Against this backdrop, CBP discussed numerous pieces of record evidence that suggested LB Wood and Cambodia Happy Home were selling Chinese plywood as Cambodian product.[39] This evidence included first-hand reports from a CBP official, which were contemporaneous to the original AD/CVD investigation. TRLED also discussed in detail evidence upon which it was unable to rely due to the Cambodian companies' inconsistent and inaccurate reporting.

Further, Respondents selectively ignore production and import trends that CBP relied on as evidence of transshipment. With regard to shifting import trends, Respondents argue that

---

[37]    *See* Cambodian Happy Home & U.S. Global Request at 14; InterGlobal Forest & American Pacific Request at 14.

[38]    *See Columbia Forest Prods. v. United States*, 339 F. Supp. 3d 1283, 1295 (Ct. Int'l Trade 2019).

[39]    *See* Final Determination at 10 (LB Wood), 17 (Happy Home).

PR 002629

GOV0002629

production shifting from Cambodia to China following the imposition of AD/CVD orders was an effort to "tak{e} advantage of {uncertainty in the Chinese plywood industry} to profitably produce plywood in Cambodia and sell the finished merchandise to the United States."[40] However, a desire to produce more hardwood plywood in Cambodia does not explain the dramatic increase in Chinese exports of hardwood plywood to Cambodia from 2016 to 2018.[41] This Chinese hardwood plywood had to go somewhere, but record evidence shows that it was not consumed in Cambodia.[42] Additionally, CBP noted, among other factors, that "the fact that Happy Home exported [      ] plywood than Cambodia produced in 2016 and 2017, CBP finds that record evidence indicates that Happy Home could not have produced all the merchandise it claimed to have produced in Cambodia."[43] Thus, while Cambodian Happy Home may claim that it established operations in Cambodia to take advantage of business opportunities, this claim is inconsistent with Cambodian production data and Chinese export statistics.

Contrary to Respondents' claims, the Cambodian production data upon which TRLED relied when making this determination are reliable and the only credible production data on the record. First, the 2016 and 2017 Forestry Yearbook production figures appropriately contributed to TRLED's affirmative finding of evasion. Regardless of whether these data were directly reported by the Cambodian government or developed by the United Nation's Food and Agriculture Organization ("U.N. FAO"), these production statistics were derived from an entity

---

[40]    *See* Cambodian Happy Home & U.S. Global Request at 11; InterGlobal Forest & American Pacific at 11-12.

[41]    *See, e.g.*, Memorandum from Kristina Horgan, Chief, EAPA Investigations Branch, to Africa Bell, Acting Director, Enf't Operations Division, re: *Initiation of Investigation for EAPA Case Number 7321 – InterGlobal Forest, LLC* (June 26, 2019) at 5.

[42]    *See id.*

[43]    Final Determination at 17.

11

GOV0002630

that is not subject to this investigation and that obtains production statistics using a standardized methodology. The Department has considered U.N. FAO production data to be reliable in its own proceedings,[44] and TRLED has recognized that other United Nations publications have been considered reliable in AD/CVD proceedings.[45]

Moreover, the only other production figures on the record were self-reported by the Cambodian companies, and TRLED properly found that there was significant incentive for bias where production figures were self-reported and unsubstantiated.[46] Further, TRLED outlined notable inconsistencies in LB Wood's production figures as additional proof of unreliability.[47]

In short, the production figures from the Forestry Yearbook are the only Cambodian production statistics obtained from a disinterested source. TRLED appropriately weighted the reliability of this evidence and reasonably determined that the U.N. FAO data were the most reliable basis for Cambodian production of hardwood plywood.[48]

## B.     TRLED Appropriately Relied on CBP's Prior Observations Regarding LB Wood's and Cambodian Happy Homes' Lack of Production Capabilities

Respondents also object to TRLED's use of a CBP official's prior observations regarding the Cambodian respondents' production capabilities. As discussed above, TRLED placed on the record of this investigation a July 2019 email correspondence with a CBP official who had

---

[44]     *See, e.g.*, Issues and Decision Memorandum accompanying *Fresh Garlic From the People's Republic of China*, 82 Fed. Reg. 27,230 (Dep't Commerce June 14, 2017) (final results and partial rescission of the 21st antidumping duty admin. rev; 2014-2015) at cmt. 8 ("For these *Final Results*, we have continued to rely on the 2013 UN FAO production data to determine that Romania and Mexico are significant producers of comparable merchandise.").

[45]     *See* Final Determination at 16.

[46]     *See id.* at 7, 12.

[47]     *Id.* at 7.

[48]     Notably, U.N. data is likely overinclusive of in-scope merchandise, as it includes all plywood, not just hardwood plywood.

PR 002631

GOV0002631

previously visited LB Wood's and Cambodian Happy Home's facilities in person.[49] Based on this visit, the CBP official concluded that "the factories just aren't sophisticated enough to produce large quantities of 'perfect' birch/poplar plywood" and that "{t}he only likely possibility is that the plywood was made in China."[50] The official made specific observations about both LB Wood and Cambodia Happy Home and corroborated these observations with photographic evidence. The official described LB Wood as equipment that was "small, broken up into multiple pieces, and {} covered in a thick layer of dust" and indicated that the facility would not be capable of producing sophisticated hardwood plywood due to its lack of employees and manufacturing.[51] Similarly, the CBP official observed that Cambodian Happy Home had stacks of product "too precise to be Cambodian," which "require{d} sophisticated manufacturing which Happy Home didn't really have."[52] In fact, Cambodian Happy Home had pallets of "typical Chinese product."[53] Clearly, in CBP's experience, these two Cambodian exporters were not capable of producing the amount and quality of hardwood plywood that they claimed.

As an initial matter, Respondents confuse the substantial evidence standard in light of the information that TRLED placed on the record in this investigation. Respondents appear to claim that TRLED's decision in this investigation was not supported by substantial evidence because TRLED did not place the entire record of the proceeding in which the CBP official made her

---

[49]    *See* Memorandum re: *Adding Certain Documents to the Administrative Record – EAPA Cases: 7321, 7323, 7327* (Sept. 12, 2019).

[50]    *Id.*

[51]    *Id.*

[52]    *Id.*

[53]    *Id.*

PR 002632

GOV0002632

observations.[54] This misunderstands the substantial evidence standard. When reviewing an agency's determinations or findings for substantial evidence, "the court assesses whether the agency action is reasonable given *the record* as a whole."[55] This requirement refers to a decision made based on evidence on the record of the ongoing proceeding; it does not require an agency to furnish the entire record of a separate proceeding from which it obtained evidence. Indeed, the Department, for example, frequently places documentation from one case or review on the record in a different proceeding.[56] Here, TRLED relied on substantial evidence by weighing all evidence on the record. In doing so, TRLED found the responses from the Cambodian companies to be unreliable and other record information, including the CBP official's observations, to provide a compelling basis for an affirmative evasion finding.

These observations are reliable evidence that the Cambodian companies were involved in transshipment. While Respondents note that this information was collected a year prior to the initiation of the EAPA investigation, this only further establishes the official's credibility, as these observations were made contemporaneously with the original investigation. Even without access to the proprietary information in this proceeding, it is clear from publicly available

---

[54]        *See, e.g.*, Cambodian Happy Home & U.S. Global Request at 14-15 ("Here, TRLED did not put the whole record of its mystery proceeding on the record of EAPA 7321 for TRLED, Respondents, or any other party or a court to judge whether TRLED's tidbits of information gleaned from the unrelated case can even serve as a basis for substantial evidence of TRLED's conclusions *in that case*, much less in EAPA Inv. 7321.").

[55]        *See, e.g.*, *US Magnesium LLC v. United States*, 70 F. Supp. 3d 1321, 1323 (Ct. Int'l Trade 2015) (citing *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006)).

[56]        *See, e.g.*, *Deacero S.A.P.I. De C.V. v. United States*, __ F. Supp. 3d __ (Ct. Int'l Trade Apr. 13, 2020) ("For its second remand redetermination, Commerce placed on the record pre-initiation documents from *ADD Order*; further Commerce has placed Deacero's margin calculations, and a table summarizing Deacero's individual transaction-specific margins in the administrative review of the *ADD Order* that immediately precedes the review at issue."); *Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1381 (Ct. Int'l Trade 2020) ("On June 25, 2018, Commerce placed on the record the Canadian International Trade Tribunal's ("CITT") final determination that SeAH's sales of steel line pipe into Canada were dumped and permitted interested parties to comment.") (internal citations omitted)

PR 002633

GOV0002633

information that the CBP official was certain that the hardwood plywood at these companies' facilities was of Chinese origin. Based on this record evidence, Respondents had ample opportunities to provide reliable and accurate evidence to counter the CBP official's observations. TRLED found that LB Wood's and Cambodia Happy Home's production figures were unreliable because they "originate from company personnel estimates and lack substantiating evidence."[57] As such, TRLED relied on the CBP official's first-hand observation as credible evidence of evasion.

### C.    TRLED's Analysis of Respondents' Reporting was Appropriate in Light of Observed Inconsistencies

Petitioner notes that much of the information that Respondents submitted in the underlying proceeding and in their requests for administrative review is heavily bracketed and, therefore, is information which Petitioner cannot review. TRLED found in its affirmative evasion determination that Respondents' proprietary sales and production information was internally inconsistent and, therefore, unreliable for determining the ultimate origin of the hardwood plywood at issue. As a result, the Coalition is limited in its ability to meaningfully respond to TRLED's findings and Respondents' arguments regarding the specific proprietary inconsistencies. However, as discussed above, public information on the record demonstrates that TRLED's affirmative determination of evasion was based on substantial evidence and should be upheld.

---

[57]    Final Determination at 7, 12.

GOV0002634

Respondents claim that they prepared their responses "in full expectation that TRLED would fully verify the information in an on-site verification."[58] Even if true, this does not excuse their inconsistent or inaccurate reporting. Regardless of whether verification was planned, verification in EAPA investigations is discretionary.[59] Thus, it is incumbent on Respondents in EAPA investigations to provide all necessary information to TRLED during the course of an investigation and to not rely on verification to clarify or supplement responses. Following Respondents' initial responses, TRLED attempted to gain additional information and clear up discrepancies from Respondents through supplemental questionnaires. Based on this information, TRLED undertook a reasonable analysis of the information that was available and found inconsistencies and discrepancies in LB Wood's payroll sheets and financial reports; production, sale, and exportation documentation for transactions with InterGlobal Forest and American Pacific Plywood; ownership; and veneer consumption.[60] TRLED found Cambodian Happy Home's reporting to have similar inconsistencies and deficiencies with regard to its transactions with U.S. Global, monthly trial balances and financial reports, entry documentation, and veneer purchases.[61] Based on these numerous deficiencies and inconsistencies, TRLED appropriately determined that "no reliable evidence exist{ed} on the record to differentiate between Cambodian-origin and Chinese-origin plywood."[62]

---

[58]     *See* LB Wood Request at 10, 17; *see also* InterGlobal Forest & American Pacific Request at 6; Cambodian Happy Home & U.S. Global Request at 10.

[59]     *See* 19 C.F.R. § 165.25(a)

[60]     *See* Final Determination at 5-10.

[61]     *See id.* at 12-15.

[62]     *See id.* at 17.

16

GOV0002635

Acting Commissoner Morgan
August 25, 2020

**PUBLIC DOCUMENT**

D.    **CBP Should Reject Respondents' Attempts to Introduce New Factual Information Not on the Underlying Record**

In their requests for an administrative review, Respondents attempt to introduce new factual information to support their claims, which was not on the record of the underlying review. Pursuant to 19 C.F.R. § 165.41(f), "{e}ach request for review must be based solely on the facts already upon the administrative record in the proceeding." That is, parties may not introduce new factual information that they failed to provide in the underlying review. Here, Respondents inappropriately attempt to further develop the record through indirect means by hinting at and discussing information contained in outside, factual sources. As a result, Petitioner respectfully requests that CBP require Respondents to refile their administrative review requests with all references to new factual information omitted.

For example, when discussing shipping routes for LB Wood's merchandise, InterGlobal Forest and American Pacific "suggest that ORR also consult Maersk's website at https://www.maersk.com/local-information/asia-pacific-feeder-shipping-routes, where ORR *may find* that Maersk runs several Intra-Asian feeder routes such as that [      ] may have run on [

].''[63] Indeed, this "assumption" is followed by a factual statement about the shipping industry, which, to the best of Petitioner's knowledge, was not previously established on the record. Clearly, InterGlobal Forest and American Pacific are attempting to direct CBP to information that is not already on the record. Not only does this tactic attempt to circumvent CBP's regulatory prohibition on new facts in a request for an administrative review, it also prejudices Petitioner, which is unable to provide its own rebuttal information.

---

[63]    InterGlobal Forest & American Pacific Request at 26 (emphasis added).

17

GOV0002636

Acting Commissioner Morgan
August 25, 2020                                              **PUBLIC DOCUMENT**

Respondents use this same tactic to rebut record evidence regarding Cambodian production statistics. To this end, Respondents direct ORR to "consult the UN FAOStat online database, which normally includes a descriptive flag on the source of the published figures. ORR *may find* that the 2016 Cambodia plywood production data were unofficial, and the production figures for 2017 and 2018 are flagged as simply repeated from 2016. In addition, ORR *may find* that all of the Cambodian import and export data for 2016-2018 are unofficial figures."[64] Again, Respondents are knowingly directing CBP to outside factual information and attempting to dodge regulatory prohibition by suggesting information that CBP "may find." The U.N. FAO Cambodian production statistics have been on the record of this review since Petitioner filed its original EAPA allegation. As such, Respondents have had ample time to place rebuttal information on the record. They have failed to do so and should not now be allowed to skirt CBP's regulations. The Coalition respectfully requests that CBP require Respondents to refile their requests for administrative review with these references to new factual information removed.

## VI.    <u>CONCLUSION</u>

For the reasons discussed herein, and in Petitioner's submissions in the underlying proceeding, CBP should affirm its affirmative determination of evasion. Substantial record evidence demonstrates that U.S. Global, InterGlobal Forest, and American Pacific evaded the Orders by importing Chinese hardwood plywood that was recorded as product of Cambodia.

---

[64]     *Id.* at 29 (emphasis added); LB Wood Request at 27 (emphasis added); Cambodian Happy Home & U.S. Global Request at 28 (emphasis added).

18

GOV0002637

\*     \*     \*

## CERTIFICATIONS

On behalf of the party making this submission, the undersigned certifies that all statements in this submission (and any attachments) are accurate and true to the best of his knowledge and belief.  Further, on behalf of the party making this submission, the undersigned certifies that any information for which business confidential treatment has not been requested pursuant to 19 C.F.R. § 165.4(a), may be released for public consumption. Further, in accordance with 19 C.F.R. § 165.4(d), this information is either information the party making this submission has a right to make public (*e.g.*, information from its own business records) or information that was publicly obtained or in the public domain.

On behalf of the party making this submission, the undersigned certifies that he will advise CBP promptly of any knowledge of or reason to suspect that the covered merchandise poses any health or safety risk to U.S. consumers pursuant to 19 C.F.R. § 165.7(a).

If you have any questions about this submission, please do not hesitate to contact us.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Stephanie M. Bell, Esq.
Tessa V. Capeloto, Esq.
John Allen Riggins, Esq.

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

19

GOV0002638